1

2

3

4

5

6                           UNITED STATES DISTRICT COURT

7                                 DISTRICT OF NEVADA

8                                        * * *
                                          )
9    SOUTH FORK BAND, et al.,              )
                                          )
10            Plaintiffs,                  )              3:08-CV-00616-LRH-RAM
                                          )
11   v.                                    )
                                          )              ORDER
12   UNITED STATES DEPARTMENT OF           )
     INTERIOR, et al.,                     )
13                                         )
              Defendants.                  )
14   _____ )

15          Presently before the court is Plaintiffs South Forth Band Council of Western Shoshone of

16   Nevada, Timbisha Shoshone Tribe, Te-Moak Tribe, Western Shoshone Defense Project ("WSDP"),

17   and Great Basin Resource Watch's ("GBRW") Motion for Preliminary Injunction (#12[1]).

18   Defendant-Intervenor Barrick Cortez, Inc. ("Barrick") and Defendants United States Department of

19   the Interior, United States Bureau of Land Management ("BLM"), and Gerald D. Smith

20   (collectively, "Defendants") have filed oppositions (##21, 36).  Barrick has also filed a

21   "Supplemental Memorandum in Opposition to Motion for Preliminary Injunction" (#39).  Plaintiffs

22   have replied (#44).  Also before the court is Barrick's Motion for Partial Judgment on the Pleadings

23   (#37).  Both Defendants and Plaintiffs have responded (##47, 48), to which Barrick replied (#54).

24          On January 26, 2009, following a four-day hearing, the court announced its decision from

25   _____

26          [1] Refers to the court's docket number.

1   the bench, denying Plaintiffs' Motion for Preliminary Injunction (#12) and denying Barrick's

2   Motion for Partial Judgment on the Pleadings (#37).  As the court indicated at that time, this order

3   serves to clarify and explain in greater detail the court's ruling.

4   **I.    Facts and Procedural History**

5        Barrick, a subsidiary of Barrick Gold U.S., Inc. and Barrick Gold Corporation, Inc.,

6   manages the Cortez Joint Venture, a gold mining and processing operation in Lander County,

7   Nevada.  Barrick seeks to construct and operate the Cortez Hills Expansion Project ("Project"),

8   which will include the development of new facilities, as well as an expansion of an existing open-

9   pit gold mining and processing operation at the Cortez Gold Mines Operations Area.  Currently,

10  Barrick operates three additional facilities in the area, including the Pipeline Complex, Cortez

11  Complex, and Gold Acres Complex.

12       The Project includes development of surface and underground mining operations associated

13  with the Cortez Hills and Pediment area near Mt. Tenabo.  The Project also includes expansion of

14  mining operations at the existing Cortez Mine and the Pipeline Mine.[2]  The majority of ore and

15  waste rock associated with the Project will come from the Cortez Hills area.  As approved, the

16  Project permits the Cortez Hills open pit to reach a depth of approximately 2000 feet and cover an

17  area of approximately 850 acres.  The anticipated life of the mine is approximately ten years of

18  active mining, followed by three years of ore processing, site closure and reclamation.

19       The Project will also include the construction of two new heap leach pads and associated

20  processing facilities, the expansion of two existing waste rock (piles of rock not currently planned

21  to be processed as ore) disposal areas, the construction of three new waste rock disposal areas, the

22  expansion of one existing mill, the expansion of one existing tailings facility, the construction of an

23  overland conveyer with associated crusher and stockpile, the development and expansion of a

24

25       [2] Cortez plans first to develop mining operations at the Cortez Hills and Pediment area, and in several

26  years expand mining operations at the Cortez Mine and the Pipeline Mine.

1  dewatering system to allow mining to take place, and the relocation of portions of two county roads

2  and a transmission line.

3       The Project boundary encompasses approximately 57,058 acres.  Of that, approximately

4  6,692 new acres will be disturbed.  In particular, the Project will disturb approximately 6,571 of

5  public lands administered by the BLM and approximately 221 acres of Cortez's private land.  Thus,

6  the majority of new disturbance from the Project (approximately 97%) will be located on public

7  lands administered by the BLM Battle Mountain District.  The Project is located entirely within the

8  territory of the Western Shoshone Nation, and includes the slopes of Mt. Tenabo.

9       As approved by BLM, the Project, including operations at or near the Cortez Hills area and

10 the additional, future operations at the Pipeline and Cortez Mines, will result in approximately

11 1,577 million tons of waste rock to be placed in new or existing waste rock facilities, 170 million

12 tons of ore, including five million tons of refractory ore to be sold to a third party, and 112 million

13 tons of heap leach ore.

14      To date, Barrick has invested approximately $380 million in the Project and expects to

15 invest approximately $290 million more through the Project's completion.  If permitted to proceed,

16 Barrick intends to expend approximately $640,000 per day on the Project over the next fifteen

17 months.  Barrick expects that the Project will require approximately 250 employees.  In addition to

18 those employees, Barrick expects to hire approximately fifty contractors, who Barrick believes will

19 have a total of approximately 300 employees.  In total, Barrick anticipates that it will extract

20 approximately six to seven billion dollars worth of gold from the Project.

21      Regardless of BLM's approval of the Project, Cortez may continue to operate the Pipeline

22 Mine and associated facilities, as well as the Cortez Hills underground mine.  At the Pipeline

23 Complex, mining and ore processing are to continue through 2014, with on-going ore-processing,

24 closure, and reclamation continuing through 2017.  The Complex currently employs approximately

25 470 individuals.  The Cortez Hills underground mine would continue through 2011 at its current

26

3

1    employment level of 55 to 65 employees.

2    On December 2, 2005, BLM published in the Federal Register a Notice of Intent to Prepare

3    an Environmental Impact Statement ("EIS") on the Project.  70 Fed. Reg. 72308 (2005).  On

4    December 19 and 20, 2005, BLM held public meetings for the EIS in Crescent Valley and Battle

5    Mountain, Nevada, respectfully, and solicited a number of interested entities, including Plaintiffs,

6    for their views on the Project.

7    On October 5, 2007, the Draft EIS Notice of Availability was published in the Federal

8    Register, initiating a sixty-day public comment period.  During that time BLM held two public

9    meetings and received over 6,000 letters and postcards and nearly 12,000 petition signatures

10   opposing the Project.

11   The Draft EIS reviewed the following four alternatives representing different operational

12   configurations for the Project: (1) Cortez's Proposed Action; (2) the Grass Valley Heap Leach

13   Alternative; (3) the Crescent Valley Waste Rock Alternative; and (4) the Cortez Hills Complex

14   Underground Mine Alternative.  The Draft EIS also considered a "no-action alternative," which

15   would permit Cortez to continue its current operations in the Crescent Valley, but would not

16   authorize new facilities at Mt. Tenabo.  The Final EIS considered the above alternatives, as well as

17   the Revised Cortez Hills Pit Design Alternative.

18   On October 3, 2008, the Final EIS Notice of Availability was published in the Federal

19   Register, initiating a thirty-day review period.  During the review period, BLM received

20   approximately 6,000 letters, postcards, and emails.  BLM considered this input, but concluded that

21   the input did not identify or present any significant new information or change in circumstances

22   that would warrant additional analysis.

23   On November 12, 2008, BLM issued its Record of Decision ("ROD") for the Project.  In

24   the ROD, BLM selected Cortez's "Proposed Action . . . with the Revised Cortez Hills Pit Design

25   Alternative for the Cortez Hills Complex facilities, and the mitigation measures specified in

26

4

1    Chapter 3.0 of the Final EIS, as the BLM's Preferred Alternative."  ROD at 3.

2    **II.    Legal Standard**

3        **A. Preliminary Injunction**

4        A preliminary injunction is an "extraordinary remedy that may only be awarded upon a clear

5    showing that the plaintiff is entitled to such relief."  *Winters v. Natural Res. Def. Council*, 129 S.

6    Ct. 365, 376 (2008) (*citing Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (per curiam)).  To

7    succeed, a plaintiff seeking a preliminary injunction must establish the following:

8    (1) a likelihood of success on the merits; (2) a likelihood of irreparable injury to the plaintiff if

9    injunctive relief is not granted; (3) a balance of hardships favoring the plaintiff; and (4)

10    advancement of the public interest.  *Id.* (citations omitted).

11        **B. Motion For Judgment On The Pleadings**

12        Rule 12© of the Federal Rules of Civil Procedure provides, "[a]fter the pleadings are closed

13    but within such time as not to delay the trial, any party may move for judgment on the pleadings."

14    Fed. R. Civ. P. 12©.  "Judgment on the pleadings is proper when there are no issues of material

15    fact, and the moving party is entitled to judgment as a matter of law."  *General Conference Corp.*

16    *of Seventh Day Adventists v. Seventh Day Adventist Congregational Church*, 887 F.2d 228, 230

17    (9th Cir. 1989) (citing Fed. R. Civ. P. 12©).  "The Motion for a judgment on the pleadings only has

18    utility when all material allegations of fact are admitted or not controverted in the pleadings and

19    only questions of law remain to be decided by the district court."  5C Charles Alan Wright &

20    Arthur R. Miller, *Federal Practice and Procedure* § 1367 (3d. Ed. 2004).

21        "In ruling on a motion for judgment on the pleadings, district courts must accept all

22    material allegations of fact alleged in the complaint as true, and resolve all doubts in favor of the

23    non-moving party." *Religious Tech. Ctr. v. Netcom On-Line Comm. Servs., Inc.,* 907 F.Supp. 1361,

24    1381 (N.D. Cal. 1995).  Judgment on the pleadings is improper if the district court must go beyond

25    the pleadings to resolve an issue.  *Hal Roach Studios v. Richard Feiner & Co.*, 896 F.2d 1542,

26                                                    5

1550 (9th Cir. 1989).  Under such circumstances, summary judgment is the proper procedure.  *Id.*

**III.    Discussion**

In the complaint, Plaintiffs allege violations of the Religious Freedom Restoration Act ("RFRA"), the Federal Land Policy and Management Act ("FLPMA"), and the National Environmental Policy Act ("NEPA").[3]  The court first will consider Plaintiffs' likelihood of success on the merits of each claim.  In its discussion of RFRA, the court will also consider Barrick's motion for judgment on the pleadings.  The court will then consider the remaining factors pertinent to the preliminary injunction inquiry.

**A.  Religious Freedom Restoration Act**

Defendants argue that Plaintiffs' RFRA claim will fail for the following four reasons: (1) RFRA does not apply to the federal government's management of its own land; (2) Plaintiffs lack standing to assert the RFRA claim; (3) Plaintiffs cannot demonstrate that the government action at issue substantially burdens the exercise of their religion in violation of RFRA; and (4) in the complaint, Plaintiffs have failed to sufficiently allege a substantial burden to the exercise of their religion.  The court will address each of these arguments below.

**1.    Application of RFRA**

As a preliminary matter, Barrick argues that the RFRA claim must fail because RFRA does not apply to the federal government's management of its own land.  In support of this proposition, Barrick cites *Lyng v. Northwest Indian Cemetery Protective Ass'n*, 485 U.S. 439 (1988), and *Navajo Nation v. United States Forest Serv.*, 535 F.3d 1058, 1068 (9th Cir. 2008).  However, neither of these cases indicate that RFRA or the corresponding compelling interest test never apply to the government's management of its own land.  In *Lyng*, a free exercise case predating the enactment of RFRA, the Supreme Court held that the government was not required to demonstrate

---

[3] Plaintiffs also allege a violation of the trust responsibility owed to the Western Shoshone.  However, in its motion for preliminary injunction, Plaintiffs do not address this claim.

6

a compelling interest because the government's actions did not impose a burden heavy enough on the plaintiffs' exercise of religion.  485 U.S. at 447-49.  Thus, in a case involving the government's management of its own land, the *Lyng* Court applied a burden shifting test similar to that required by RFRA.

Similarly, Barrick's citation to *Navajo Nation* is not convincing.  There, in a footnote, the court expressly noted that it did not consider whether RFRA applied to the government's use and management of its own land because the parties failed to raise the issue.  535 F.3d at 1067 n.9.  Instead, the court assumed, without deciding, that RFRA applied to the government's use and management of its land.  *Id.*

However, the dissent in *Navajo Nation* explicitly addressed the application of RFRA to federal land.  The dissent stated, "the majority misstates the law when it treats as an open question whether RFRA applies to federal land . . . It is hardly an open question whether RFRA applies to federal land."  535 F.3d at 1095 (Fletcher, J., dissenting).  The dissent continued, "For good reason, none of the defendants argue that RFRA is inapplicable to actions on federal land.  There is nothing in the text of RFRA that says, or even suggests, that such a carve-out from RFRA exists.  No case has ever so held, or even suggested that RFRA is inapplicable to federal land."  *Id.*

In support of its argument, Barrick also cites RFRA's Senate Committee Report.  The report states, "[S]trict scrutiny does not apply to government actions involving only management of internal Government affairs or the use of the Government's own property or resources."  S. Rep. No. 103-111, at 9 (1993).  In support of this contention, the Senate Report cites *Bowen v. Roy*, 476 U.S. 693 (1986) and *Lyng*, 485 U.S. 439 (1988).  As noted above, the Court in *Lyng* held that the government's action did not impose a "heavy enough" burden on the plaintiffs' exercise of religion to require the government to demonstrate a compelling interest.  Thus, *Lyng* does not stand for the proposition that the strict scrutiny standard never applies to the government's management of its own land.

In *Bowen*, the parents of an Indian child challenged under the Free Exercise Clause a statute requiring their daughter to obtain a Social Security number before receiving certain welfare benefits because they believed the number would harm their daughter's spirit.  476 U.S. at 695-96.  In rejecting the free exercise claim, the Court stated, "The Free Exercise Clause simply cannot be understood to require the Government to conduct is own internal affairs in ways that comport with the religious beliefs of particular citizens."  *Id.* at 699.  Further, the Court noted, "The Free Exercise Clause affords an individual protection from certain forms of governmental compulsion; it does not afford an individual a right to dictate the conduct of the Government's internal procedures."  *Id.* at 700.

Nonetheless, the Court in *Bowen* did not hold that the strict scrutiny analysis never applies to the government's management of its own affairs.  In *Bowen*, five Justices rejected Justice Burger's contention that the "Government meets its burden when it demonstrates that a challenged requirement for governmental benefits, neutral and uniform in its application, is a reasonable means of promoting a legitimate public interests."  *See Hobbie v. Unemployment Appeals Comm'n*, 480 U.S. 136, 141 (1987) (discussing the holding of the Court in *Bowen*).  In *Hobbie*, the Supreme Court expressly rejected Justice's Burger's less rigorous standard and held that a free exercise claim alleging denial of a government benefit on religious grounds was subject to strict scrutiny.  480 U.S. at 141-42.  (*citing Sherbert v. Verner*, 374 U.S. 398 (1963); *Thomas v. Bd. of Indiana Employment Div.*, 450 U.S. 707 (1981)).

Congress enacted RFRA for the following two reasons: (1) to restore the compelling interest test as set forth in *Shervert v. Verner*, 374 U.S. 398 (1963) and *Wisconsin v. Yoder*, 406 U.S. 205 (1972) and (2) to provide a claim or defense to persons whose religious exercise is substantially burdened by the government.  42 U.S.C. § 2000bb(b).  In restoring the compelling interest test, Congress repudiated the Supreme Court's ruling in *Employment Div., Dept. Of Human Res. of Oregon v. Smith*, 494 U.S. 872 (1990), in which the Court abolished the use of the

compelling interest test in free exercise cases.  RFRA states, "the compelling interest test as set forth in . . . Federal court rulings [prior to *Smith*] is a workable test for striking sensible balances between religious liberty and competing prior governmental interests."  42 U.S.C. § 2000bb(a)(5). Thus, the Ninth Circuit recently noted, "The cases that RFRA expressly adopted and restored, *Sherbert*, *Yoder*, and federal court rulings prior to *Smith*," control both the compelling interest test and the substantial burden inquiry set forth in RFRA.  *Navajo Nation*, 535 F.3d at 1069-70.  Those cases have not held that the strict scrutiny analysis does not apply to the government's management of its own land, and the text of RFRA does not suggest such a limitation.  Accordingly, the court finds that RFRA applies to the government action at issue here.

### 2. Standing

Barrick next argues that Plaintiffs lack standing to assert the RFRA claim.  Article III of the United States Constitution requires federal courts to adjudicate only actual cases and controversies. *Allen v. Wright*, 468 U.S. 737, 750 (1984).  The party invoking federal jurisdiction has the burden of demonstrating standing.  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992).  "A suit brought by a plaintiff without Article III standing is not a 'case or controversy,' and an Article III federal court therefore lacks subject matter jurisdiction over the suit."  *Cetacean Cmty. v. Bush*, 386 F.3d 1169, 1174 (9th Cir. 2004) (*citing Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 101 (1998)).  Where at least one plaintiff has demonstrated standing, the court may reach the merits of the claim without determining whether the remaining plaintiffs also have standing.  *Bd. of Natural Res. v. Brown*, 992 F.2d 937, 942 (9th Cir. 1993) (citations omitted).

"In essence the question of standing is whether the litigant is entitled to have the court decide the merits of the dispute or of particular issues."  *Id.* at 750-51 (*quoting Warth v. Seldin*, 422 U.S. 490, 498 (1975)).  Generally, "the standing inquiry requires careful judicial examination of a complaint's allegations to ascertain whether the particular plaintiff is entitled to an adjudication of the particular claims asserted."  *Allen*, 468 U.S. at 752.  Here, Barrick argues

Plaintiffs fail to meet the standing requirements because they lack both first-party and representational standing.

### a.     Plaintiff Tribes' Capacity To Bring Suit

As an initial matter, the parties dispute the capacity in which Plaintiff tribes, including Plaintiff South Fork Band Council, have brought the present suit.  Barrick contends Plaintiff tribes assert standing in their capacity as *parens patriae*.  The doctrine of *parens patriae* permits a sovereign to bring an action on behalf of the interests of its citizens where the injury alleged affects the general population of a State in a substantial way.  *Maryland v. Louisiana*, 451 U.S. 725, 739 (1981); *Louisiana v. Texas*, 176 U.S. 1, 19 (1900).

Here, Plaintiff tribes deny bringing suit in their capacity as *parens patriae*.  Indeed, Plaintiff tribes have not alleged *parens patriae* standing in their complaint or in any other pleading before this court.  Instead, the complaint states that Plaintiffs bring their claims on their own behalf and on behalf of their members.  (First. Am. Compl. (#41) ¶ 1.)

The court finds that provided Plaintiff tribes, including the South Fork Band Council, can satisfy both the constitutional and prudential limits on standing, their standing can be viewed as analogous to organizational standing.  Thus, Plaintiff tribes may have standing to sue in their "own right to seek judicial relief from injury to itself and to vindicate whatever rights and immunities the association itself may enjoy."  *Warth*, 422 U.S. at 511.  In addition, "[e]ven in the absence of injury to [themselves], [Plaintiffs] may have standing solely as the representative of [their] members."  *Id.*

### b.     Plaintiffs As "Persons" Under RFRA

Barrick next argues Plaintiffs lack standing because Plaintiffs have failed to satisfy a prudential standing requirement.  In relevant part, one aspect of the prudential standing inquiry asks "whether a particular plaintiff has been granted a right to sue by the statute under which he or she brings suit."  *Nuclear Inf. & Res. Serv. v. Nuclear Regulatory Comm'n*, 457 F.3d 941, 949 (9th Cir. 2006) (*quoting City of Sausalito v. O'Neil*, 386 F.3d 1186, 1199 (9th Cir. 2004)).

RFRA provides, "A *person* whose religions exercise has been burdened in violation of this section may assert that violation as a claim or defense in a judicial proceeding and obtain appropriate relief against a government." 42 U.S.C. 2000bb-1© (emphasis added). Barrick argues that none of Plaintiffs are "persons" under RFRA, and therefore the statute does not grant them a right to sue.

Generally, the court looks to the language of the statute itself to determine the meaning of a term used therein. However, RFRA does not define its use of the term "person." In support of its argument, Barrick cites *Mahoney v. United States Marshals Serv.*, a case from the District Court in the District of Columbia, which in a footnote states, "Judgment for defendants is . . . warranted on any RFRA claims advanced by the Christian Defense Coalition, an 'unincorporated religious association,' because that entity is not a 'person' and thus does not have rights under RFRA." 454 F. Supp. 2d 21, 38 n.7 (D.D.C. 2006) (citing 42 U.S.C. § 2000bb-1(a)).[4]

However, the *Mahoney* decision provides little guidance to this court. Beyond stating that the plaintiff Coalition is an "unincorporated religious association," the court in *Mahoney* offers no explanation for its conclusion that the organizational plaintiff was not a "person." In addition here, unlike the plaintiff in *Mahoney*, Plaintiffs are more than "unincorporated religious associations," and instead are sovereign tribal entities, a federally recognized Indian band, and fully incorporated non-profit organizations.

Plaintiffs cite *Rasul v. Meyers*, a decision from the Circuit Court for the District of Columbia, for the proposition that, for purposes of RFRA claims, the court should interpret "person" broadly. 512 F.3d 644 (D.C. Cir. 2008), *vacated on other grounds*, 77 U.S.L.W. 3358

---

[4] Barrick also cites cases holding that Indian tribes are not "persons" capable of bringing claims under 42 U.S.C. § 1983. *See Inyo County v. Paiute-Shoshone Indians*, 538 U.S. 701, 711 (2003) (holding that the tribe could not sue under § 1983 to vindicate the sovereign right it claimed in the case); *Skokomish Indian Tribe v. United States*, 410 F.3d 506, 515-516 (9th Cir. 2005) (finding that the tribe was not a "person" under § 1983 when attempting to assert communal rights granted under a treaty between the tribe and the federal government). However, those cases turned on the tribes' assertion of sovereign rights. Here, the tribes do not assert sovereign rights.

(Dec. 15, 2008).  There, the court held that non-resident aliens were not "persons" eligible to bring a RFRA claim.  *Id.* at 671-72.  The court reasoned, "Because RFRA's purpose was . . . to restore what, in the Congress's view, is the free exercise of religion guaranteed by the Constitution, 'person' as used in RFRA should be interpreted as it is in constitutional provisions."  *Id.* at 671.

As discussed above, in enacting RFRA, Congress intended courts to look to free exercise cases decided before *Smith* for guidance in applying RFRA.[5]  Accordingly, it is helpful to look to pre-RFRA free exercise cases to determine whether an association possesses enforceable rights under the Free Exercise Clause and whether Congress intended to limit the meaning of "person" under RFRA to individuals.  In the context of free exercise challenges, the Ninth Circuit has held that the Free Exercise Clause protects not only individuals, but also organizations.  *See*

---

[5] Although Congress intended to restore federal court rulings prior to *Smith* concerning the applicable test in free exercise challenges, the Ninth Circuit has indicated that RFRA expands the protection for religious exercise beyond the protection provided for by the Constitution.  *See Guam v. Guerrero*, 290 F.3d 1210, 1218 (9th Cir. 2002) (RFRA "provides a level of protection to religious exercise beyond that which the First Amendment requires."); *Friedman v. South*, 92 F.3d 989, 989 (9th Cir. 1996) ("The statutory protection created by 'RFRA' was a significant clarification and expansion of the right to the free exercise of religion secured by the First Amendment."); *United States v. Bauer*, 84 F.3d 1549, 1558 (9th Cir. 1995) ("The effects of [RFRA] are widespread.").  Among the primary effects noted by the Ninth Circuit is that the statute "expands the constitutional language that forbids the 'prohibiting' of the free exercise of religion and uses the broader verb 'burden': a government may burden religion only on the terms set out by the new statute."  *Bauer*, 84 F.3d at 1558.

Despite RFRA's "[expansion of] the constitutional language," pre-RFRA cases involving free exercise challenges indicate that courts have applied an analysis substantially similar to that set forth in RFRA.  *See Yoder*, 406 U.S. at 214 (to establish a free exercise violation, "it must appear either that the State does not deny the free exercise of religious belief by its requirement, or that there is a state interest of sufficient magnitude to override the interest claiming protection under the Free Exercise Clause."); *E.E.O.C. v. Pacific Press Publ'g Ass'n*, 676 F.3d 1272, 1279 (9th Cir. 1982) (weighing the following factors in evaluating a facially neutral law incidentally restricting the free exercise of religion: (1) the size of the statute's impact upon the exercise of religious belief; (2) the existence of a compelling state interest justifying the burden imposed; and (3) the extent to which recognition of an exemption from the statute would impede the objective sought to be advanced by the state).

These cases indicate that, even before the enactment of RFRA, courts considered whether the government action *burdened* the plaintiffs exercise of religion.  *See also Navajo Nation*, 535 F.3d at 1069 (noting that in *Yoder* the Court held the application of the law to the defendants "unduly burden[ed]" the exercise of their religion in violation of the Free Exercise Clause).  Thus, while RFRA may broaden the constitutional language, the analysis called for by RFRA is nonetheless substantially similar to the analysis applied in pre-RFRA free exercise cases.

12

*Presbyterian Church (U.S.A.) v. United States*, 870 F.2d 518, 521 (9th Cir. 1989) (*citing Serbian Eastern Orthodox Dioceses v. Milivojevich*, 426 U.S. 969 (1976)); *Kedroff v. St. Nicholas Cathedral*, 344 U.S. 94 (1952)) ("[I]t is settled law that churches may sue to vindicate organizational interests protected by the Free Exercise Clause of the First Amendment;  *EEOC v. Townley Eng'g & Mfg. Co.*, 859 F.2d 610, 620 n.15 (9th Cir. 1988) (*citing Kedroff v. St. Nicholas Cathedral*, 344 U.S. 94 (1952)) ("[T]he Free Exercise Clause protects 'religious organizations' as well as individuals . . . We have often assumed without discussion that organizations with religious elements have Free Exercise rights").

These cases indicate that, subject to prudential and constitutional standing limitations, an organization can bring a free exercise claim.  There is no indication that, in enacting RFRA, Congress intended to deny organizations the right to bring free exercise claims in an individual or representative capacity.  Accordingly, the court finds that despite their status as organizations, Plaintiffs have "been granted a right to sue by the statute under which [they] bring suit."[6]  *Nuclear Inf. & Res. Serv.*, 457 F.3d at 949 (*quoting City of Sausalito v. O'Neil*, 386 F.3d 1186, 1199 (9th Cir. 2004)).  Accordingly, Barrick's prudential challenge to Plaintiffs' standing fails.

### c.   Associational Standing

As discussed above, Plaintiffs assert standing on their own behalf and on behalf of their members.  An organizational plaintiff may have standing based on an injury to itself or one of its members.  *Warth v. Seldin*, 422 U.S. at 511.  Here, in stating their RFRA claim, Plaintiffs assert standing based on injuries to their individual members.  For instance, Plaintiffs allege that the Project will substantially burden the "exercise and practice of traditional Native American religion by Western Shoshone people, including members of the South Fork Band, Timbisha Tribe, WSDP, and Native American members of GBRW."  (First. Am. Compl. (#41) ¶ 109.)  Plaintiffs further

---

[6] Nonetheless, as noted, this conclusion does not affect the constitutional standing limitations.  In particular, as discussed below, it is not clear to the court that Plaintiff GBRW has satisfied the constitutional standing requirements.

allege that these members use Mt. Tenabo for religious purposes.  (First. Am. Compl. (#41) ¶ 108.)

Generally, an association has standing to bring suit on behalf of its members if the following requirements are met: (1) its members would otherwise have standing to sue in their own right; (2) the interests it seeks to protect are germane to the organization's purpose; and (3) neither the claim asserted nor the relief sought require the participation of individual members in the lawsuit.  *Hunt v. Washington State Apple Adver. Comm'n*, 432 U.S 333, 343 (1977).

## I.    Individual Injury

To establish associational standing, Plaintiffs must first demonstrate that their individual members would have standing to sue in their own right.  *Hunt*, 432 U.S. at 342.  To have standing, an individual plaintiff must meet the following three requirements: (1) the plaintiff must have suffered an injury in fact that is not conjectural; (2) there must be a causal connection between the injury and the conduct complained of; and (3) it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992) (citations omitted).

Barrick argues Plaintiffs have not satisfied the first constitutional standing requirement because they have not "alleged that any of the 'Declarants' in Exhibits 11 through 20 to the Plaintiffs' Motion are members of any of Plaintiffs, (except for Carrie Dann who is purported to be the founding member of the WSDP), including tribal and band plaintiffs."  (Cortez's Opp. Pls.' Mot. Prelim. Inj. (#21) at 15.)  This argument is unpersuasive.  At this stage in the litigation, the appropriate question is whether the complaint alleges that members of each Plaintiff organization have been injured.  *See Lujan*, 504 U.S. at 561 ("At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we 'must presume that general allegations embrace those specific facts that are necessary to support the claim.'")  Thus, Barrick errs in focusing solely on the provided declarations rather than the allegations in the complaint.  The complaint alleges that the Project will result in a substantial

burden upon the exercise of religion by members of each Plaintiff organization.  These allegations
are sufficient at this stage in the litigation.

Moreover, the court finds that Plaintiffs' members satisfy the constitutional standing
requirements and would have standing to assert RFRA claims in their own right.  In the complaint,
Plaintiffs assert that Western Shoshone members of the South Fork Band, Timbisha Tribe, and
WSPD, and Native American members of GBRW, use the area covered by the Project facilities for
prayer, healing ceremonies, fasting, vision quests, sacred sweats and other religious practices.  As a
result of Defendants' approval of the Project, Plaintiffs allege that their members' exercise of
religion will be substantially burdened.  Further, Plaintiffs allege that Defendants do not have a
compelling interest in imposing this burden and that Defendants have not implemented the least
restrictive alternative.  Plaintiffs seek declaratory relief and an injunction prohibiting Barrick from
proceeding with the Project.  Thus, Plaintiffs have alleged a redressable injury to their members'
religious practice caused by Defendants' actions.  Through these allegations, Plaintiffs have
demonstrated that their members would have standing in their own right.  Accordingly, Plaintiffs
have satisfied the first associational standing requirement.

### ii.    Organizations' Purpose

Plaintiffs must next demonstrate that the interests they seek to protect are germane to their
organizational purpose.  First, with regard to Plaintiff tribes, including Plaintiff South Fork Band
Council, the court finds Plaintiffs' allegations sufficient to demonstrate that the protection of
religious interests is germane to their purpose.  Tribes generally concern themselves with a variety
of issues, including the religious affairs of the tribe.  Indeed, the South Fork Band and the Te-Moak
Tribe submitted comments to BLM detailing the negative impacts of the Project to Western
Shoshone religious uses at the Project site.  Accordingly, the court finds that protection of religious
interests is germane to the tribes' and South Fork Band Council's organizational purpose.

Second, with regard to Plaintiff WSDP, at this time the court also finds Plaintiffs'

allegations sufficient to demonstrate that the protection of religious interests is germane to WSDP's organizational purpose.  The first amended complaint states that the mission of WSDP is to "protect and preserve Western Shoshone rights and homelands for present and future generations based upon cultural and spiritual traditions."  (First. Am. Compl. (#41) at ¶ 13.) Taking the complaint's allegations as true, the protection of these "cultural and spiritual traditions" would encompass the type of religious interests Plaintiffs seek to protect in their RFRA claim.

Finally, with regard to Plaintiff GBRW, the complaint states that GBRW is a "nonprofit conservation organization . . . concerned with protecting the Great Basin's land, air, water, wildlife and communities from the adverse impacts of hard rock mining."  (First. Am. Compl. (#41) at ¶ 14.)  Even viewed in the light most favorable to GBRW, it is not clear to the court that this mission statement encompasses the type of religious interests protected by RFRA.  Nonetheless, because the court finds that at least one plaintiff has demonstrated standing, the court need not determine whether Plaintiff GBRW also satisfies the second associational standing requirement.  *See Bd. of Natural Res.*, 992 F.2d at 942 (citations omitted) (noting that where one plaintiff demonstrates standing the court need not consider whether the remaining plaintiffs satisfy the standing requirements).

### iii.    Individual Participation

Finally, under the third associational standing requirement, the plaintiff organization must demonstrate that neither the claim asserted nor the relief sought require the participation of individual members in the lawsuit.  *Hunt*, 432 U.S. at 343.  Unlike the first two associational standing requirements, this requirement is prudential, rather than constitutional in nature.  *United Food and Commercial Workers Union Local 751 v. Brown Group, Inc.*, 517 U.S. 544, 546 (1996) Thus, while the first two associational standing requirements address Article III concerns of injury in fact, causal connection to the defendant's conduct, and redressability, the individual participation requirement focuses on "matters of administrative convenience and efficiency."  *Id.* at

557.  This final requirement serves to "promote adversarial intensity . . . guard against the hazard of litigating a case to the damages stage only to find the plaintiff lacking . . . evidence necessary to show harm with sufficient specificity . . . [and] hedge against any risk that the damages recovered by the association will fail to find their way into the pockets of the members on whose behalf injury is claimed."  *Id.* at 556.

Barrick argues that the individualized nature of the Western Shoshone religion requires the participation of individual plaintiffs to demonstrate how the Project substantially burdens their individual beliefs.  However, individual participation is not normally necessary where an association seeks prospective or declaratory relief rather than money damages.  *United Food*, 517 U.S. at 556 (1996) (*citing Hunt*, 432 U.S. at 343).  While money damages require the court to quantify harm to each individual, "[i]f in a proper case the association seeks a declaration, injunction, or some other form of prospective relief, it can reasonably be supposed that the remedy, if granted, will inure to the benefit of those members of the association actually injured."  *Warth*, 422 U.S. at 512.  Here, Plaintiffs do not seek money damages and instead seek only declaratory and injunctive relief.  Thus, individualized determinations of the extent of harm to each individual member will be unnecessary.

Barrick relies on *Harris v. McRae*, where the Supreme Court stated, because "it is necessary in a free exercise case for one to show the coercive effect of the enactment as it operates against him in the practice of religion," free exercise claims ordinarily require individual participation.  448 U.S. 297, 321 (1980) (*quoting Abington Sch. Dist. v. Schempp*, 374 U.S. 203, 223 (1963)).  There, the Court held that the participation of individual members of the organizational plaintiff, Women's Division of the Board of Global Ministries of the United Methodist Church, was essential to a proper understanding of their free exercise claims.  *Id.*  The Court based its conclusion on the organization's concession that "the permissibility, advisability and/or necessity of abortion according to circumstances is a matter about which there is diversity of

1  view within . . . [the organization's] membership, and is a determination which must be ultimately

2  and absolutely entrusted to the conscience of the individual before God." *Id.*

3       The court does not read the decision in *McRae* as a *per se* rule mandating individual

4  participation in every free exercise case. To succeed on their RFRA claim, Plaintiffs must prove

5  that the Project will substantially burden the religious practice of their members. While a

6  resolution of this claim may be fact-specific, this case presents unique circumstances that the court

7  finds significant. For nearly two decades, the Western Shoshone religious practice has been

8  subject to thorough study and analysis. Indeed, since the early 1990s, there have been numerous

9  ethnographic studies discussing the Western Shoshone religious practice, including the

10  significance of Mt. Tenabo to that practice. In addition, there have been several archeological

11  surveys of the area. Through these studies and surveys the court will be able to determine to a

12  large extent the importance of Mt. Tenabo to the Western Shoshone practice of religion. Although

13  Plaintiffs may rely on testimony from some individual members, this does not preclude Plaintiffs

14  from asserting associational standing on behalf of their individual members. *See Hosp. Council W.*

15  *Pennsylvania v. City of Pittsburgh*, 949 F.2d 83, 89 (3d. Cir. 1991) (noting that in *Warth* the court

16  stated individual participation was required when *each* injured party was indispensable, not when

17  *some* injured parties were indispensable). Thus, the court finds that the participation of individual

18  members is not required in this case.

19       Finally, Barrick argues Plaintiffs lack standing because they do not represent the views of

20  all of their members. Indeed, at the hearing on the preliminary injunction, the court heard

21  testimony from Felix Ike, an affiliate of the Western Shoshone Te-Moak Bands, including Plaintiff

22  South Fork Band, indicating that the Project will not impact the Western Shoshone practice of

23  religion. Similarly, other Western Shoshone witnesses testified that the Project will not impact the

24  Western Shoshone religious practice. However, although Western Shoshone, these witnesses were

25  not members of any of Plaintiffs. For instance, the court heard testimony from Diane Buckner, a

26

18

member of the Ely Shoshone Tribe, and Jerry Millet and Mary Lou Alexander, members of the Duckwater Shoshone Tribe.  Neither of these tribes are plaintiffs in this case.  The court has heard from only one member of a plaintiff organization stating that he did not believe the Project would harm Western Shoshone religious beliefs.  Thus, the extent of actual conflict among the views of Plaintiffs' members is not clear.

Moreover, the Ninth Circuit has declined to interpret the associational standing's individual participation requirement to "require that no actual or potential conflict exist between the organization's members." *Associated Gen. Contractors of California, Inc. v. Coal. for Econ. Equity*, 950 F.2d 1401, 1408 (9th Cir. 1991).  Thus, in *Associated General Contractors*, the court concluded that an organization's "internal conflicts properly should be resolved through its own internal procedures, not through limitations on standing." *Id.* at 1409.  The court noted that courts can protect dissenters' interests by liberally approving their intervention in the lawsuit or by refusing to preclude subsequent claims by dissenting members. *Id.* (citations omitted).  Accordingly, the court finds that the possibility of conflicting views among Plaintiffs' members does not preclude Plaintiffs' associational standing.

To summarize, the court finds Plaintiff tribes, including Plaintiff South Fork Band Council, have satisfied their burden of demonstrating associational standing at this time.  Similarly, the court finds Plaintiff WSDP has satisfied its burden.  While it is not clear that Plaintiff GBRW has met the associational standing requirements, at least one plaintiff has demonstrated standing.  Accordingly, the court may proceed to consider the merits of Plaintiffs' motion. *See Bd. of Natural Res.*, 992 F.2d at 942 (citations omitted) (noting that where one plaintiff demonstrates standing the court need not determine whether the remaining plaintiffs satisfy the standing requirements).

///

///

///

19

### 3.   Likelihood of Success on the Merits of the RFRA Claim

Having concluded that RFRA applies and that some Plaintiffs have standing to bring their RFRA claim, the court now turns to Plaintiffs' likelihood of success on the merits of the RFRA claim.  To establish a prima facie RFRA claim, a plaintiff must present evidence sufficient to allow a trier of fact to find the existence of the following two elements: (1) the activities the plaintiff claims are burdened by government action must be an "exercise of religion" and (2) the government action must "substantially burden" the plaintiff's exercise of religion.  *Navajo Nation*, 535 F.3d at 1068 (quoting 42 U.S.C. § 2000bb-1(a)).[7]  If the plaintiff fails to prove either of these two elements, the RFRA claim must fail.  *Id.*  However, should the plaintiff establish a substantial burden on his exercise of religion, the burden shifts to the government to prove that the challenged action furthers a "compelling governmental interest" and is implemented by the "least restrictive means."  *Id.* (quoting 42 U.S.C. § 2000bb-1(b)).

The court does not question the sincerity of Plaintiffs' religious beliefs.  In particular, the court recognizes that Plaintiffs view Mt. Tenabo as a sacred site significant to the exercise of their religion.  The real issue in this case is whether BLM's actions "substantially burden" Plaintiffs exercise of religion.  In analyzing a RFRA claim, the Ninth Circuit recently held that government action imposes a "substantial burden" on the exercise of religion in violation of RFRA only when the government action (1) forces individuals to choose between following the tenants of their religion and receiving a governmental benefit or (2) coerces individuals to act contrary to their religious beliefs by the threat of civil or criminal sanctions.  *Navajo Nation*, 535 F.3d at 1069-70.

The facts before the court in *Navajo Nation* closely mirror the facts of the present case.  There, the plaintiffs contended that the use of artificial snow made from recycled wastewater on a ski resort located on federal land imposed a substantial burden on the exercise of their religion in

---

[7] On January 5, 2009, a petition for certiorari was filed.  Thus, the Supreme Court is currently deciding whether to review the Ninth Circuit's decision in *Navajo Nation*.

20

violation of RFRA. *Id.* at 1067. The Forest Service had guaranteed that religious practitioners would continue to have access to the mountain for religious purposes. *Id.* at 1070. Thus, the court reasoned, "the only effect of the proposed upgrades is on the [p]laintiffs' subjective, emotional religious experience. . . . [as] it will spiritually desecrate a sacred mountain and will decrease the spiritual fulfillment they get from practicing their religion on the mountain." *Id.* However, based on the lack of objective harm to the plaintiffs' religious practice, the court concluded that the "diminishment of spiritual fulfillment-- serious though it may be-- is not a 'substantial burden' on the free exercise of religion." *Id.*

The Supreme Court's decision in *Lyng* is also demonstrative.[8] 485 U.S. 439 (1988). There, Indian tribes challenged the Forest Service's approval of plans to build a logging road in California's Six Rivers National Forest. *Id.* at 442. The tribes argued that the construction of the road would interfere with the free exercise of their religion by disturbing a sacred area. *Id.* at 442-43. A study commissioned by the Forest Service concluded, and the Court accepted, that the entire area was "significant as an integral and indispensable part of Indian religious conceptualization and practice" and that construction of the road "would cause serious and irreparable damage to the sacred areas which are an integral and necessary part of the [Indian's] belief system . . . ." *Id.* at 442. Noting that it was undisputed that the government's action would have severe and potentially devastating effects on the practice of religion, the Court held that the government's action nonetheless did not impose a burden "heavy enough" on the exercise of religion to trigger the compelling interest test. *Id.* at 448. The Court reasoned that even though the challenged action would "interfere significantly with private persons' ability to pursue spiritual fulfillment according to their own religious beliefs," the affected individuals would neither be coerced into violating their religious beliefs nor penalized for their religious activity by denying any person rights,

---

[8] Although *Lyng* predates the enactment of RFRA, in *Navajo Nation* the Ninth Circuit made clear that the Court's reasoning in *Lyng* applies equally to RFRA cases. *See Navajo Nation*, 535 F.3d at 1071-72 n.13.

1    benefits, and privileges enjoyed by other citizens. *Id.* at 449.

2    Similarly, in *Snoqualmie Indian Tribe v. Fed. Energy Regulatory Comm'n*, the Ninth

3    Circuit recently held that the Federal Energy Regulatory Commission did not substantially burden

4    the plaintiff tribe's exercise of religion in re-licensing a hydroelectric power plant at Snoqualmie

5    Falls, a 268-foot waterfall near Seattle. 545 F.3d 1207 (9th Cir. 2008). The tribe considered the

6    falls a sacred site, as the falls played a central role in the tribe's creation story and was an important

7    location for the tribe's religious practices. *Id.* at 1211. Applying the standard set forth in *Navajo*

8    *Nation*, the court stated, "the Tribe's arguments that the dam interferes with the ability of tribal

9    members to practice religion are irrelevant to whether the hydroelectric project either forces them

10   to choose between practicing their religion and receiving a government benefit or coerces them

11   into a Catch-22 situation: exercise of their religion under fear of civil or criminal sanction." *Id.* at

12   1214. Thus, the court held FERC's decision to re-license the project did not substantially burden

13   the tribe's exercise of religion under RFRA. *Id.* at 1214-15.

14   The above cases indicate that Plaintiffs' burden in demonstrating a substantial burden on

15   the exercise of their religion is high. The court has found no evidence in the record indicating that

16   BLM's approval of the Project (1) forces Plaintiffs to choose between following their religion and

17   receiving a government benefit or (2) coerces Plaintiffs into violating their religious beliefs by

18   threat of civil or criminal sanctions. To the contrary, the evidence demonstrates that Plaintiffs will

19   continue to have access to the areas identified as religiously significant, including the top of Mt.

20   Tenabo, the White Cliffs, the Shoshone Wells, and Horse Canyon.

21   Thus, at this time, Plaintiffs have failed to show a substantial burden on the exercise of

22   their religion. Accordingly, Plaintiffs' have failed to establish a likelihood of success on the merits

23   of the RFRA claim. Because Plaintiffs' have not met their burden under RFRA, the court does not

24   consider whether BLM has articulated a compelling government interest or whether the BLM has

25   used the least restrictive means of implementing that interest.

26

**4.      Motion for Judgment on the Pleadings**

Finally, Barrick seeks a judgment on the pleadings with regard to Plaintiffs' RFRA claim. In the first amended complaint, Plaintiffs allege the following: (1) Western Shoshone members of Plaintiffs use Mt. Tenabo and the surrounding area for various religious uses; (2) these uses constitute an exercise of religion under the RFRA; (3) the project will result in a substantial burden upon the exercise of religion by Western Shoshone people, including members of Plaintiffs; (4) BLM has not demonstrated a compelling governmental interest in approving the Project; (5) the Project is not the least restrictive means of furthering a compelling interest, if one exists; and (6) therefore, in approving the Project, BLM violated RFRA.

Barrick argues that the allegations in the complaint, even if taken as true, fail to demonstrate that the Project will substantially burden Plaintiffs' exercise of religion.  In particular, Barrick deems the complaint inadequate because it fails to allege specific facts needed to meet the test outlined by the Ninth Circuit in *Navajo Nation* for determining what constitutes a "substantial burden."  As noted, in *Navajo Nation* the Ninth Circuit held that under RFRA, a "substantial burden" is imposed only when individuals are (1) forced to choose between following the tenants of their religion and receiving a governmental benefit or (2) coerced to act contrary to their religious beliefs by the threat of civil or criminal sanctions.  *Navajo Nation*, 535 F.3d at 1069-70.

Barrick essentially argues Plaintiffs have failed to satisfy the pleading requirements set forth by Rule 8(a) of the Federal Rules of Civil Procedure.  Rule 8(a) provides that a claim for relief shall contain "a short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a).  "All that is required is that the complaint gives 'the defendant fair notice of what the plaintiff's claim is and the ground upon which it rests.'"  *Kimes v. Stone*, 84 F.3d 1121, 1129 (9th Cir. 1996) (*quoting Datagate, Inc. v. Hewlett-Packard Co.*, 941 F.2d 864, 870 (9th Cir. 1991)).  "This simplified notice pleading standard relies on liberal discovery rules and summary judgment motions to define disputed facts and issues and to dispose of unmeritorious

23

claims." *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 512 (2002) (citations omitted).  However, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels, conclusions, and a formulaic recitation of the elements of the cause of action.  *Bell Atlantic Corp. v. Twombly*, 127 S.Ct. 1955, 1965 (2007).  "Factual allegations must be enough to raise a right to relief above the speculative level on the assumption that all the allegations in the complaint are true (even if doubtful in fact)."  *Id.* (internal citations omitted).

Barrick's argument fails.  As the briefing indicates, Barrick's real challenge is to the substance of Plaintiffs's RFRA claim, not the adequacy of the allegations in the complaint.  The complaint identifies Plaintiffs' religious uses of Mt. Tenabo and alleges that the Project will substantially burden Plaintiffs' exercise of religion.  Taken as true, as the court must when reviewing a motion for judgment on the pleadings, Plaintiffs's assertions are sufficient to state a RFRA claim.

**B.  Federal Land Policy And Management Act**

Plaintiffs also allege that Defendants violated FLPMA, 43 U.S.C. §§ 1701-1787.  FLPMA governs BLM's management of public lands and establishes standards for BLM to regulate hardrock mining activities on public lands.  FLPMA requires the Secretary of the Interior to manage public lands for multiple use, including the use of land for its renewable and non-renewable resources, which include "recreation, range, timber, minerals, watershed, wildlife and fish, and natural scenic, scientific and historical values."  43 U.S.C. § 1702©.  Thus, FLPMA "attempts to balance [the following] two vital–but often competing–interests": (1) the "need for domestic sources of minerals, food timber, and fiber from the public lands," and (2) the need to "mitigate the devastating environmental consequences of hardrock mining."  *Mineral Policy Center v. Norton*, 292 F. Supp. 2d 30, 33 (D.D.C. 2003) (citing 43 U.S.C. §§ 1701(a)(12), 1701(a)(8)).

The heart of FLPMA requires, "In managing the public lands the Secretary [of Interior]

24

shall, by regulation or otherwise, take any action necessary to prevent unnecessary and undue

degradation of the lands." 43 U.S.C. § 1732(b).  Pursuant to this mandate, BLM cannot approve a

mining plan that would result in "unnecessary or undue degradation of public land."  43 C.F.R.

3809.411(d)(3)(iii).

BLM defines unnecessary and undue degradation ("UUD") as conditions, activities, or

practices that:

> (1) Fail to comply with one or more of the following: the performance standards in § 3809.420, the terms and conditions of an approved plan of operations, operations described in a complete notice, and other Federal and state laws related to environmental protection of cultural resources;
>
> (2) Are not "reasonably incident" to prospecting, mining, or processing operations as defined § 3715.0-5 of this chapter; or
>
> (3) Fail to attain a stated level of protection or reclamation required by specific laws in areas such as the California Desert Conservation Area, Wild and Scenic Rives, BLM-administered portions of the National Wilderness System, and BLM-administered National Monuments and National Conservation Areas.

43 C.F.R. 3809.5.

The court reviews decisions allegedly in violation of both FLPMA and NEPA under the

Administrative Procedures Act ("APA").  *Oregon Natural Res. Council Fund v. Brong*, 492 U.S.

F.3d 1120, 1124-25 (9th Cir. 2007).  Under the APA, a reviewing court may set aside agency

actions that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with

the law."  *Id.* at 1125 (*quoting Natural Res. Def. Council v. Nat'l Marine Fisheries Serv.*, 421 F.3d

872, 877 (9th Cir. 2005)); 5 U.S.C. § 706(2)(A).

Review under the arbitrary and capricious standard is narrow, and the court must not

substitute its own judgment for that of the agency.  *Lands Council v. McNair*, 537 F.3d 981, 987

(9th Cir. 2008) (en banc) (citations omitted).  Nonetheless, the court must "engage in a substantial

inquiry" and a "thorough, probing, in-depth review."  *Brong*, 492 F.3d at 1125 (*quoting Native

Ecosystems Council v. U.S. Forest. Serv.*, 418 F.3d 953, 960 (9th Cir. 2005)).  To meet its burden

under this standard, an agency must present a "rational connection between the facts found and the conclusion made." *Id.*   Thus, "the court will reverse a decision as arbitrary and capricious only if the agency relied on factors Congress did not intend it to consider, entirely failed to consider an important aspect of a problem, or offered an explanation that runs counter to the evidence before the agency or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Lands Council*, 537 F.3d at 987 (citations and internal quotations omitted).

Plaintiffs allege that by failing to protect (1) sacred areas, (2) water resources, (3) visual resources, and (4) reserved water rights, BLM has permitted unnecessary and undue degradation to public lands in violation of FLPMA.  The court has reviewed the record currently before it, including the Final EIS and supporting documents, the Record of Decision, the relevant law, and the arguments of the parties.  The court finds that based on the evidence and arguments presented to it at this time, it appears that BLM has fully considered the relevant issues and presented a rational connection between the facts found and the conclusions made.  Thus, Plaintiffs have failed to establish a likelihood of success on the merits of their FLPMA claim.  The court will briefly address each of the identified challenges below.

First, in considering the Project, BLM went to great lengths to evaluate potential impacts on Native American traditional values and culture.  The Final EIS includes more than seventy pages discussing the Project's potential disruption of "Native American traditional values," including the effect of the proposed project on Western Shoshone religious sites and practices.  As part of its review, BLM (1) consulted several environmental and ethnographic impact studies, which began in the early 1990s, concerning mining and Native American activities in the area; (2) conducted extensive archeological surveys of the Project area; and (3) addressed public comments challenging the Draft and Final EIS.  Based on the evidence presented and the arguments presently before the court, it appears that BLM's conclusion was supported by substantial evidence and otherwise not

arbitrary or capricious.[9]

Similarly, in reviewing the Project's impact on water resources, BLM conducted an extensive analysis. Although BLM ultimately concluded that it is impossible to determine conclusively the effect of the Project on water sources, BLM implemented a monitoring and mitigation requirement to ensure that future impacts to water sources would be controlled. Based on the evidence and arguments presented to the court at this time, it appears that BLM's conclusion and analysis with regard to water resources was not arbitrary, capricious, or unsupported by the law.

In addition, it appears that BLM has satisfied its visual resource management ("VRM") obligations. In the Final EIS, BLM considered visual values and made reasonable attempts to meet the VRM objectives and minimize the visual impacts of the Project. In particular, BLM has ensured that the long-term effects of the project will be minimized through recontouring and revegetation. Accordingly, at this time Plaintiffs have not demonstrated that BLM failed to satisfy its VRM obligations in violation of FLPMA.

Finally, with regard to BLM's alleged violation of Public Water Reserve Number 107 ("PWR 107"), BLM is not required to afford absolute protection to all seeps and springs located on

---

[9] Plaintiffs also claim that BLM violated Executive Order 13007 (May 24, 1996), 61 Fed. Reg. 26771. The order states that agencies are to (1) accommodate access to and ceremonial use of Indian sacred sites by Indian religious practitioners and (2) avoid adversely affecting the physical integrity of such sacred sites." The preamble to 43 C.F.R. § 3809 states, "In these regulations, BLM has decided that it will approve plans of operations . . . if the requirements of subpart 3809 are satisfied and other considerations that attach to a Federal decision, such as Executive Order 13007 on Indian Sacred Sites, are also met." 65 Fed. Reg. 69998, 70032 (Nov. 21, 2000).

Despite the clear applicability of the executive order here, BLM did not violate the order in approving the site. The order requires agencies to "accommodate access" to religious sites and requires agencies to "avoid adversely affecting the physical integrity" of sacred sites. Here, the BLM has implemented mitigation procedures to minimize harm to the mountain. Moreover, the BLM has concluded that the Project will not adversely harm the areas that identified as important to the Western Shoshone religion (the Shoshone Wells, the top of Mt. Tenabo, the White Cliffs, and Horse Canyon). Thus, it does not appear that BLM has violated Executive Order 13007.

1    federal land.  Instead, PWR 107 applies only to those water sources that are "important" and have

2    sufficient flow for consumption.  (Cortez's Opp. Pls.' Mot. Prelim. Inj. (#21), Ex. 12, Solicitor's

3    Opinion, 90 Interior Dec. 81, 1983 WL 187400 (D.O.I.) (Feb. 16, 1983).)  Plaintiffs have failed to

4    identify any waters within the Project that are important and have sufficient flow for consumption

5    by humans or livestock.  Moreover, Plaintiffs do not assert that the reservation of water from the

6    seeps and springs is for human or animal consumption.  Instead, they argue that the reduction in

7    water will harm their use and enjoyment.  PWR 107 does not protect these interests.  Thus, at this

8    time, Plaintiffs have failed to demonstrate that the BLM violated PWR 107.

9        Plaintiffs have failed to present arguments or point to deficiencies in the record indicating

10   that by failing to protect sacred areas, water resources, visual resources, and reserved water rights,

11   BLM has permitted unnecessary and undue degradation to public lands in violation of FLPMA.

12   Accordingly, the court finds that Plaintiffs' are unlikely to be successful on the merits of their

13   FLPMA claim.

14       **C.  National Environmental Policy Act**

15       NEPA, 42 U.S.C. §§ 4321-4370, requires federal agencies to examine the environmental

16   effects of proposed federal actions.  "NEPA is a statute that aims to promote environmentally

17   sensitive governmental decision-making, without prescribing any substantive standards."

18   *Anderson v. Evans*, 314 F.3d 1006, 1016 (9th Cir. 2002), *amended and superseded on other*

19   *grounds by* 371 F.3d 475 (9th Cir. 2004) (*citing Robertson v. Methow Valley Citizens Council*, 490

20   U.S. 332, 353 (1989)).  Pursuant to NEPA, a federal agency must prepare an EIS for all "major

21   Federal actions significantly affecting the quality of the human environment."  42 U.S.C. §

22   4332(2)©; *Klamath-Siskiyou Wildlands Center v. Bureau of Land Mgmt.*, 387 F.3d 989, 993 (9th

23   Cir. 2004).

24       "An EIS is a thorough analysis of the potential environmental impact that 'provide[s] full

25   and fair discussion of significant environmental impacts . . .[and] inform[s] decisionmakers and the

26

public of the reasonable alternatives which would avoid or minimize adverse impacts or enhance the quality of the human environment.'" *Id*. (citing 40 C.F.R. § 1502.1).  More specifically, NEPA requires a federal agency to consider the following: (1) the environmental impact of the proposed action; (2) any adverse environmental effects that cannot be avoided should the proposed action be implemented; (3) alternatives to the proposed action; (4) the relationship between local short-term uses of the environment and the maintenance and enhancement of long-term productivity; and (5) any irreversible and irretrievable commitments of resources should the proposed action be implemented.  42 U.S.C. § 4332©.

"In assessing the adequacy of an EIS, [the court] employ[s] a 'rule of reason' test to determine whether the EIS contains a 'reasonably thorough discussion of the significant aspects of probable environmental consequences.'" *Hells Canyon Alliance v. U.S. Forest Serv.*, 227 F.3d 1170, 1177 (9th Cir. 2000) (*quoting Neighbors of Cuddy Mountain v. U.S. Forest Serv.*, 137 F.3d 1372, 1376 (9th Cir. 1998)).  "Under this standard, [the court's] task is to ensure that the [agency] took a 'hard look' at these consequences." *Id*. (*citing Assoc. of Pub. Customers v. Bonneville Power Admin.*, 126 F.3d 1158, 1188 (9th Cir. 1997)).  "This review requires the district court to make a 'pragmatic judgment whether the EIS's form, content, and preparation foster both informed decision-making and informed public participation." *Half Moon Bay Fishermans' Marketing Assoc. v. Carlucci*, 857 F.2d 505, 508 (9th Cir. 1988) (*quoting California v. Block*, 690 F.2d 753, 761 (9th Cir. 1982)).

Plaintiffs argue BLM violated NEPA by (1) failing to fully analyze all aspects of baseline conditions; (2) failing to consider adequately the environmental impacts of the Project, particularly with regard to air quality; (3) failing to provide the public with an opportunity to review and comment on all material aspects of the Project; and (4) failing to discuss mitigation measures in sufficient detail.

The court has reviewed the record currently before it, including the Final EIS and

29

supporting documents, the Record of Decision, the relevant law, and the arguments of the parties. Based on its review, at this time it appears to the court that BLM adequately provided for and responded to public comments, thoroughly considered the Project's potential impacts, and took a "hard look" at the environmental consequences of the proposed action.  In particular, the Final EIS contains an in-depth analysis of the Project's impact on air quality.  In this analysis, the agency does not appear to rely on conclusory statements unsupported by data, authorities, or explanation. Instead, the agency appears to have made a reasoned decision based on its evaluation of the evidence.

Further, based on the arguments and record provided to the court at this time, it appears that BLM has adequately addressed and discussed mitigation measures.  NEPA requires an EIS to contain a detailed discussion of possible mitigation measures.  *Robertson v. Methow Calley Citizens Council*, 490 U.S. 332, 351 (1989).  However, NEPA does not impose a substantive requirement that mitigation measures actually be taken.  *Id.* at 352-53.  Instead, NEPA requires that mitigation measures be "discussed in sufficient detail to ensure that environmental consequences have been fairly evaluated . . . ."  *Id.* at 352-53.

At this time, Plaintiffs have failed to demonstrate that BLM's mitigation measures constitute "broad generalizations and vague references."  *Neighbors of Cuddy Mountain*, 137 F.3d at 180-81.  In the Final EIS, BLM provides a variety of mitigation measures, including monitoring and other requirements, and for each discusses its substance and effectiveness.  Thus, it appears that, as required by NEPA, BLM's mitigation analysis constitutes a reasonably complete discussion of possible mitigation measures.  Accordingly, the court finds that Plaintiffs have failed to establish a likelihood of success on the merits of the NEPA claim.

///

///

///

**D.  The Remaining Preliminary Injunction Factors**

To succeed on a request for a preliminary injunction, a plaintiff must establish the following: (1) a likelihood of success on the merits; (2) a likelihood of irreparable injury to the plaintiffs if injunctive relief is not granted; (3) a balance of hardships favoring the plaintiff; and (4) advancement of the public interest.  *See Winters*, 129 S. Ct. at 376 (citations omitted).  The court has concluded that Plaintiffs are not likely to be successful on the merits of their claims. Nonetheless, a brief discussion of the remaining factors solidifies the court's conclusion that a preliminary injunction is not warranted here.

The court does not question that the implementation of the Project will irreparably harm the environment.  However, the Ninth Circuit has held, "Our law does not . . . allow us to abandon a balance of harms analysis just because a potential environmental injury is at issue." *Id.  Lands Council*, 537 F.3d at 1003.  Barrick has provided evidence establishing the substantial monetary losses which will occur should the court grant a preliminary injunction.  Further, Barrick has provided evidence through the testimony of an expert witness, a representative of Lander County, affected contractors and sub-contractors, and Western Shoshone tribal representatives in favor of the Project, which demonstrates a great likelihood of substantial harm to both the local and state economies should the Project be delayed.  In light of the claimed harms to Plaintiffs, Barrick, and the public, the court finds that Plaintiffs have failed to establish that the balance of hardship tips in their favor.  Accordingly, the court will deny the motion for preliminary injunction.

**IV.  Conclusion**

To summarize, the court finds that Plaintiffs have failed to demonstrate a likelihood of success on the merits of their claims, that the balance of hardships tips in their favor, or that an injunction is in the public interest.  Accordingly, the court has denied the motion for preliminary injunction.  Similarly, the court has denied the motion for partial judgment on the pleadings. Nonetheless, the court emphasizes that in no way does its ruling foreclose Plaintiffs from

31

continuing to pursue their claims. The court has neither seen all of the evidence nor heard all of the arguments in this case.  The court's findings extend only to the preliminary injunction and motion for partial judgment on the pleadings presently before the court.

IT IS THEREFORE ORDERED that Plaintiffs' Motion for Preliminary Injunction (#12) is hereby DENIED.

IT IF FURTHER ORDERED that Barrick's Motion for Partial Judgment on the Pleadings (#37) is hereby DENIED.

IT IS SO ORDERED.

DATED this 3rd day of February, 2009.

_____
LARRY R. HICKS
UNITED STATES DISTRICT JUDGE