JIM B. BUTLER (Nevada Bar No. 8389)
MICHAEL R. McCARTHY (Nevada Bar No. 9345)
PARSONS BEHLE & LATIMER
50 West Liberty Street, Suite 750
Reno, NV  89501
Telephone:  (775) 323-1601
Facsimile:  (775) 348-7250
E-mail:     JButler@parsonsbehle.com
            MMccarthy@parsonsbehle.com
            ECF@parsonsbehle.com

FRANCIS M. WIKSTROM (Admitted Pro Hac Vice)
MICHAEL L. LARSEN (Admitted Pro Hac Vice)
JEFFREY J. DROUBAY (Admitted Pro Hac Vice)
PARSONS BEHLE & LATIMER
One Utah Center
201 South Main Street, Suite 1800
P.O. Box 45898
Salt Lake City, UT  84145-0898
Telephone:  (801) 532-1234
Facsimile:  (801) 536-6111
E-mail:     FWikstrom@parsonsbehle.com
            MLarsen@parsonsbehle.com
            JDroubay@parsonsbehle.com
            ECF@parsonsbehle.com

Attorneys for Barrick Cortez Inc.

UNITED STATES DISTRICT COURT
DISTRICT OF NEVADA

| | |
|---|---|
| SOUTH FORK BAND COUNCIL OF WESTERN SHOSHONE OF NEVADA, et al., | Case No.  3:08-CV-00616-LRH-RAM |
| Plaintiffs, | **BARRICK CORTEZ INC.'S MOTION FOR ENTRY OF AN APPROPRIATELY TAILORED PRELIMINARY INJUNCTION AND MEMORANDUM IN SUPPORT THEREOF** |
| v. | |
| UNITED STATES DEPARTMENT OF THE INTERIOR, et al., | |
| Defendants, | |
| and | Judge:   Larry R. Hicks |
| BARRICK CORTEZ INC., | Magistrate Judge:  Robert A. McQuaid, Jr. |
| Defendant-Intervenor. | |

PARSONS
BEHLE &
LATIMER

1      Defendant-Intervenor Barrick Cortez Inc. ("Cortez") hereby moves the Court to enter a

2 narrowly tailored preliminary injunction that is consistent with the Ninth Circuit's decision

3 (holding that the environmental impact statement ("EIS") was deficient in two discrete areas) and

4 also consistent with this Court's obligations under *Winter v. Natural Resources Defense Counsel*,

5 129 S. Ct. 365 (2008) to consider all four relevant factors (likelihood of prevailing on the merits,

6 irreparable harm, public interest, and balance of harms) when determining the scope of an

7 injunction.  In addition, the Ninth Circuit has made it clear that a court exercising its equitable

8 powers should narrowly tailor any injunction to balance the equities of the situation.  *See Sierra*

9 *Forest Legacy v. Rey*, 577 F.3d 1015 (9th Cir. 2009).

10      As set forth in detail in the following memorandum in support of this motion, the

11 irreparable harm that could result from the deficiencies identified by the Ninth Circuit is limited

12 and can be prevented by a narrow injunction.  On the other hand, a blanket injunction halting the

13 entire Project would be extremely harmful to the public interest because it would result in the loss

14 of hundreds of jobs and cause millions in damage to the economy.  The balance of harms tilts

15 strongly in favor of a narrow injunction.

16      Cortez proposes that the Court enter a limited preliminary injunction, in the form attached

17 as Exhibit 12, directed to the two National Environmental Policy Act ("NEPA") deficiencies in

18 the EIS identified by the Ninth Circuit.  The proposed injunction would, *inter alia*, prohibit 1) all

19 off-site shipping of refractory ore from the Cortez Hills open pit and 2) all pumping of

20 groundwater in excess of previously approved rates and would remain in effect until BLM has

21 completed a Supplemental Environmental Impact Statement ("SEIS") and determined whether to

22 issue a new Record of Decision based on the SEIS.  The proposed injunction would also establish

23 a timetable for completion of the SEIS.  Such an injunction would ensure that no harm will result

24 from the NEPA deficiencies, but will allow the Project to continue and avoid irreparable harm to

25 employees and the community.

26

27

28

PARSONS
BEHLE &
LATIMER

1    Dated:  January 25, 2010.

2                                    Respectfully submitted,

3                                    PARSONS BEHLE & LATIMER

4

5                                    By:  /s/ Francis M. Wikstrom
                                         Jim B. Butler, Nevada Bar No. 8389
6                                        Michael R. McCarthy Nevada Bar No. 9345
                                         Francis M. Wikstrom (*pro hac vice*)
7                                        Utah Bar No. 3462
                                         Michael L. Larsen (*pro hac vice*)
8                                        Utah Bar No. 4069
                                         Jeffrey J. Droubay (*pro hac vice*)
9                                        Utah Bar No. 9119

10                                       50 West Liberty Street, Suite 750
                                         Reno, NV  89501
11                                       Telephone:  (775) 323-1601
                                         Facsimile:  (775) 348-7250

12
                                         201 South Main Street, Suite 1800
13                                       Salt Lake City, UT 84111
                                         Telephone:  (801) 532-1234
14                                       Facsimile:  (801) 536-6111

15                                       Attorneys for Barrick Cortez Inc.

16

17

18

19

20

21

22

23

24

25

26

27

28

PARSONS
BEHLE &
LATIMER

-2-

MEMORANDUM OF POINTS AND AUTHORITIES

INTRODUCTION

On December 3, 2009, the Ninth Circuit issued its opinion on Plaintiffs' appeal from this Court's denial of Plaintiffs' motion seeking a preliminary injunction to halt the Cortez Hills Expansion Project (the "Project"). The Ninth Circuit affirmed this Court's decision on Plaintiffs' Federal Land Policy Management Act ("FLPMA") claims, including Plaintiffs' FLPMA claim based on religious grounds, but held that Plaintiffs were likely to succeed on the merits of two discrete National Environmental Policy Act ("NEPA") claims. Specifically, the Ninth Circuit held that the BLM's Environmental Impact Statement ("EIS") was deficient because BLM failed to analyze the air quality impacts of the transportation and off-site processing of refractory ore[1] and failed to assess the effectiveness of mitigation measures designed to address mine dewatering impacts on springs and seeps. In addition, the Ninth Circuit stated: "Because the BLM must revise its study of the environmental consequences of this project as a result of this litigation, it should do separate modeling for $PM_{2.5}$ particulate emissions." The Ninth Circuit remanded the case to this Court for "entry of injunctive relief consistent with this opinion."

The NEPA deficiencies identified by the Ninth Circuit are narrow and discrete. The overwhelming majority of the EIS was not successfully challenged by Plaintiffs. Accordingly, it falls to this Court to craft an injunction that addresses the NEPA deficiencies, yet recognizes the equities as they currently exist.

*Proposed Injunction*: A blanket injunction of the Project would cause many hundreds of people to lose their jobs and would cause severe damage to the northern Nevada economy. Stopping the entire Project would violate the requirement that an injunction must be narrowly tailored to balance the harms and the public interest. Therefore, Cortez proposes that the Court enter a limited preliminary injunction that is directed to the two NEPA deficiencies in the EIS

---

[1] "Refractory ore" is ore that must be oxidized before processing. It is not amenable to processing in the Pipeline Mill and thus was intended to be trucked to a nearby Barrick-owned mine for processing. It represents a relatively small amount of the ore to be mined from the Cortez Hills pit (approximately 3%) and a similarly small percentage of ore to be processed at the offsite facility.

1   identified by the Ninth Circuit.  The proposed injunction would prohibit 1) all off-site shipping of

2   refractory ore from the Cortez Hills open pit and 2) all pumping of groundwater in excess of rates

3   approved prior to the November 12, 2008 Record of Decision[2] until BLM completes a

4   Supplemental Environmental Impact Statement ("SEIS") and issues a new Record of Decision.

5   Such an injunction would ensure that no harm will result from the NEPA deficiencies, but will

6   allow the Project to continue and avoid irreparable harm to employees and the community.

7       A blanket injunction against the entire Project, however, would violate both Supreme

8   Court and Ninth Circuit precedent.  Under *Winter v. Natural Resources Defense Counsel*, 129

9   S. Ct. 365, 374 (2008), a party seeking a preliminary injunction must prove all four elements

10  (likelihood of prevailing on the merits, irreparable harm, public interest, and balance of harms)

11  before a court can issue an injunction.  Moreover, as discussed below, the Ninth Circuit has made

12  it clear that a court exercising its equitable powers should narrowly tailor any injunction to

13  balance the equities of the situation.

14      While the Ninth Circuit held that Plaintiffs were likely to prevail on the merits of the two

15  discrete NEPA claims, it lacked the factual record necessary to perform a meaningful analysis of

16  three of the four *Winter* factors.  It also lacked evidence of current circumstances so that it could

17  determine how to appropriately tailor an injunction.  It is, therefore, up to this Court to analyze

18  the *Winter* factors and to appropriately tailor an injunction in light of the Ninth Circuit decision

19  and the current facts and circumstances.

20      *Likelihood of Prevailing on the Merits*.  The Ninth Circuit has held that Plaintiffs are

21  likely to prevail on two NEPA deficiencies (offsite transportation and treatment of refractory ore,

22  and lack of an effectiveness analysis for mitigation plans for seeps and springs).  As to all other

23

24  _____

    [2] In addition to approving the Cortez Hills Project, the November 12, 2008 Record of Decision

25  consolidated Cortez's three existing mining plans of operations (Pipeline/South Pipeline Plan of
    Operations [NVN-067575], Cortez Plan of Operations [NVN-67261], as amended for the

26  Underground Exploration Project, and Gold Acres Plan of Operations [NVN-67174]) into a single
    plan with a single plan of operations boundary.  The three previously approved plans of

27  operations authorized exploration and mining activities, including dewatering to accommodate
    open pit and underground mining.  At the time of the November 12, 2008 Record of Decision,

28  these three plans of operations had been approved by BLM and those approvals are not subject to
    the present litigation.

PARSONS
BEHLE &
LATIMER

-4-

1   NEPA and FLPMA challenges raised by Plaintiffs, this Court held that Plaintiffs were not likely

2   to prevail and that decision has been affirmed by the Ninth Circuit.  This is the context with

3   which the Court should begin its *Winter* analysis.

4       *Irreparable Harm.*  There is no evidence currently before the Court that Plaintiffs will

5   suffer irreparable injury on account of the NEPA deficiencies that the Ninth Circuit identified.

6   Plaintiffs previously alleged irreparable harm arising from alleged religious injuries.  The primary

7   focus of their lawsuit was a RFRA claim and a "FLPMA claim that is substantially the same as

8   the RFRA claim, but is cast in procedural rather than substantive terms."  *South Fork Band*

9   *Council of W. Shoshone of Nev. v. U.S. Dep't of Interior*, 588 F.3d 718, 723 (9th Cir. 2009).  The

10  narrow NEPA deficiencies identified by the Ninth Circuit (air quality impacts of transportation

11  and processing of refractory ore and an effectiveness analysis of dewatering mitigation measures)

12  have a tenuous relation, at best, to the alleged religious injuries.  Plaintiffs' RFRA claims have

13  been dismissed with prejudice and their FLPMA claims have been rejected by this Court and the

14  Ninth Circuit.

15      Plaintiffs have the burden to establish irreparable harm flowing from the two discrete

16  NEPA deficiencies.  Cortez notes, however, that its proposed injunction would prevent any harms

17  that might arise from those deficiencies since Cortez would be enjoined from offsite shipping of

18  refractory ore from the Cortez Hills open pit and from pumping groundwater at rates beyond

19  those previously authorized, until a supplemental EIS is completed and acted on by BLM.

20      *Public Interest.*  The Supreme Court and the Ninth Circuit have made it clear that the

21  Court should consider and weigh both environmental and non-environmental elements of the

22  public interest, including the impact on jobs and the local economy.  The Project currently

23  employs approximately 1,250 people, and about 550 of them would lose their jobs within four

24  months of an injunction halting the entire Project.  If the Project is stopped for a year, 215 more

25  employees would lose their jobs, and 400 planned new jobs would not be created.  The Project

26  also injects millions of dollars into the northern Nevada economy and provides millions in state

27  and local tax revenues.  A blanket injunction suspending the Project would result in enormous

28  individual and public harm.  On the other hand, Cortez's proposed injunction would satisfy the

PARSONS
BEHLE &
LATIMER

-5-

1  environmental public interest, because it would halt activities related to the two NEPA

2  deficiencies, and satisfy the public interest of avoiding massive layoffs and loss of critical state

3  and local tax revenues.

4  _Balance of Harms._  When balancing the harms and the public interest, the Court should

5  consider that the state of affairs have changed dramatically in the eleven months since the

6  preliminary injunction hearing.  As of January 2009, very little work had been done.  Now the

7  construction and development of the Project has been completed except for a few minor

8  infrastructure items.  Approximately 70 million tons of overburden have been mined from the

9  open pit, which is now several hundred feet deep and one mile wide, and placed in waste dumps.

10  Cortez has spent an additional $251 million in 2009 for a total investment of approximately $633

11  million.  A blanket injunction stopping the Project would also cause irreparable harm to Cortez.

12  Accordingly, the balance of harms favors entry of an injunction narrowly tailored to remedy the

13  NEPA deficiencies rather than a broad injunction halting all mining activity.

14  <u>STATEMENT OF FACTS</u>

15  **A.**     **Procedural Background**

16  After more than three years of investigation and study and the issuance of a Final EIS, the

17  Bureau of Land Management issued a Record of Decision ("ROD") on November 12, 2008,

18  authorizing Cortez to proceed with the Project.  _See_ ROD at 1 and cover letter.  By the time the

19  ROD issued, Cortez had already invested approximately $380 million for the exploration,

20  engineering, design, and permitting process, and had secured contractors and purchased materials

21  and equipment to construct and operate the mine and related facilities.  When the ROD issued,

22  Cortez began work on the Project.

23  Plaintiffs moved for temporary injunctive relief on November 24, 2008.  (Docket No. 12.)

24  The parties stipulated to an order allowing certain work on the Project to proceed while other

25  work was halted until this Court could hold a preliminary injunction hearing.  (Docket No. 29.)

26  That hearing was held January 20-23, 2009, during which the Court heard live testimony and oral

27  arguments and considered submissions by the parties.  On January 26, 2009, this Court issued an

28  oral ruling denying a preliminary injunction (Docket Nos. 68, 71) ("Jan. 26 Order") supplemented

1    by a written order on February 3, 2009.  *South Fork Band Council of W. Shoshone of Nev. v. U.S.*
2    *Dep't of Interior*, 643 F. Supp. 2d. 1192 (D. Nev. 2009) (Docket No. 69).

3         After this Court's denial of the preliminary injunction on January 26, 2009, Cortez
4    immediately resumed construction of the Project.  Plaintiffs appealed and sought an injunction
5    pending appeal, which was denied both by this Court and the Ninth Circuit.  (Docket No. 79;
6    9th Cir. Docket No. 18.)  The Ninth Circuit heard oral argument on June 10, 2009, and issued its
7    decision six months later on December 3, 2009.

8         **B.    Current Status of the Cortez Hills Project.**

9         The construction phase of the Project, including Project infrastructure and preliminary
10   excavation of the pit, is more than 98% complete.  (*See* Exhibit 1, Declaration of Daniel W.
11   Banghart ("Banghart Decl.") at ¶¶ 5, 6.)  The ultimate footprint of the mine has been almost
12   entirely cleared.  (*Id*.)  The 9.5-mile conveyor and the 92-acre heap leach pad are completed.
13   (*Id.*)  The open pit is currently several hundred feet deep and measures approximately one mile by
14   3/4 mile.  (*Id.*)  To date, Cortez has mined more than 70 million tons from the open pit and most
15   of it has been placed in the waste dumps.  (*Id.*)  The mining and milling of gold ore has begun.
16   (*Id.*)

17        **C.    Impacts of Delaying or Shutting Down the Cortez Hills Project.**

18        Before the Project had significantly begun, this Court ruled that Cortez had established a
19   "great likelihood of substantial harm to both the local and state economies should the Project be
20   delayed."  *South Fork Band Council*, 643 F. Supp. 2d at 1213.  The Court noted that there were
21   "certainly huge implications for the public at a time of severe economic difficulties throughout
22   the nation, not just in the State of Nevada."  Jan. 26 Order at 4:5-4:7.  Since then, the harmful
23   consequences of a shutdown of the Project have only exacerbated.

24        **1.    Loss of Approximately 550 Jobs.**

25        A complete shutdown of the Project would have a drastic impact on people working for
26   Cortez and its operational contractors.  Layoffs would begin immediately.  Within the first two

27

28

PARSONS
BEHLE &
LATIMER

-7-

weeks, 125 people would lose their jobs, and by four months, 415 people will be out of work.[3] (*See* Exhibit 2, Declaration of Joseph Dick ("Dick Decl.") at ¶¶ 3-7.)  If the Project is halted for one year, 215 additional people will be laid off.  (*Id.* at ¶¶ 7, 12.)  These layoffs would also include Western Shoshone employees.  (*Id.* at ¶ 11.)

In addition, Cortez has construction contractors who will be affected by a shutdown of the Project.  (*See* Ex. 1, Banghart Decl. ¶¶ 2-3.)  These companies are involved in the last details of construction of the Project (as opposed to operation of the mines) and collectively employ approximately 130 people.  (*Id.*)  If the Project is shut down, these companies will be required to stop work, and they will lay off most of their 130 employees.[4]  (*See id.*; *see also* Exhibit 3, Declaration of Russ Harvey ("Harvey Decl.") at ¶¶ 3-5; Exhibit  4, Declaration of David Evans ("Evans  Decl.") at  ¶¶ 2-3; Exhibit 5, Declaration of Pedro Ormaza at  ¶¶ 2-4; Exhibit 6, Declaration of John Szczawinski at ¶¶ 2-5).)  Accordingly, within four months of a shutdown, about 550 people will lose their jobs.

The devastating impact on these people of losing their jobs and their paychecks goes without saying.  The Court can take judicial notice of the current state of the economy and the high unemployment rates in Nevada.  It is no consolation to the people losing their jobs that they may be re-employed in the future if the Project is restarted.  Since every day of lost work is lost forever and since people have to eat and pay their bills on a current basis, even a "temporary" job loss will cause them irreparable injury and is contrary to the public interest.

A Project shutdown would also do serious harm to the companies that contract with Cortez.  They stand to lose millions of dollars in expected future work.  (*See, e.g.*, Ex. 3, Harvey Decl. at ¶¶ 4-5; Ex. 4, Evans Decl. at ¶ 4.)

---

[3] This includes 305 Cortez employees and 110 operational contractors.  (*See* Ex. 2, Dick Decl. at at ¶¶ 3-7.)  Operational contractors support the day-to-day mining operations by, for example, performing routine maintenance on the equipment.  These operational contractors *do not* include the construction contractors that are employed constructing the infrastructure for the Project.  (*Id.* at ¶ 3.)

[4] These contractors are scheduled to complete their work, with the number of their employees gradually decreasing, over the next several months.  (*See* Ex. 1, Banghart Decl. at ¶ 2.)

## 2. Reduction in Cortez's Planned Hiring, Contractor Work, and Capital and Operational Expenditures.

A shutdown of the Project would not only cause massive layoffs, it would also cause Cortez to forego the planned hiring of additional employees. (*See* Ex. 2, Dick Decl. ¶¶ 8, 10.) Cortez plans to increase its workforce by approximately 100 employees by the end of 2010. (*Id.* at ¶ 10.) Those jobs will not be created if the Project is stopped.

In addition, Cortez plans to spend $132 million for major capital expenditures and contractor work in 2010. (*Id.* at ¶ 8.) In the event of a shutdown, Cortez will be forced to reduce this number to about $40 million. (*Id.*) Cortez estimates that this $90 million reduction in spending for 2010 would translate into 300 contractor jobs that would not be created. (*Id.*) Additionally, a shutdown would cause a reduction in the amount Cortez spends for goods and services associated with its mine operations. (*Id.* at ¶ 9.) Cortez estimates that its mine operations expenditures for goods and services would drop by $170,000 per day. (*Id.*)

## 3. Impact on Local and State Economies.

The Project has had, and will continue to have, a profoundly positive impact on the Nevada economy, which suffers from the nation's highest negative home equity and the third highest unemployment rate. (*See* Exhibit 7, Declaration of Michael R. Alastuey ("Alastuey Decl.") at ¶¶ 5-6.) Mr. Alastuey opines that if the Project is delayed for six months to a year, state and local government entities will lose approximately $24.5 to $48.9 million. (*Id.* at ¶ 4.) This loss would come at a time the state needs money the most. (*Id.* at ¶¶ 5-11; *see also* Transcript of January 22, 2009 Hearing (Exhibit 8) at 549-570 (testimony at preliminary injunction hearing).) Lander County alone would lose approximately $7.2 to $14.4 million. (*See* Alastuey Decl. at ¶ 4.) The magnitude of this loss to Lander County cannot be overstated given that Lander County's total operating and capital budget for 2010 is $18.7 million. (*See* Exhibit 9, Declaration of Gene P. Etcheverry at 1.) These revenues would be used for necessary public works and improvement projects, such as a municipal drinking water system to replace the existing system that has arsenic levels that violate state and federal drinking water standards, and for investments in health and safety services, such as a new ambulance for the town of Austin.

PARSONS
BEHLE &
LATIMER

1    (*Id.* at 1-3.)  In addition to lost tax revenues, delay of the Project may harm Lander County by

2    causing its property tax base to shrink for the period of the delay because the Cortez property

3    would be diminished in value for that time if it cannot be operated as a mine.  (*Id.* at 2.)

4         Cortez's economics expert, Dr. John Dobra, opines that a six-month delay would result in

5    an unrecoverable loss of approximately $57 million to the local and state economies due to the

6    delay in paying compensation and taxes, and in the purchase of goods and services.  (*See* Exhibit

7    10, Declaration of John L. Dobra, Ph.D. at ¶ 5.)  This economic loss would result solely on

8    account of the delay and cannot be recovered even if the Project eventually proceeds at a later

9    date. (*Id.* at  ¶¶ 2, 5.)  In addition, the consequences of the Project's reduced spending on payroll,

10   taxes, and goods and services have a ripple effect throughout the economy and result in fewer

11   secondary jobs and lower economic output.  (*Id.* at  ¶ 6.)

12                    **4.    Loss of Return on Cortez's Investment.**

13        Cortez has invested approximately $633 million from the Project's inception to present.

14   (*See* Ex. 1, Banghart Decl. at ¶ 4.)  A delay in the Project delays Cortez's ability to recoup its

15   investment.  (*Id.* at ¶ 4.)  Indeed, for every day Cortez is delayed in realizing a return on its

16   investment—in other words, every day the Project is delayed—Cortez will lose $350,000.  (*Id.*)

17   This loss results from the time value of money and can never be recovered, even if the Project

18   ultimately resumes.  (*Id.*)

19                                ARGUMENT

20   **I.    THE NINTH CIRCUIT FOUND ONLY TWO DISCRETE NEPA DEFICIENCIES.**

21        The Court of Appeals has determined that Plaintiffs were likely to succeed on the merits

22   of their NEPA claims that the EIS was deficient in two discrete areas:  (1) It fails to analyze the

23   air quality impacts associated with the transportation off-site and processing of the refractory

24   portion of the ore to be mined; and (2) although the EIS adequately analyzes the potential impacts

25   to springs and seeps from mine dewatering associated with the Project, it does not contain an

26   effectiveness analysis of the mitigation measures proposed for those springs and seeps that may

27   be impacted.  *South Fork Band Council*, 588 F.3d at 725-27.  The Court of Appeals has directed

28   that this Court issue a preliminary injunction pending the preparation of a supplemental EIS to

PARSONS
BEHLE &
LATIMER
                                    -10-

1   correct those deficiencies.  In addition, the Court of Appeals stated that "[b]ecause the BLM must

2   revise its study of the environmental consequences of this project as a result of this litigation, it

3   should do separate modeling for PM$_{2.5}$ particulate emissions" as part of the supplemental EIS

4   process.  *Id.* at 728.  The Court of Appeals has not, however, defined the scope of the injunction

5   that this Court should enter.  Instead, in a tacit recognition of this Court's equitable powers, the

6   Ninth Circuit has ordered entry of an injunction, "consistent with this opinion." *Id.* at 729.  Thus,

7   it is incumbent upon this Court to determine the breadth and scope of an appropriate injunction.

8        On the other hand, the Ninth Circuit affirmed this Court's conclusion that Plaintiffs were

9   unlikely to prevail on their FLPMA claims and the balance of their NEPA claims.  The Ninth

10  Circuit also ruled that the EIS's analysis of religious issues was very thorough. *Id.* at 721-25.  As

11  the Court is well aware, these religious claims were at the heart of Plaintiffs' lawsuit to date.

12  **II.    NINTH CIRCUIT PRECEDENT REQUIRES A TAILORED INJUNCTION.**

13       Under Ninth Circuit law, district courts should not impose blanket injunctions to remedy

14  NEPA violations if the harm caused by those violations does not affect the entire development

15  permitted by an agency. *See N. Cheyenne Tribe v. Norton*, 503 F.3d 836, 843-44 (9th Cir. 2007).

16  "A NEPA violation is subject to traditional standards in equity for injunctive relief and does not

17  require an automatic blanket injunction against all development." *Id.* at 842.  These standards

18  require district courts to "balance the competing claims of injury and . . . consider the effect on

19  each party of the granting or withholding of the requested relief." *Amoco Prod. Co. v. Village of*

20  *Gambell, AK*, 480 U.S. 531, 542 (1987).  Sometimes "the equities demand a partial injunction."

21  *Northern Cheyenne Tribe*, 503 F.3d at 843; *see also Nat'l Wildlife Fed'n v. Nat'l Marine*

22  *Fisheries Serv.*, 422 F.3d 782, 800 (9th Cir. 2005) (remanding injunction to the district court for

23  determination of whether injunction "should be more narrowly tailored or modified" to remedy

24  the alleged Endangered Species Act violation.).

25       Consistent with this balancing approach, the Ninth Circuit has consistently upheld partial

26  injunctions that allow for some level of continued implementation of commercial activities

27  pending full NEPA compliance.  Recently, in *Northern Cheyenne Tribe*, the district court held an

28  EIS inadequate because it failed to address a "phased development" alternative for the

PARSONS
BEHLE &
LATIMER

-11-

1    development of coal bed methane.  503 F.3d at 841.  The district court issued an injunction that

2    allowed aspects of the development to proceed while the NEPA deficiency was addressed.  *See*

3    *id.*  On appeal, the Ninth Circuit upheld the district court's limited remedy, ruling: "We

4    cannot . . . fault the district court's exercise of its discretion to issue a partial injunction balancing

5    the equities rather than an automatic full injunction."  *Id.* at 843; *see also High Sierra Hikers*

6    *Ass'n v. Blackwell*, 390 F.3d 630, 638, 640, 649 (9th Cir. 2004) (affirming the district court's

7    decision to order "a reduction in the allocation of special-use permits and limited access to areas

8    of environmental concern" where the district court found that the Forest Service violated NEPA

9    by failing to complete an EIS analyzing the impacts of various special use permits for commercial

10   outfitters and guides in wilderness areas); *Idaho Watersheds Project v. Hahn*, 307 F.3d 815, 822-

11   23, 833-34 (9th Cir. 2002) (affirming the district court's narrow injunction where the BLM

12   violated NEPA by issuing grazing permits under an outdated 16-year-old EIS but where the

13   district court "considered the hardship of a complete halt to grazing and concluded that such a

14   remedy would be too drastic.").

15         The recent Ninth Circuit case of *Sierra Forest Legacy v. Rey*, 577 F.3d 1015 (9th Cir.

16   2009) is particularly instructive.  In that case, the Ninth Circuit reversed the district court's denial

17   of a preliminary injunction, and held that the plaintiffs were likely to succeed on the merits of

18   their NEPA claim because the Forest Service had failed to consider a reasonable range of

19   alternatives to the "2004 Framework" (an amendment to the forest plans governing California's

20   Sierra Nevada region).  *Id.* at 1018.  The Ninth Circuit held that the district court had erred by

21   conducting an all-or-nothing analysis of the 2004 Framework and by deciding that it either had to

22   accept the 2004 Framework or reject it entirely and require the Forest Service to take no action

23   with respect to fire prevention.  *Id.* at 1022-23.  The Ninth Circuit ruled: "The district court

24   appears not to have recognized its power to issue [a] narrow injunction" and remanded the case to

25   the district court to reconsider the injunction in light of the correct legal standard.  *Id.* at 1022-24.

26         On remand, the district court held that the 2004 Framework complied with NEPA except

27   to the extent that it was implemented without proper consideration of alternative options.  *Sierra*

28   *Forest Legacy v. Rey*, 2009 WL 3698507, at *1 (E.D. Cal. Nov. 4, 2009).  The plaintiffs had

PARSONS
BEHLE &
LATIMER

-12-

1  requested the district court to enjoin the entire 2004 Framework, and to require that Forest
2  Service revert back to the 2001 Framework. *Id.* The district court rejected the plaintiffs' request,
3  however, holding that "[n]arrow, curative remedies that do not prohibit the agency from acting
4  are favored," and that "[r]elief should consequently be narrowly tailored to remedy the legal
5  violation found and to balance the hardships between the parties." *Id.* at *2. The court declined
6  to issue a blanket injunction against implementation of the 2004 Framework (which regulated
7  11.5 million acres of land within the national forests) because such an injunction would be "an
8  excessively-broad rather than a narrowly-tailored injunction." *Id.* at *3. Instead, the district court
9  held that "the availability of site-specific NEPA review can ameliorate any harm from ongoing
10 projects while the agency corrects a program level NEPA error." *Id.*

11     Similarly, in the present case, the law does not require the Court to enter an "all-or-
12 nothing" injunction against the entire Project as approved by the November 12, 2008 ROD.
13 Indeed, it requires the opposite. Because both this Court and the Ninth Circuit reviewed the EIS
14 and determined it to be adequate in all respects other than the discrete shortcomings identified by
15 the Ninth Circuit, the law requires the Court to tailor the injunction to deal with those
16 shortcomings and no more. The Court should exercise its discretion to fashion a narrowly
17 tailored injunction to prohibit only those mining operations that relate to the two NEPA
18 deficiencies identified by the Ninth Circuit (air quality impacts from the transportation and offsite
19 processing of refractory ore and the inadequacy of the effectiveness analysis of the mitigation
20 measures proposed for those springs and seeps that may be impacted by mine dewatering). Doing
21 so will not prejudice the outcome of the supplemental EIS process because the enjoined activities
22 will not take place unless and until BLM decides to allow them.

23 **III.    NINTH CIRCUIT PRECEDENT REQUIRES THE COURT TO CAREFULLY
        WEIGH THE NON-MERITS *WINTER* FACTORS WHEN DETERMINING THE
24      APPROPRIATE SCOPE OF AN INJUNCTION.**

25     The standards for issuing a preliminary injunction are set forth in *Winter*: A party seeking
26 an injunction must prove all of the following: "that he is likely to succeed on the merits, that he is
27 likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities
28 tips in his favor, and that an injunction is in the public interest." 129 S. Ct. at 374. The Supreme

PARSONS
BEHLE &
LATIMER

-13

Court has also held that courts must apply these equitable factors in determining the scope of an injunction pending compliance with procedural environmental laws. *See Amoco Prod. Co.*, 480 U.S. at 544-45.

In its determination of the nature of the injunction, a court should balance the equities with the most current information available. In *Winter*, the Supreme Court held that the district court improperly failed to factor in new information when reconsidering an injunction decision that had been remanded. 129 S. Ct. at 376. The Supreme Court noted that the "District Court originally found irreparable harm from sonar-training exercises generally," but when the district court fashioned its final injunction, it mistakenly "did not reconsider the likelihood of irreparable harm in light of the four restrictions not challenged by the Navy." *Id.*

In *Sierra Forest Legacy v. Rey,* the district court on remand applied the *Winter* decision and reconsidered an injunction decision based on the latest available facts and circumstances. First, the court reviewed additional evidence from both parties that related to the "irreparable harm and public interest concerns necessary to sustain injunctive relief." 2009 WL 3698507, at *3. Second, in determining whether to enjoin implementation of the 2004 Framework, the court ruled that it was relevant to consider the fact that the 2004 Framework had "been in place some five years" and that an injunction of the use of that framework "would waste countless resources already devoted to project assessment and disrupt continuing efforts." *Id.* at *1, 4.

Here, this Court should determine the appropriate scope of the injunction based on applying the *Winter* elements to the facts as they exist now, rather than the facts that existed a year ago. The Court should consider the attached declarations concerning the jobs and taxes that will be lost, and other negative impacts that would occur if the mine site were entirely shut down while the discrete EIS flaws are addressed. If Plaintiffs wish to dispute any of these current facts, then the Court should hold an evidentiary hearing in order to determine the facts necessary for application of the *Winter* factors.

**A.      Any Harm That Might Result From the NEPA Deficiencies Identified by the Ninth Circuit Is Slight and Can be Averted by a Limited Injunction.**

There is little or no evidence in the record of specific harms that would be suffered by Plaintiffs on account of the NEPA deficiencies found by the Ninth Circuit.  Plaintiffs never explained how they would be harmed by offsite transportation and processing of refractory ore or the lack of an effectiveness-rating of mitigation measures for seeps and springs.  In fact, at the preliminary injunction stage, Plaintiffs focused on their RFRA and religious-based FLPMA claims, and presented little evidence or argument to the district court on their NEPA claim.  As a result, the record evidence of Plaintiffs' irreparable harm relates almost exclusively to alleged religious injuries resulting from the Project as a whole.  These alleged religious injuries related directly to Plaintiffs' RFRA claims (which they lost, did not appeal, and have since dismissed), and indirectly to their FLPMA claims, which this Court and the Ninth Circuit both rejected.

This Court previously found "that the implementation of the Project will irreparably harm the environment," (*see South Fork Band Council*, 643 F. Supp. 2d at 1213), and the Ninth Circuit noted this finding.  *See South Fork Band Council*, 588 F.3d at 728.  But this statement regarding irreparable harm related to "implementation of the Project" as a whole.  This Court did not attempt to identify any particular harm flowing from any specific activity or aspect of the Project. *See South Fork Band Council*, 643 F. Supp. 2d at 1213.  In this regard, it is important to remember that Plaintiffs attacked all aspects of the Project, including the removal of trees and topsoil, the excavation of the pit, the waste dumps, the heap-leaching facility, the dewatering operations, the offsite transportation and treatment of the refractory ore, etc. (Pls.' Mot. for TRO and Prelim. Inj. and Mem. in Supp. (Docket No. 12) at 1-9; Pls.' Consolidated Reply in Supp. of Mot. for Prelim. Inj. (Docket No. 44) at 1-3.)  Yet the Ninth Circuit held that the EIS was only deficient with respect to the refractory ore and the effectiveness of mitigation relating to dewatering activities.  *See South Fork Band Council*, 588 F.3d at 725-27.  Plaintiffs never presented evidence of any environmental harms that would flow from those discrete activities for which the Ninth Circuit required further NEPA study.[5]  There is no record evidence that the off-

---

[5] It is true that Plaintiffs complain about impacts to "sacred waters" of Mt. Tenabo.  But Plaintiffs

PARSONS
BEHLE &
LATIMER

1  site transportation and processing of refractory ore will cause irreparable injury, nor is there any

2  record evidence that the EIS's incomplete discussion of the efficacy of groundwater mitigation

3  measures will cause irreparable injury.

4         In any event, the lack of evidence of such injury or harm does not really matter because

5  Cortez's proposed injunction would ensure that no harm will result from the NEPA deficiencies.

6  It would prohibit 1) all off-site shipping of refractory ore from the Cortez Hills open pit, and 2) all

7  pumping of groundwater in excess of rates approved prior to the November 12, 2008 ROD until

8  BLM completes a supplemental EIS and approves these activities.   The scope of Cortez's

9  proposed injunction is consistent with the Ninth Circuit's directive that injunctive relief be

10 entered consistent with its opinion because all other aspects of the Project were appropriately

11 examined under NEPA.   The proposed injunction would prevent any harm from the NEPA

12 deficiencies, but it would also allow the Project to continue and avoid irreparable harm to

13 employees and the community.

14         **B.        <u>The Public Interest Is Better Served By a Limited Injunction.</u>**

15         The public interest in employment for 500 to 1,000 people, the public interest in the

16 economic health of the local community, and the public interest in receiving tax revenues in a

17 time of desperate need, weigh heavily against an injunction that would completely halt the

18 Project. The importance of the public interest prong of the injunction test was recently

19 emphasized by the Supreme Court in *Winter*:  "In exercising their sound discretion, courts of

20 equity should pay particular regard for the public consequences in employing the extraordinary

21 remedy of injunction." 129 S. Ct. at 376-77.  Indeed, the Supreme Court in *Winter* reversed the

22 district court's granting of a preliminary injunction primarily because the injunction was not in

23 the public interest.  *Id.* at 376-78.

24         In determining whether an injunction serves the public interest in an environmental case,

25 the Ninth Circuit has ruled that courts must not ignore economic consequences and job losses.

26 *The Land's Council v. McNair* 537 F.3d 981, 1005 (9th Cir. 2008).   The *en banc* panel

27

28 argued that any harm to them resulting from ground water depletion was religious harm and
related to their RFRA and FLPMA claims.

1    determined that "the public's interest in aiding the local economy and preventing job loss" for 27

2    workers were proper considerations in the district court's decision to deny a preliminary

3    injunction to halt logging activities.   *Id.*   Likewise, in *High Sierra Hikers Association v.*

4    *Blackwell*, the Ninth Circuit commented favorably on the fact that the district court "balanced the

5    environmental and economic concerns" when fashioning an injunction that did not "drastically

6    curtail" commercial operations while the Forest Service completed a NEPA analysis.   390 F.3d at

7    642-43.   Lastly, in *Idaho Watersheds Project v. Hahn*, the Ninth Circuit approved the district

8    court's partial injunction of cattle grazing, that gave "due regard to protection of the environment

9    and the welfare of the affected ranching families."   307 F.3d at 835; *see also Greater Yellowstone*

10   *Coalition v. Timchak*, Case No. 09-35478, Docket. No. 26 at 2, 7-8 (9th Cir. June 4, 2009)

11   (considered the "significant interim economic harm and job loss," including the layoff of 104

12   employees, when it lifted a temporary stay and denied an emergency motion to enjoin mining

13   activities) (attached hereto as Exhibit 11); *Nelson v. Nat'l Aeronautics & Space Admin.*, 568 F.3d

14   1028, 1030 n.6 (9th Cir. 2009) ("Clearly, the public interest in minimizing job loss in this difficult

15   economic climate … weighs in favor of the injunction.")

16        In this case, the public's interest in avoiding the drastic consequences of a complete

17   shutdown of the Project should be determinative—particularly  since Cortez proposes to be

18   enjoined from activities associated with the flaws indentified by the Ninth Circuit while a

19   supplemental EIS is prepared.   This Court previously commented on the "great likelihood of

20   substantial harm to both the local and state economies," (*South Fork Band Council*, 643 F. Supp.

21   2d at 1213), and the "huge implications to the public at a time of severe economic difficulties."

22   *See* Jan. 26 Order at 4:6-4:7.   The Court further noted:  "[T]here is a huge public interest involved

23   here which directly concerns the economy and the financial implications to many Western

24   Shoshones as well as other interested parties.  I have to say that I was awestruck by the monetary

25   implications of this mining operation."   *Id.* at 15:13-17.

26        Since that ruling, the negative economic consequences of a shutdown of the Project have

27   become far more significant.  More people will lose their jobs and more families will suffer.  *See*

28   *supra* at 7-10.  The negative impact on the local economy will be greater.  *See supra* at 9-10.  Tax

PARSONS
BEHLE &
LATIMER                                                           -17-

revenues needed in this year will not be paid. *Id.* In addition, 400 new jobs will not be created in 2010 as planned . *See supra* at 9. These harms would be irreparable. The fact that a shutdown may only be temporary does not lessen the irreparable impact on those who lose their job or do not get a job because it is not created. It does not lessen the impact to local businesses that lose the income they would realize from selling goods and services to those employees or to the Project. It does not lessen the harm to governmental agencies that are already facing severe budget cuts. And it does not lessen the irreparable impact on those who would not receive public services when they need them because the tax dollars are not there to pay for them.

All of these negative consequences to the public interest can be avoided if the limited injunction proposed by Cortez is entered rather than a blanket injunction.

C.   **The Balance of Harms Favors Entry of a Limited Injunction That Addresses the Narrow NEPA Deficiencies.**

Balancing the harms and the public interest weighs heavily against a blanket injunction. In addition to the harms to workers, the economy, and the public discussed above, Cortez's financial loss from a blanket injunction would be irreparable. To date, Cortez has invested more than $600 million dollars in the Project. *See supra* at 10. The cost of delay on Cortez's return on investment is $350,000 per day and it never will be recovered. *Id.*

On the other hand, if the Court were to enter the proposed injunction, Plaintiffs would suffer no harm whatsoever, there would be no harm to the public interest, and there would be very limited harm to Cortez. Accordingly, the balance of harms favors a tailored injunction.

IV.   **PROPOSED PRELIMINARY INJUNCTION**

Based on the foregoing, Cortez proposes that the Court enter a limited injunction as follows:

1.   **Offsite Shipment and Processing of Refractory Ore**

Cortez proposes the Court enjoin the transport offsite for processing of any refractory ore mined from the Cortez Hills open pit mine. (*See* Exhibit 12, Cortez's Proposed Preliminary Injunction, at 2 (¶ 2.a).) The refractory ore represents about 3% of the overall ore production for

1    the life of the Project.  If so enjoined, Cortez would stockpile the refractory ore pending future

2    approval following the Supplemental EIS.

3                    **2.    Additional Groundwater Pumping**

4            Prior to the November 12, 2008 ROD, Cortez had been dewatering pursuant to previously

5    existing and approved permits that were not challenged in this lawsuit.  Previously approved

6    dewatering would continue.  Cortez proposes, however, that it be enjoined from pumping any

7    additional groundwater as permitted by the November 12, 2008 ROD pending future approval

8    based on the Supplemental EIS.  *Id*. at 2-3 (¶ 2.b).

9                    **3.    Additional Modeling of PM$_{2.5}$**

10           The Ninth Circuit indicated that the SEIS evaluation of PM$_{2.5}$ was correctly performed

11   under the guidance in effect at the time.  *South Fork Band Council*, 588 F.3d at 728.  But the

12   Ninth Circuit noted that the modeling guidance had changed after BLM began the permitting

13   process and the PM$_{2.5}$ evaluation was completed.  *Id.*  As a result, the Court of Appeals ordered

14   that, "[b]ecause the BLM must revise its study of the environmental consequences of this project

15   as a result of this litigation, it should do separate modeling for PM$_{2.5}$ particulate emissions."  *Id.*

16   Accordingly, as part of the proposed limited injunction, BLM would be required to model PM$_{2.5}$

17   air particulate emissions.  *See* Ex. 12 at 2 (¶ 1).

18                   **4.    Supplemental EIS Schedule**

19           After consultation with BLM, Cortez proposes that the Court set certain deadlines for the

20   supplemental EIS and NEPA procedures.  *Id.* at 2 (¶ 1.a to 1.c).

21                             **CONCLUSION**

22           For all of the foregoing reasons, Cortez requests the Court to enter an appropriate,

23   narrowly tailored injunction.

24

25

26

27

28

PARSONS
BEHLE &
LATIMER

-19-

Dated:  January 25, 2010.

Respectfully submitted,

PARSONS BEHLE & LATIMER

By: /s/ Francis M. Wikstrom
    Jim B. Butler, Nevada Bar No. 8389
    Michael R. McCarthy Nevada Bar No. 9345
    Francis M. Wikstrom (*pro hac vice*)
    Utah Bar No. 3462
    Michael L. Larsen (*pro hac vice*)
    Utah Bar No. 4069
    Jeffrey J. Droubay (*pro hac vice*)
    Utah Bar No. 9119

    50 West Liberty Street, Suite 750
    Reno, NV  89501
    Telephone:  (775) 323-1601
    Facsimile:  (775) 348-7250

    201 South Main Street, Suite 1800
    Salt Lake City, UT 84111
    Telephone:  (801) 532-1234
    Facsimile:  (801) 536-6111

    Attorneys for Barrick Cortez Inc.

PARSONS
BEHLE &
LATIMER

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

CERTIFICATE OF SERVICE

I hereby certify that on January 25, 2010, I electronically filed the foregoing **BARRICK CORTEZ INC.'S MOTION FOR ENTRY OF AN APPROPRIATELY TAILORED INJUNCTION AND MEMORANDUM IN SUPPORT THEREOF** with the Clerk of Court using the CM/ECF system, which sent notification of such filing to the following:

| | |
|---|---|
| Henry Egghart, Nevada Bar No. 3401<br>630 East Plumb Lane<br>Reno, NC 89502<br>Telephone: (775) 333-5282<br>Facsimile:   (303) 823-5732<br>Email:  hegghart@nvbell.net<br><br>Roger Flynn (*pro hac vice*)<br>Jeffrey C. Parsons (*pro hac vice*)<br>WESTERN ACTION MINING<br>   PROJECT<br>P.O. Box 349<br>440 Main Street, #2<br>Lyons, CO 80540<br>Telephone: (303) 823-5738<br>Facsimile:   (303) 823-5732<br>Email:  wmap@igc.org | Tyler Bair, Trial Attorney<br>Sara E. Costello, Trial Attorney<br>United States Department of Justice<br>Environmental & Natural Resources<br>   Division<br>General Litigation Section<br>P.O. Box 663<br>Washington, D.C., 20044-0663<br>Telephone:  (202) 305-0476<br>Facsimile:  (202) 305-0506<br>Email:  Donna.Fitzgerald@usdoj.gov<br><br>Gregory A. Bower<br>United States Attorney<br>Greg Addington<br>   Nevada Bar No. 6875<br>Assistant United States Attorney<br>Ronald J. Tenpas<br>Assistant United States Attorney<br>United States Attorney's Office<br>100 West Liberty Street<br>Suite 600<br>Reno, NV 89501<br>Telephone: (775) 784-5438<br>Facsimile:  (775) 784-5181 |
| | /s/ Michael R. McCarthy |

PARSONS
BEHLE &
LATIMER