Henry Egghart, NV Bar # 3401
630 East Plumb Lane
Reno, NV 89502
(775) 333-5282
hegghart@nvbell.net

Roger Flynn, *Pro Hac Vice*
Jeffrey C. Parsons, *Pro Hac Vice*
WESTERN MINING ACTION PROJECT
P.O. Box 349
440 Main Street, #2
Lyons, CO 80540
(303) 823-5738
Fax (303) 823-5732
wmap@igc.org

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT
DISTRICT OF NEVADA

|  |  |
|---|---|
| ———————————————— )<br>SOUTH FORK BAND COUNCIL OF )<br>WESTERN SHOSHONE OF NEVADA; )<br>TE-MOAK TRIBE OF WESTERN SHOSHONE )<br>INDIANS OF NEVADA; )<br>TIMBISHA SHOSHONE TRIBE; )<br>WESTERN SHOSHONE DEFENSE PROJECT; )<br>and GREAT BASIN RESOURCE WATCH, )<br>                 )<br>              Plaintiffs, )<br>       v. )<br>           )<br>UNITED STATES DEPARTMENT OF THE )<br>INTERIOR; UNITED STATES BUREAU OF )<br>LAND MANAGEMENT; GERALD M. SMITH, )<br>District Manager, Battle Mountain, Field Office, )<br>            )<br>          Defendants. )<br>BARRICK CORTEZ, INC. )<br>          )<br>       Defendant-Intervenor )<br>———————————————— | Case No: 08-CV-616-LRH-RAM<br><br><br>**PLAINTIFFS' MOTION FOR<br>ENTRY OF PRELIMINARY<br>INJUNCTION AS DIRECTED<br>BY THE COURT OF APPEALS**<br><br><br>         and<br><br>**PLAINTIFFS' RESPONSE IN<br>OPPOSITION TO<br>BARRICK CORTEZ'S MOTION<br>FOR LIMITED INJUNCTION** |

1

## INTRODUCTION AND SUMMARY

Appellants, South Fork Band Council of Western Shoshone of Nevada ("South Fork Band"),  Te-Moak Tribe of Western Shoshone Indians of Nevada ("Te-Moak Tribe"), Timbisha Shoshone Tribe ("Timbisha Tribe"), Western Shoshone Defense Project ("WSDP"), and Great Basin Resource Watch ("GBRW") (collectively, "the Tribes") file this Motion for Entry of Preliminary Injunction suspending the challenged Cortez Hills Project in accordance with the Order and Mandate issued by the Ninth Circuit Court of Appeals in this case.  The Tribes also herein respond in opposition to Barrick Cortez ("Barrick")'s Motion requesting that this Court divert from the Order and Mandate of the Ninth Circuit by issuing only a very limited injunction against a small subset of Project activities. (Barrick Motion, Docket # 133).

In an attempt to proceed with the completion of the Project's construction and commencement of actual ore production with no letup, Barrick's Motion misapplies the specific direction and holding of the Ninth Circuit, and ignores the fact that the Ninth Circuit specifically ruled against Barrick that a full injunction suspending the Project was warranted in this case. Barrick argues that the district court must conduct a *de novo* review of the equities of whether to grant the injunction – essentially asking that the parties re-litigate the issues already considered and resolved by the Ninth Circuit.

In its Motion, Barrick argues three main points: (1) that this court should revisit the findings of the Ninth Circuit in order to fashion a limited stay of only a few activities, rather than the larger injunction ruled upon by the appeals court; (2) that its proposal to curtail some operations at the site removes any likelihood of irreparable harm to the Tribes or the environment from operation of the Project; and (3) that Barrick's decision to proceed with the Project, and incur greater financial risk, while the case was before the Ninth Circuit somehow gives it greater equities against an injunction.

Barrick ignores the fact that the Ninth Circuit has already determined that the Tribes satisfy each prong of the four-part test for a preliminary injunction.  The Ninth Circuit caselaw cited by

2

Barrick primarily deals with the situation where the appeals court was affirming the district court's original issuance of a limited injunction, especially the district courts' rulings that the equities in those cases did not warrant suspension of the project. This case is markedly different, as the Ninth Circuit reversed this court's holding that the Tribes did not satisfy the four-part test – and specifically held that "suspending the project until [BLM complied with NEPA] comports with the public interest." South Fork Band Council of Western Shoshone of Nevada v. U.S. Department of Interior, 588 F.3d 718, 728 (9th Cir. 2009). That is a critical determination, as the law requires that the district court must implement the holding and Mandate from the Court of Appeals, and not revisit issues decided by the Ninth Circuit.

Barrick's proposal to curtail a limited subset of Project activities (i.e., some groundwater pumping, transport of refractory ore) does **not** prevent irreparable harm. Barrick is essentially asking that a revised Project be allowed to proceed during the time that this court considers the merits and while BLM prepares a Supplemental EIS to comply with NEPA and the Ninth Circuit's decision. This ignores controlling decisions from the Ninth Circuit in numerous cases which hold that such a "construct first, comply with NEPA later" approach violates NEPA at its core.

Without a legally-valid EIS, BLM failed to take the requisite "hard look" at the Project's environmental impacts. Without that "hard look," a project could never be authorized, as the agency would not know if the project complied with other environmental and public land laws. Indeed, BLM has consistently argued that it complied with FLPMA's duty to "prevent undue degradation" to public lands and waters because of its mitigation plan – the same mitigation plan rejected by the Ninth Circuit. Regarding compliance with air quality standards under FLPMA and the Clean Air Act, based on the Ninth Circuit's holding that BLM failed to ascertain the extent of harmful $PM_{2.5}$ emissions, it is impossible to know if the Project will comply with these standards. In other words, the violation of NEPA found by the Ninth Circuit is not of idle consequence, as asserted by Barrick.

Even under Barrick's view of NEPA (that a Project may continue despite numerous NEPA violations by the agency), and despite Barrick's pledge to curtail a limited set of activities, irreparable harm to the Tribes and the environment will occur.  Barrick fails to propose any reduction whatsoever of harmful emissions of $PM_{2.5}$, which will undisputedly be released into the air by Project activities while this case continues.  Barrick's proposal to create a new stockpile of up to 5 million tons of refractory ore creates its own set of additional potential environmental harms that have never received any BLM or public scrutiny.

Regarding water, Barrick argues that its vaguely-worded proposal to curtail some groundwater pumping prevents all irreparable harm to the Tribes and the environment.  This contradicts its argument to this court and the Ninth Circuit that the Project's pumping would not cause any irreparable harm while this case was argued on the merits (due to, in Barrick's view, that groundwater depletions would not be realized for many years).  Now, in direct contradiction of its brief to the courts, Barrick argues that irreparable harm would be prevented if it stopped some pumping – essentially admitting that short-term pumping causes irreparable harm.  Barrick cannot be allowed to play such litigation games with the courts.

Lastly, Barrick's claim that its decision to proceed with construction while the case was before the Ninth Circuit somehow provides greater equities to the company ignores Supreme Court and Ninth Circuit precedent holding that a project proponent proceeds at its own risk when it decides to continue construction in the face of litigation.

Overall, Barrick acts as if the Ninth Circuit had not ruled that the Tribes satisfied the four-part test for a preliminary injunction, argues that NEPA is a superfluous federal statute, and asserts that the Tribes and the environment will not suffer any harm from one of the largest mining projects in the United States.  While the Tribes certainly understand Barrick's desire to proceed with their Project without any meaningful hindrance, that is not what federal statutory and case law allow in this case.

## ARGUMENT

### I.   THE DISTRICT COURT IS BOUND TO IMPLEMENT THE NINTH CIRCUIT'S FINDINGS

Although couched in terms of "new circumstances," Barrick's Motion essentially requests that this court re-litigate the Tribe's request for a preliminary injunction suspending the Project. Under Supreme Court and Ninth Circuit precedent, such a tactic must be rejected. Upon issuance of the court of appeals' Mandate, this court is bound to implement the directive of the Ninth Circuit.

> When a case has been decided by this court on appeal, and remanded to the district court, whatever was before this court, and disposed of by its decree, is considered as finally settled. The district court is bound by the decree as law of the case, and must carry it into execution according to the mandate. That court cannot vary it, or examine it for any other purpose than execution; or give any other or further relief; or review it, even for apparent error; or intermeddle with it, further than to settle so much as has been remanded.

U.S. v. Thrasher, 483 F.3d 977, 981 (9th Cir. 2007). The only exception to this strict rule is for "matters left open by the mandate." Id. Barrick asserts that the Ninth Circuit, outside of its rulings on the Tribes' likelihood of success on the merits, apparently left every other matter regarding the four-part test up to this court on remand. However, as detailed below, the Ninth Circuit specifically considered all of the evidence regarding harm, public interest, and the balance of hardships – including hundreds of pages of evidence submitted by Barrick – and made its legal and factual findings that suspension of the Project until BLM complied with NEPA was warranted.

Barrick argues that, because the Ninth Circuit's remand did not specifically delineate the language of the injunction (i.e., it ordered that this court enter "injunctive relief consistent with this opinion"), this means that the court of appeals did not rule on the Tribes' request for an injunction suspending the Project. However, the Tribes have consistently argued to both this court and the Ninth Circuit that a full injunction should be issued pending BLM's compliance with

federal law.  The Ninth Circuit did not hold, as Barrick asserts, that a less-than-full injunction is warranted.  Rather, the appeals court stated in no uncertain terms that:

> We reverse the denial of injunctive relief on the NEPA claims … and remand for the entry of an injunction pending preparation of an EIS that adequately considers the environmental impact of the extraction of millions of tons of refractory ore, mitigation of the adverse impact on local springs and streams, and the extent of fine particulate emissions.

588 F.3d at 722.

In implementing the Mandate, the district court must abide by the findings of the appeals court, for every issue "decided explicitly or by necessary implication." Thrasher, 483 F.3d at 981. "The mandate is controlling as to all matters within its compass, but leaves the district court any issue not expressly or impliedly disposed of on appeal." U.S. v. Washington, 172 F.3d 1116, 1118 (9th Cir. 1999).  "On remand, the trial court should only have considered matters left open by the mandate of this [appellate] court." Waggoner v. Dallaire, 767 F.2d 589 (9th Cir. 1985)(reversal of district court's action that was not consistent with original appellate decision).

Here, there is no doubt that the Ninth Circuit ruled on the issue of whether the Project should be suspended pending BLM's compliance with NEPA.  This issue was not "left open" for the district court to consider. Id.  The Ninth Circuit decided the issue regarding the Tribe's request to suspend the Project when it held that "Suspending a project until [BLM complied with NEPA] comports with the public interest." 588 F.3d at 728.  Barrick's Motion completely avoids this holding.  Although Barrick apparently (and incorrectly) argues that this statement from the Ninth Circuit does not "explicitly" order the suspension of the Project, at a minimum the Ninth Circuit's finding certainly "impliedly" found that Project suspension is required under the law and facts of this case. Washington, 172 F.3d at 1118.  According to Barrick, the Ninth Circuit's finding that the Project should be suspended is essentially meaningless dicta and superfluous – an assertion without merit under any credible reading of the Ninth Circuit's decision.

II.     **WITHOUT A VALID EIS TO SUPPORT APPROVAL OF THE PROJECT, AN INJUNCTION AGAINST THE PROJECT IS WARRANTED**

A.      <u>NEPA, FLPMA, and BLM Regulations Require a Valid EIS as a Prerequisite for Allowing Mining Operations to Occur on Public Land</u>

In addition to complying with the decision of the Ninth Circuit in this case, a preliminary injunction suspending the Project is fully compliant with controlling precedent and implements the Congressional intent in enacting NEPA.  The Ninth Circuit determined that BLM likely violated NEPA in issuing the Final Environmental Impact Statement ("FEIS") for the Project.  588 F.3d at 725-728.  In its Motion, Barrick essentially concedes BLM's NEPA violation and proposes that BLM immediately begin the process of preparing a Supplemental EIS.[1]

As the Ninth Circuit has repeatedly held, injunctive relief is especially appropriate in the NEPA context when significant environmental harms will occur and the agency failed to properly analyze a project's environmental impacts (and measures to mitigate against those harms).  Although a finding that the agency violated NEPA does not automatically require an injunction against a project, the Supreme Court has recognized that "[e]nvironmental injury, by its nature, can seldom be adequately remedied by money damages and is often . . . irreparable.  If such injury is sufficiently likely, therefore, the balance of harms will usually favor the issuance of an injunction to protect the environment." <u>Amoco Prod. Co. v. Vill. of Gambell, Alaska</u>, 480 U.S. 531, 545 (1987).

When a NEPA violation has been found, and "[w]hen the 'proposed project may significantly degrade some human environmental factor,' injunctive relief is appropriate." <u>National Parks Conservation Assn. v. Babbitt</u>, 241 F.3d 722, 737 (9th Cir. 2001), quoting <u>Alaska</u>

---

[1]  In is unclear how Barrick's proposed injunction would work, as the parties are currently briefing the merits on cross-motions for summary judgment.  Under Barrick's proposed schedule, BLM would complete the new Draft EIS while the parties were still briefing the motions, and a Draft EIS would be submitted for public comment shortly after briefing was completed (only a few days after the parties submitted the relevant portions of the record to this court). *Compare* Barrick's proposal that the Draft EIS would be completed by June 1, 2010, *with* briefing schedule requiring submittal of the relevant portions of the record by May 28, 2010. (Docket # 131, at 2).

Wilderness Recreation and Tourism Assn. v. Morrison, 67 F.3d 723, 732 (9th Cir. 1995).  As the

Ninth Circuit has stated:

> NEPA "is our basic national charter for protection of the environment." 40 C.F.R. §
> 1500.1(a).  NEPA emphasizes the importance of coherent and comprehensive up-front
> environmental analysis to ensure informed decision making to the end that "the agency
> will not act on incomplete information, only to regret its decision after it is too late to
> correct." Marsh v. ONRC, 490 U.S. 360, 371 (1989).

Blue Mountains Biodiversity Project v. Blackwood, 161 F.3d 1208, 1215-16 (9th Cir. 1998).  "An

adequate EIS is essential to informed agency decision-making and informed public participation,

without which the environmental objectives of NEPA cannot be achieved." South Fork Band

Council, 588 F.3d at 725.

    "Because NEPA can do no more than require the agency to produce and consider a proper

EIS, the harm that NEPA intends to prevent is imposed when a decision to which NEPA

obligations attach is made without the informed consideration that NEPA requires." ONRC Fund

v. Goodman, 505 F.3d 884, 898 (9th Cir. 2007).  In Goodman, the Ninth Circuit was responding to

the project proponent's argument – almost identical to Barrick's Motion – that NEPA "violations

are insignificant and are outweighed by the risk of financial harm should the project be enjoined

further." Id.  The Ninth Circuit rejected such an argument and plainly stated that: "We disagree

and find that in this case, the risk of permanent ecological harm outweighs the temporary

economic harm that [the proponent] may suffer pending further study." Id.  The Ninth Circuit has

further emphasized that "because NEPA is a purely procedural statute, the requisite harm is the

failure to follow the appropriate procedures." National Parks, 241 F.3d at 737-38, n. 18 (*citing*

then-Circuit Judge Breyer's decision in Sierra Club v. Marsh, 872 F.2d 497, 500 (1st Cir. 1989).

    Regarding whether a project should be suspended until the agency has complied with

NEPA, the Ninth Circuit has determined that: "Where an EIS is required, allowing a potentially

environmentally damaging project to proceed prior to its preparation runs contrary to the very

purpose of the [NEPA] statutory requirement." National Parks, 241 F.3d at 737.  In "'unusual

circumstances' an injunction may be withheld, or more likely, limited scope." <u>California Ex Rel.</u>
<u>Lockyer v. U.S. Dept. of Agriculture</u>, 575 F.3d 999, 1020 (9th Cir. 2009), *quoting* <u>National Parks</u>,
241 F.3d at 737-38, n. 18.  "The 'unusual circumstances' that have led this court to refrain from
enjoining a project from proceeding without compliance with NEPA have been the existence of
irreparable harm that would flow from injunction of the project." <u>Thomas v. Peterson</u>, 753 F.2d
754, 764, n. 8 (9th Cir. 1985) (further holding that the irreparable harm resulting in "unusual
circumstances" is the harm to the environment that would occur if the project was enjoined).

   In this case, the requisite "unusual circumstance" – irreparable harm to the environment
would occur if the project was enjoined – does not exist.  On the contrary, as the Ninth Circuit
found, irreparable harm has already occurred, and will continue to occur, both from the lack of an
adequate EIS, as well as from the ongoing environmental damage.  Although economic harm to
Barrick and others will occur if the Project is suspended, such economic harm is not the type of
"unusual circumstance" that justifies allowing a project to continue without a valid EIS.

   The fact that the Project has already substantially completed initial construction does not
mean that an injunction should not issue in the face of a NEPA violation.  In <u>Blue Mountains</u>, 161
F. 3d at 1215, the Ninth Circuit specifically recognized that ongoing construction during the
pendency of the injunctive phase of the case did not obviate the need for an immediate injunction
against further harms.  The Ninth Circuit ordered an injunction despite the fact that "in the two and
one-half months between the denial of plaintiffs' motion for injunction pending appeal and our
injunction following oral argument, over half of the trees in the Big Tower project area have been
cut and removed without the benefit of meaningful environmental analysis."  The court
specifically noted that despite the fact that the agency and project proponents pushed the projects
through while the injunction was litigated, that does not override the court's obligation to enjoin
further ground disturbance pending NEPA compliance.  "[W]e now impose the 'snag' that the
[agency] feared but the law requires." <u>Id</u>.

Contrary to Barrick's assertions, compliance with NEPA is not an idle exercise that can be "fixed" while the Project proceeds apace.  Compliance with NEPA is an absolute prerequisite in order for BLM to allow mining operations to occur on public land.  Under BLM's mining regulations, BLM cannot allow mining operations to occur on public lands absent the approval of a valid and in-effect Plan of Operations. 43 C.F.R. §§ 3809.412, 415, 420.  BLM's approval of a Plan of Operations is a "major federal action" that can only occur upon full compliance with NEPA. *See* 43 C.F.R. § 3809.411(a) (upon an applicant's submission of a Plan of Operations, and prior to approving the Plan, BLM must "complete[] the environmental review required under the National Environmental Policy Act.").  Thus, without a valid EIS, BLM cannot comply with NEPA, and accordingly its approval of Barrick's Plan of Operations is inoperative.

Further, BLM's duty to "prevent undue degradation" to public lands under FLPMA, 43 U.S.C. § 1732(b), requires that BLM ensure that the Project complies with all federal and state environmental requirements.  BLM regulations provide that "unnecessary or undue degradation" means, among other things, "conditions, activities, or practices" that "[f]ail to comply" with, "other Federal and state laws related to environmental protection …."  43 C.F.R. § 3809.5.  BLM's failure to comply with the environmental review requirements of NEPA is considered "undue degradation."  "To the extent BLM failed to meet its obligations under NEPA, it also failed to protect public lands from unnecessary or undue degradation." Island Mountain Protectors, 144 IBLA 168, 202, 1998 WL344223, at * 28 (Interior Department Board of Land Appeals, 1998).

The Ninth Circuit's determination that BLM failed to "adequately consider … the extent of fine particulate [$PM_{2.5}$] emissions" under NEPA directly relates to BLM's approval of Barrick's Plan of Operations.  FLPMA and its implementing regulations prohibit BLM from approving any mining plan that may violate environmental standards and requirements, such as the Clean Air Act standards and requirements for $PM_{2.5}$. 43 CFR § 3809.420(b).  Under NEPA, BLM must also

analyze whether the alternatives will meet federal and state air quality standards. *See* 40 CFR §1508.27 (10) (requiring that the agency evaluate "[w]hether the action threatens a violation of Federal, State, or local law or requirements imposed for the protection of the environment"). Without knowing "the extent of fine particulate [$PM_{2.5}$] emissions," BLM cannot determine whether the Project complies with air pollution standards.  As such, it has failed to ensure that the Project complies with FLPMA, NEPA and the 43 CFR Part 3809 regulations.

Regarding water issues, and in response to the Tribes' claim that the Project would cause "undue degradation" under FLPMA, BLM argued to the Ninth Circuit that the agency prevented undue degradation to local waters due to the mitigation plan in the FEIS. BLM appellate brief at 29 (attached as Exhibit 1).  This is the very same plan that the Ninth Circuit held violated NEPA. Accordingly, without a valid mitigation plan, BLM's assurance that the Project will not cause undue degradation lacks the necessary evidentiary support.

Thus, BLM's violations of NEPA have significant ramifications not only for the agency's failure to comply with NEPA's procedural requirements, but also for BLM's substantive duty to protect public land and the environment.  Accordingly, suspending the Project pending completion of a legally-valid EIS not only comports with Ninth Circuit caselaw, it is needed to effectuate the purposes of NEPA, FLPMA and federal public land regulations.

B.     Barrick's Proposal Does Not Prevent Irreparable Harm

In addition to attempting to re-litigate the public interest and balance of hardship prongs of the four-part injunction test, Barrick argues that its proposal to limit some groundwater pumping and refrain from transporting off-site the 5 million tons of refractory ore completely eliminates all irreparable harm to the Tribes and the environment.  In essence, Barrick proposes to continue with construction and operation of the Project with no real hindrance whatsoever.

At the outset, it is beyond question, and as determined by the Ninth Circuit, that continuation of the Project as approved by BLM will cause irreparable harm. 588 F.3d at 728. Barrick's proposal, while allegedly temporarily reducing this impact somewhat (although Barrick provides no specific evidence as to how much harm will be reduced), does not prevent all irreparable harm as would be required in order to forestall the issuance of an injunction.  As noted above, only in "unusual circumstances" (defined as irreparable harm to the environment if a project was enjoined) should a court issue a limited, or no, injunction suspending the Project.  That certainly is not the case here, as suspending the Project will clearly benefit the environment.

Even if Barrick's reduced-impacts proposal could be considered an "unusual circumstance" under Ninth Circuit caselaw (which it does not), Barrick's proposal to curtail a limited subset of Project activities (i.e., some groundwater pumping, transport of refractory ore) does **not** prevent irreparable harm.  First, Barrick fails to propose **any** reduction in emissions of $PM_{2.5}$, which will undisputedly be released into the air by Project activities while this case continues.  As detailed below, Barrick's attempt to eliminate the Ninth Circuit's ruling that BLM violated NEPA by failing to analyze the "extent of fine particulate emissions," so as to allow it to continue releasing this pollution, is groundless.

Due to the $PM_{2.5}$ emissions alone, the continuation of the Project will cause irreparable harm.  As held by one recent federal court, "exposure to $PM_{2.5}$ – even at or below the NAAQS [National Ambient Air Quality Standard] of 15 $ug/m^3$ – results in adverse cardiopulmonary effects, including increased or exacerbated asthma and chronic bronchitis." North Carolina . TVA, 593 F.Supp.2d 812, 822 (W.D.N.C. 2009)(injunction issued against power plants in part due to harmful $PM_{2.5}$ emissions).  That decision further detailed the "very negative effects on human health, visibility, and the environment [that] can result at $PM_{2.5}$ levels well below 15 $ug/m^3$." Id. at 825.

Regarding the creation of a new open-air "stockpile" of refractory ore while the BLM prepares the new EIS, there is no mention at all of how, where, and when this stockpile would be created – let alone any public review of this change and its environmental consequences.  Barrick is essentially asking this Court to sanction a revised Plan of Operations while the case proceeds, and without the necessary agency and public review.  No support is given for bypassing the proper regulatory process.

Regarding water, Barrick argues that its curtailing of some groundwater pumping prevents all irreparable harm to the Tribes and the environment.  This contradicts its argument to the Ninth Circuit, where Barrick asserted that the Project's pumping would not cause any irreparable harm while this case was before this court on the merits (due to, in Barrick's view, that groundwater depletions would not be realized for many years). Barrack appellate brief at 42 (stating that "none of the harms" from groundwater pumping, among other activities "will occur before the district court could decide the case on the merits.")(attached as Exhibit 2).

Now, in contrast, Barrick argues that irreparable harm would be prevented if it stopped some pumping – essentially admitting that short-term pumping causes irreparable harm.  Barrick cannot have it both ways – arguing all along to this court and the Ninth Circuit that there will be no irreparable harm from groundwater pumping while the case is litigated, yet now stating that all irreparable will be ended when it stops this additional pumping.

Barrick proposes, in vague language, to curtail some groundwater pumping at the site, without specifying the amount of pumping that would be stopped. Further, there is no discussion (and certainly no public review) as to where the extensive amounts of water needed and required to control the relentless clouds of dust produced by the blasting, haul trucks, and other Project activities will come from.  Apparently this water will now be pumped uphill from the groundwater wells from previously-approved projects at the base of Mt. Tenabo and in Crescent Valley.  Again, Barrick is essentially unilaterally revising its Plan of Operations as a means to keep its major

operations going nonstop.  Any such major revision in the water management regime would require BLM and public review under NEPA and FLPMA, yet Barrick hopes to achieve this change via the submittal of a legal brief.  Such 11th-hour slight-of-hand should be rejected.

C.    Barrick's NEPA Caselaw Is Easily Distinguished

Barrick places great weight on a few NEPA decisions that recognize that courts may issue a limited injunction in certain unique situations. Barrick Motion at 11-13.  However, each of these cases can be easily distinguished.  These cases dealt primarily with the situation where the appeals court was affirming the district court's original issuance of a limited injunction, especially the district courts' rulings that the equities in those cases did not warrant suspension of the project. Barrick notes that each Ninth Circuit decision "affirmed" or "upheld" the district court's decision to limit the injunction based on the district court's (not the Ninth Circuit's) findings regarding the equitable considerations of the four-part injunction test. Id. at 12 (describing N. Cheyenne Tribe v. Norton, 503 F.3d 836 (9th Cir. 2007); High Sierra Hikers v. Blackwell, 390 F.3d 630 (9th Cir. 2004), and Idaho Watersheds Project v. Hahn, 307 F.3d 815 (9th Cir. 2002)).

This case is markedly different, as the Ninth Circuit reversed, not upheld, this court's holding that the Tribes did not satisfy the four-part test – and specifically held that "suspending the project until [BLM complied with NEPA] comports with the public interest." 588 F.3d at 728. That is a critical determination that, as law of the case, must be implemented by this Court under the appellate Mandate.  In other words, when the district court determines to issue a limited injunction based on equitable considerations, and that decision is upheld by the appeals court as proper, then it is appropriate for the appeals court to affirm the lower court.  However, when the appeals court overturns the district court's determinations regarding the public interest and balance of hardships – the case here – then it is the Ninth Circuit's findings, not the district court's, that must prevail.

Regarding Barrick's other case, <u>Sierra Forest Legacy v. Rey</u>, 577 F.3d 1015 (9th Cir. 2009), Barrick neglects to mention that the limited injunction allowed by the Ninth Circuit was in fact requested by the plaintiffs. <u>Id</u>. at 1022.  The Ninth Circuit simply recognized that because the district court based its equitable considerations on whether to enjoin all public land activities across 11.5 million acres, instead of on plaintiffs' request for a limited injunction against a few timber sales, it was proper for the district court to consider that limited injunction. <u>Id</u>. at 1022-23.

Regarding Barrick's reliance on the remanded district court decision, that too does not support Barrick's Motion since the district court specifically held upon remand that the plaintiffs had failed to show that the public interest warranted suspension of the timber sales. <u>Sierra Forest Legacy v. Rey</u>, 2009 WL 3698507 (E.D. Cal. 2009).  The court found that an injunction would actually harm the environment, noting that the challenged Forest Service Framework "accomplishes greater fuels reduction and better serves the public interest in protecting human, animal and old growth tree communities from stand replacing wildfires." <u>Id</u>. at *3.  That is certainly not the case here, as continuing the Project will not benefit the environment and "suspending a project until [BLM complies with NEPA] thus comports with the public interest." 588 F.3d at 728.

In this case, the Ninth Circuit has already found that the Tribes satisfy the four-part injunction prerequisite.  Barrick's 11th-hour attempt to reconfigure its Project to avoid the Ninth Circuit's decision does not change this.

III.    **BARRICK IMPROPERLY LIMITS THE SCOPE OF THE NINTH CIRCUIT'S RULING**

A.    Barrick Misleadingly Downplays the Ninth Circuit's Holding Regarding BLM's NEPA Violations

In an attempt to minimize the scope of the Ninth Circuit's ruling, Barrick repeatedly misapplies the facts and the Ninth Circuit's ruling.  Barrick states that: "The NEPA deficiencies identified by the Ninth Circuit are narrow and discrete.  The overwhelming majority of the EIS was not successfully challenged by Plaintiffs." Barrick Motion at 3.  That is wrong.

Before the Ninth Circuit, the Tribes challenged three deficiencies in BLM's EIS: (1) failure to analyze the extent of harmful $PM_{2.5}$ emissions; (2) failure to analyze impacts from off-site processing and transportation of refractory ore; and (3) the lack of an adequate mitigation analysis for surface and groundwater. *See* Tribes' Opening Brief to the Ninth Circuit, at 39-48 (attached as Exhibit 3).[2]  The Ninth Circuit agreed with every one of these arguments. South Fork Band Council, 588 F.3d at 725-728.  Of course, the Tribes did not challenge every single aspect of the FEIS, but for every aspect the Tribes did challenge, the Ninth Circuit found BLM in violation of NEPA.[3]  The Ninth Circuit summarized its decision regarding the NEPA violations and the Tribes' requested injunctive relief.

_____

[2] In its reply brief to this court in support of its Preliminary Injunction Motion, the Tribes had briefly raised the fact that the FEIS failed to ascertain the air emissions from the Grass Valley Borrow facility. (Docket # 44).  However, in an effort to narrow the scope of the appeal, that limited issue was not presented to the Ninth Circuit.  In any event, due to the Ninth Circuit's ruling that BLM failed to "adequately consider … the extent of fine particulate emissions," 588 F.3d at 722, BLM is now required to fully consider these emissions from all Project operations, including the Grass Valley facility.

[3] The Tribes' NEPA arguments at the preliminary injunction stage of the case were presented prior the BLM's submission of the administrative record to the parties.  In their recent summary briefing to this court, and based on documents uncovered in that record, the Tribes have further argued that many critical conclusions in the FEIS that formed the basis for BLM's decision to approve the Project, such as BLM's statement regarding the lack of use of the project site by Western Shoshone for religious purposes, were improperly written by Barrick, in violation of NEPA.  *See* Tribes' Summary Judgment brief at 29-34 (Docket # 127).

> We reverse the denial of injunctive relief on the NEPA claims … and remand for the entry of an injunction pending preparation of an EIS that adequately considers the environmental impact of the extraction of millions of tons of refractory ore, mitigation of the adverse impact on local springs and streams, and the extent of fine particulate emissions.

Id. at 722.  Barrick's Motion essentially ignores these explicit holdings.

Similarly, Barrick's attempt to label the Ninth Circuit's NEPA ruling as "narrow and discrete" is unfounded.  Despite the above holding from the Ninth Circuit that all three of the Tribes' NEPA claims to the Ninth Circuit were successful, Id., Barrick misleadingly argues that "[t]he Ninth Circuit has held that Plaintiffs are likely to prevail on two NEPA deficiencies (offsite transportation and treatment of refractory ore, and the lack of an effectiveness analysis for mitigation plans for seeps and springs).  As to all other NEPA and FLPMA challenges raised by Plaintiffs, this Court held that Plaintiffs were not likely to prevail and that decision has been affirmed by the Ninth Circuit." Barrick Motion at 4-5. See also Barrick Motion at 10-11.  Again, that is wrong.

Barrick ignores the Ninth Circuit's holding that BLM failed to "adequately consider …the extent of fine particulate emissions." 588 F.3d at 722.  Barrick tries to downplay this ruling by stating that the Ninth Circuit merely ordered that the BLM "do separate modeling for $PM_{2.5}$ emissions." Id. at 728.  The Ninth Circuit reached this conclusion after finding that BLM misinterpreted federal air quality regulations by using modeled $PM_{10}$ emissions as a surrogate for $PM_{2.5}$ emissions. Id.  However, by ruling that BLM failed to do the proper modeling for $PM_{2.5}$, the Ninth Circuit correctly held that such failure amounted to BLM failing to "adequately consider …the extent of fine particulate emissions."  As held by the Ninth Circuit, this is a clear violation of NEPA that must be corrected when BLM prepares the requisite Supplemental EIS.

The reason behind Barrick's attempt to nullify the Ninth Circuit's ruling on $PM_{2.5}$ is clear from its proposed limited injunction.  In its proposal, Barrick does not intend to reduce in any way whatsoever the Project's air pollution, including $PM_{2.5}$ emissions.  Indeed, by creating a new refractory ore stockpile, these on-site emissions may increase.  It is clear that Barrick desires to

avoid the Ninth Circuit's ruling on $PM_{2.5}$ because that would mean, even under Barrick's mistaken view that only certain NEPA issues decided by the appeals court can be the focus of an injunction, the entire Project would have to be suspended due to the pervasive emissions of $PM_{2.5}$ from the mine pit, waste dumps, processing, haul roads, and other surface facilities.

Regarding the lack of an adequate mitigation analysis, the Ninth Circuit held that a Supplemental EIS was needed that would "adequately consider[] … mitigation of the adverse impact on local springs and streams." 588 F.3d at 722.  Contrary to Barrick, this is not limited to only determining the "effectiveness" of water mitigation.  Although the appeals court did find that BLM failed to analyze the effectiveness of BLM's mitigation plan, the court also rejected BLM's contention that it was "impossible to conclusively identify specific springs and seeps that would or would not be impacted." Id. at 727.

> That these individual harms are somewhat uncertain due to BLM's limited understanding of the hydrologic features of the area does not relieve BLM of the responsibility to discuss mitigation of reasonably likely impacts at the outset. See National Parks, 241 F.3d at 733 ("lack of knowledge does not excuse the preparation of an EIS; rather it requires [the agency] to do the necessary work to obtain it.")

588 F.3d at 727.  The Ninth Circuit further noted that the injunction was warranted due to BLM's "inadequate study of the serious effects of … exhausting water resources." Id. at 728.  Thus, in addition to requiring a detailed analysis of the effectiveness of BLM's mitigation plan, the Ninth Circuit further required BLM to "do the necessary work to obtain" the necessary underlying information regarding the "hydrologic features" that will be adversely affected by the Project as part of an adequate mitigation plan and EIS, as well as conducting an adequate "study of the serious effects of exhausting water resources." Id. at 727-28.

B.      Barrick Ignores the Ninth Circuit's Ruling That An Injunction Suspending the Project Should Be Issued

Barrick repeatedly argues that the Ninth Circuit did not determine the scope of the preliminary injunction.  "The Court of Appeals has not, however, defined the scope of the

injunction this Court should enter." Barrick Motion at 11.  That is wrong.  In the part of its

decision entitled "Scope of Injunction," in analyzing whether the Tribes satisfied the four-part test

for the issuance of the requested injunction, the Ninth Circuit stated in no uncertain terms that:

> As to the public interest, Congress's determination in enacting NEPA was that the public
> interest requires careful consideration of environmental impacts before major federal
> projects may go forward.  Suspending a project until that consideration has occurred thus
> comports with the public interest.

588 F.3d at 728.

This was precisely what the Tribes argued to the Ninth Circuit – that suspending the

Project until BLM complied with NEPA was in the public interest.  This position was vigorously

opposed by Barrick and BLM.  However, Barrick's Motion reads as if the Ninth Circuit never

made this finding.

Barrick also misleadingly states that the Ninth Circuit "lacked the factual record to perform

a meaningful analysis of three of the four *Winter* factors." Barrick Motion at 4.  Again, that is

wrong.  All parties presented voluminous evidence to the Ninth Circuit regarding all four parts of

the test for preliminary injunction discussed in <u>Winter v. NRDC</u>, 129 S.Ct. 365 (2008).  Barrick in

particular presented hundreds of pages of evidence regarding the economic harms to the company

that would occur if the Project was suspended, as well as evidence of the harms to the local

economy and the workers that Barrick hired after the lawsuit was filed.

Indeed, much of Barrick's newly-offered materials submitted with its recent Motion are

just slight updates of evidence presented to the Ninth Circuit.  For example, Barrick's submittal of

the reports and testimony of economists John Alastuey and John Dobra (Exhibits 7 and 10 to its

new Motion), Barrick Motion at 9-10, repeat the allegations and evidence presented to the Ninth

Circuit from these same consultants.  Barrick also submitted to the Ninth Circuit the transcripts of

the testimony of these witnesses before this court at the January, 2009 hearing on the Tribes PI

Motion.  *See* Barrick's appellate brief, at 11-12 (Exhibit 2) (discussing Mr. Dobra's statement that

a one-year delay of the Project could result in a $60 million loss to the local and state economies; discussing Mr. Alastuey's statement that suspension of the Project could result in state and local governments "los[ing] tens of millions of dollars of tax revenue."). *See also*, Barrick's appellate brief at 46-47 (same); 50-51 (same).  Similarly, Barrick's "new" information regarding the economic impact of Project suspension on Lander County, submitted by Gene Etcheverry, was already presented to the Ninth Circuit. *Compare* Barrick's appellate brief, at 12, *with* Barrick's Motion at 9, and Exhibit 9 (Etcheverry declaration).

Regarding Barrick's supposedly "new" information regarding the impacts to its workforce, again, the company's "new" information submitted with its Motion is essentially the same as its evidence presented to the Ninth Circuit.  For example, in its appellate brief, Barrick argued that suspension of the Project would cost the jobs of "most if not all of the contractors' 300 employees." Barrick appellate brief at 13 (Exhibit 2).  This is in addition to the direct hiring of 250 people by Barrick itself for the Project and the upwards of the 660 employees that Barrick said it would transfer to the Cortez Hills Project from its other operations. Id. at 10-11; 46-47; 50-51. These numbers, while slightly updated in Barrick's new Motion, represent essentially the same figures, evidence, and argument presented to the Ninth Circuit in the form of Barrick's brief and its submittal of the testimony transcripts of its consultants, employees, and contractors.

As it does here again before this court, Barrick presented all of this evidence to the Ninth Circuit to argue that the Tribes failed to show that suspension of the Project satisfied the four-part test for a preliminary injunction, including the two prongs of the test where Barrick's economic evidence was relevant (public interest and balance of hardships). *See* Barrick's appellate brief at 45-49 (public interest test); 50-54 (balance of hardships test)(Exhibit 2).

After reviewing all of this extensive evidence, the Ninth Circuit rejected each of Barrick's (and BLM's) arguments regarding each of the four prerequisites for an injunction. 588 F.3d at 728.  Barrick asserts that suspending the Project would violate controlling precedent because, in

its view, the Tribes have not satisfied the four-part test. Barrick Motion at 4.  Yet this is simply a re-hashing of its arguments and evidence that was submitted to – and rejected by – the Ninth Circuit.

Overall, a central argument in Barrick's Motion is that this Court must revisit the Ninth Circuit's holdings because the "state of affairs have changed dramatically in the eleven months since the preliminary injunction hearing." Barrick Motion at 6.  This is incorrect for a number of reasons.  First, as discussed below, the fact that Barrick made a business decision to proceed with the Project in the face of this lawsuit, does not provide any additional equities for the company.  *See, e.g.*, People of Saipan v. U.S. Dept. of Interior, 502 F.2d 90, 100 (9th Cir. 1974) (no equities to developer by proceeding with project during litigation).

Second, Barrick's focus on the "state of affairs" in January, 2009 is wrong.  The case was argued in June, 2009 and the court issued its decision in December, 2009.  That is when the court of appeals weighed the evidence and issued its findings on the need for an injunction suspending the Project.  The fact that time has passed, more workers were hired, and initial Project construction was almost completed does not change the calculus of the four-part test.  In any event, as noted above, Barrick's evidence of economic hardship to itself, workers, and the local economy were all couched in terms of the harms that would result in the future, not just in January of last year.

Under Barrick's view, a court's review of a preliminary injunction would never end, as a company would always be able to continue construction, incur additional financial liability, etc., as the case was litigated and then argue that "things have changed" so as to warrant a new round of injunction briefings and hearings.  Such manipulation of the legal process, especially under the controlling caselaw that proceeding with the Project in the face of litigation cannot be used by the operator to its advantage, should not be condoned by this Court.

**IV.   BARRICK'S DECISION TO PUSH FORWARD WITH CONSTRUCTION DOES NOT ALLOW IT TO AVOID AN INJUNCTION**

Finally, Barrick argues that because Project construction is nearly complete and that ore production will soon commence it is entitled to avoid an injunction suspending further operations. As detailed above, Barrick's evidence of the economic harm that such a suspension would have is essentially a re-submittal of its evidence it presented to the Ninth Circuit, albeit slightly adjusted for the passage of time and Barrick's additional work.

However, the fact that Barrick rushed its construction schedule during litigation does not justify denying injunctive relief.  "It has long been established that where a defendant with notice in an injunction proceeding completes the acts sought to be enjoined the court may by mandatory injunction restore the status quo." Porter v. Lee, 328 U.S. 246, 251 (1946).  Similarly, a company's accelerated construction schedule does not mean that an injunction should not issue to halt further damage. People of Saipan v. U.S. Dept. of Interior, 502 F.2d 90, 100 (9th Cir. 1974) (rejecting defendants' argument that "it has acquired some equities by proceeding with the construction of its hotel while its right to do so is being litigated"). The Ninth Circuit recently enjoined another mining operation, despite the claimed economic harms by the mining company and despite the fact that the project had already commenced. Southeast Alaska Conservation Council, 472 F.3d 1097, 1100 (9th Cir. 2006) *reversed on the merits* 129 S.Ct. 2458 (2009).

While the Tribes are certainly mindful of the economic harms to workers and the local economy that suspension of the Project will entail, Barrick took a calculated risk in hiring these workers.  Although the workers themselves have done nothing wrong, the fault lies with Barrick. Allowing project proponents to operate on public land in violation of federal environmental laws, as the Ninth Circuit held, is not in the public interest.  Otherwise, companies would be free to promise employment, spend considerable monies building the project, and then argue that no court should be able to suspend operations due to these self-inflicted economic harms.  This Court should reject this sort of litigation gamesmanship.

## **CONCLUSION**

The Tribes respectfully request that this Court immediately implement the Mandate from the Ninth Circuit and issue an order enjoining further construction and operation of the Cortez Hills Project pending BLM's compliance with federal law.  A proposed Order is attached (Exhibit 4).

Respectfully submitted this 5th day of February, 2010.

*/s/ Roger Flynn*

_____

Roger Flynn
Jeffrey C. Parsons
WESTERN MINING ACTION PROJECT
P.O. Box 349
440 Main Street, #2
Lyons, CO 80540
Phone (303) 823-5738
Fax (303) 823-5732
wmap@igc.org

Henry Egghart, NV Bar # 3401
630 East Plumb Lane
Reno, NV 89502
(775) 333-5282
hegghart@nvbell.net