1

2

3

4

5

6                          UNITED STATES DISTRICT COURT

7                               DISTRICT OF NEVADA

8                                        * * *

9    SOUTH FORK BAND, et al.,              )
                                           )
10                   Plaintiffs,           )          3:08-CV-00616-LRH-RAM
                                           )
11   v.                                    )
                                           )          ORDER
12   UNITED STATES DEPARTMENT OF           )
     INTERIOR, et al.,                     )
13                                         )
                     Defendants.           )
14   _____)

15          Before the court is Plaintiffs South Fork Band Council of Western Shoshone of Nevada,

16   Timbisha Shoshone Tribe, Te-Moak Tribe, Western Shoshone Defense Project, and Great Basin

17   Resource Watch's Motion for Summary Judgment (#127[1]).  In response, Defendant-Intervenor

18   Barrick Cortez and Defendants United States Department of the Interior, United States Bureau of

19   Land Management ("BLM"), and Gerald D. Smith filed separate cross motions for summary

20   judgment (##141, 142).  The motions are fully briefed.

21   ///

22   ///

23   ///

24   ///

25

26   _____

        [1]Refers to the court's docket entry number.

I.      **Facts and Procedural History**

The facts of this case are largely undisputed.[2]  Barrick, a subsidiary of Barrick Gold U.S., Inc. and Barrick Gold Corporation, Inc., seeks to construct and operate the Cortez Hills Expansion Project ("Project"), a gold mining and processing operation, on and around Mt. Tenabo in Lander County, Nevada.  The Project will include the development of new facilities, as well as an expansion of an existing open-pit gold mining and processing operation at the Cortez Gold Mines Operations Area.

On October 3, 2008, after nearly three years of public comment and review, the BLM published a Final Environmental Impact Statement ("EIS") Notice of Availability for the Project in the Federal Register.  Shortly after the BLM issued the Project's Record of Decision, on November 20, 2008, Plaintiffs initiated this action pursuant to the Administrative Procedures Act ("APA"), 5 U.S.C. §§ 701-706, for judicial review of the BLM's approval of the Project.  Plaintiffs contend that the BLM's approval violated the Federal Land Policy and Management Act ("FLPMA"), 43 U.S.C. §§ 1701-1787, and the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321-4370.[3]

Within days of filing their complaint, Plaintiffs filed a motion for temporary restraining order and preliminary injunction.  Following a four-day hearing, on January 26, 2009, the court denied the motion.  (*See* Order (#69).)  On appeal, the Ninth Circuit affirmed the court's order in part and reversed the court's order in part.  *See South Fork Band Council of W. Shoshone of Nev. v. U.S. Dep't of Interior*, 588 F.3d 718 (9th Cir. 2009) (per curiam).

In particular, the Ninth Circuit confirmed that Plaintiffs had not shown a likelihood of

---

[2]For a complete discussion of the facts, see this court's Order (#69), published at 643 F. Supp. 2d 1192 (D. Nev. 2009), and the Ninth Circuit's decision in *South Fork Band Council of Western Shoshone of Nevada v. United States Department of Interior*, 588 F.3d 718 (9th Cir. 2009) (per curiam).

[3]Initially, Plaintiffs also alleged a claim under the Religious Freedom Restoration Act, 42 U.S.C. §§ 2000bb-2000bb-4.  Plaintiffs have since dropped this claim.

2

success on the merits for their claims alleging violations of FLPMA.  However, the court reversed this court's denial of preliminary injunctive relief as to Plaintiffs' claims alleging violations of NEPA.  The court found Plaintiffs had shown a likelihood of success on the merits of some of their NEPA claims and remanded for the "entry of an injunction pending preparation of an [Environmental Impact Statement] that adequately considers the environmental impact of the extraction of millions of tons of refractory ore, mitigation of the adverse impact on local springs and streams, and the extent of fine particulate emissions."  588 F.3d at 722.

On April 13, 2010, in accordance with the Ninth Circuit's opinion, this court entered a preliminary injunction enjoining Barrick from transporting refractory ore for off-site processing and pumping groundwater.  In addition, the preliminary injunction directed the BLM to prepare a Supplemental Environmental Impact Statement ("SEIS") addressing (1) the potential air quality impacts of the off-site transportation and processing of refractory ore, (2) the efficacy of the mitigation measures described in the October, 2008, Final EIS and November, 2008, Record of Decision to mitigate potential impacts on seeps and springs from groundwater pumping, and (3) the extent of fine particulate emissions from the Project.

## II.      Legal Standard

Summary judgment is appropriate only when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  In assessing a motion for summary judgment, the evidence, together with all inferences that can reasonably be drawn therefrom, must be read in the light most favorable to the party opposing the motion.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *County of Tuolumne v. Sonora Cmty. Hosp.*, 236 F.3d 1148, 1154 (9th Cir. 2001).

The moving party bears the burden of informing the court of the basis for its motion, along

with evidence showing the absence of any genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). On those issues for which it bears the burden of proof, the moving party must make a showing that is "sufficient for the court to hold that no reasonable trier of fact could find other than for the moving party." *Calderone v. United States*, 799 F.2d 254, 259 (6th Cir. 1986); *see also Idema v. Dreamworks, Inc.*, 162 F. Supp. 2d 1129, 1141 (C.D. Cal. 2001).

To successfully rebut a motion for summary judgment, the non-moving party must point to facts supported by the record that demonstrate a genuine issue of material fact. *Reese v. Jefferson Sch. Dist. No. 14J*, 208 F.3d 736 (9th Cir. 2000). A "material fact" is a fact "that might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Where reasonable minds could differ on the material facts at issue, summary judgment is not appropriate. *See v. Durang*, 711 F.2d 141, 143 (9th Cir. 1983). A dispute regarding a material fact is considered genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Liberty Lobby*, 477 U.S. at 248. The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient to establish a genuine dispute; there must be evidence on which the jury could reasonably find for the plaintiff. *See id.* at 252.

Where, as here, parties file cross-motions for summary judgment on the same claims before the court, the court must consider each party's motion separately and on its own merits. *Fair Hous. Council of Riverside County, Inc. v. Riverside Two*, 249 F.3d 1132, 1136 (9th Cir. 2001) (citations omitted). "[T]he court must consider the appropriate evidentiary material identified and submitted in support of both motions, and oppositions to both motions, before ruling on each of them." *Id.* at 1134.

**III.    Discussion**

The court reviews agency decisions allegedly in violation of both FLPMA and NEPA under the APA. *Or. Natural Res. Council Fund v. Brong*, 492 F.3d 1120, 1124-25 (9th Cir. 2007). Under the APA, a reviewing court may set aside agency actions that are "arbitrary, capricious, an

1   abuse of discretion, or otherwise not in accordance with the law." *Id.* at 1125 (quoting *Natural*

2   *Res. Def. Council v. Nat'l Marine Fisheries Serv.*, 421 F.3d 872, 877 (9th Cir. 2005)); 5 U.S.C. §

3   706(2)(A).

4        Review under the arbitrary and capricious standard is narrow, and the court must not

5   substitute its own judgment for that of the agency. *Lands Council v. McNair*, 537 F.3d 981, 987

6   (9th Cir. 2008) (en banc) (citations omitted). Nonetheless, the court must "engage in a substantial

7   inquiry" and a "thorough, probing, in-depth review." *Brong*, 492 F.3d at 1125 (quoting *Native*

8   *Ecosystems Council v. U.S. Forest. Serv.*, 418 F.3d 953, 960 (9th Cir. 2005)). To meet its burden

9   under this standard, an agency must present a "rational connection between the facts found and the

10  conclusion made." *Id.* Thus, "the court will reverse a decision as arbitrary and capricious only if

11  the agency relied on factors Congress did not intend it to consider, entirely failed to consider an

12  important aspect of a problem, or offered an explanation that runs counter to the evidence before

13  the agency or is so implausible that it could not be ascribed to a difference in view or the product

14  of agency expertise." *Lands Council*, 537 F.3d at 987 (citations and internal quotations omitted).

15       Plaintiffs seek summary judgment on both their NEPA and FLMPA claims. Barrick and

16  the federal defendants counter that the BLM fully complied with the requirements of these statutes.

17  **A. National Environmental Policy Act**

18       NEPA, 42 U.S.C. §§ 4321-4370, requires federal agencies to examine the environmental

19  effects of proposed federal actions. "NEPA is a statute that aims to promote environmentally

20  sensitive governmental decision-making, without prescribing any substantive standards."

21  *Anderson v. Evans*, 371 F.3d 475, 487 (9th Cir. 2004) (citing *Robertson v. Methow Valley Citizens*

22  *Council*, 490 U.S. 332, 353 (1989)). Pursuant to NEPA, a federal agency must prepare an EIS for

23  all "major Federal actions significantly affecting the quality of the human environment." 42

24  U.S.C. § 4332(2)(C); *Klamath-Siskiyou Wildlands Ctr. v. Bureau of Land Mgmt.*, 387 F.3d 989,

25  993 (9th Cir. 2004).

26       "An EIS is a thorough analysis of the potential environmental impacts that 'provide[s] full

5

1   and fair discussion of significant environmental impacts . . .[and] inform[s] decisionmakers and the

2   public of the reasonable alternatives which would avoid or minimize adverse impacts or enhance

3   the quality of the human environment.'" *Klamath-Siskiyou Wildlands Ctr.*, 387 F.3d at 993 (citing

4   40 C.F.R. § 1502.1).  More specifically, NEPA requires a federal agency to consider the following:

5   (1) the environmental impact of the proposed action; (2) any adverse environmental effects that

6   cannot be avoided should the proposed action be implemented; (3) alternatives to the proposed

7   action; (4) the relationship between local short-term uses of the environment and the maintenance

8   and enhancement of long-term productivity; and (5) any irreversible and irretrievable commitments

9   of resources should the proposed action be implemented.  42 U.S.C. § 4332(2)(C).

10          "In assessing the adequacy of an EIS, [the court] employ[s] a 'rule of reason' test to

11   determine whether the EIS contains a 'reasonably thorough discussion of the significant aspects of

12   probable environmental consequences.'" *Hells Canyon Alliance v. U.S. Forest Serv.*, 227 F.3d

13   1170, 1177 (9th Cir. 2000) (quoting *Neighbors of Cuddy Mountain v. U.S. Forest Serv.*, 137 F.3d

14   1372, 1376 (9th Cir. 1998)).  "Under this standard, [the court's] task is to ensure that the [agency]

15   took a 'hard look' at these consequences." *Id.* (citing *Ass'n of Pub. Customers v. Bonneville Power

16   Admin.*, 126 F.3d 1158, 1188 (9th Cir. 1997)).  "This review requires the district court to make a

17   'pragmatic judgment whether the EIS's form, content, and preparation foster both informed

18   decision-making and informed public participation." *Half Moon Bay Fishermans' Mktg. Ass'n. v.

19   Carlucci*, 857 F.2d 505, 508 (9th Cir. 1988) (quoting *California v. Block*, 690 F.2d 753, 761 (9th

20   Cir. 1982)).

21          Plaintiffs argue the BLM violated NEPA by (1) permitting Barrick to influence and write

22   critical portions of the Final EIS, (2) failing to analyze properly the air pollution emissions from

23   the Project, (3) failing to consider the effectiveness of mitigation measures concerning the loss of

24   ground and surface water, and (4) failing to analyze the air quality impacts of transporting ore to an

25   off-site processing facility.  The court will address each of these arguments below.

26

1

**1.       Barrick's Involvement in Drafting the EIS**

2        Plaintiffs argue the BLM acted arbitrarily and capriciously in permitting Barrick to assist in

3   preparing the EIS.  The participation of a party with a financial interest in a project in drafting an

4   EIS does not automatically invalidate the EIS.  *Ctr. for Biological Diversity v. Fed. Highway*

5   *Admin.*, 290 F. Supp. 2d 1175, 1186 (S.D. Cal. 2003) (citations omitted).  Indeed, the regulations

6   governing NEPA permit the BLM to require an applicant to participate in the NEPA process by

7   providing environmental information to the agency.  40 C.F.R. § 1506.5(a).  Under the regulations,

8   while the agency may use the information an applicant submits in the EIS either directly or by

9   reference, the agency must independently evaluate the information and is responsible for its

10  accuracy.  *Id.*  The intent of the regulations is that "acceptable work not be redone, but that it be

11  verified by the agency."  *Id.*  "[T]he ultimate question . . . is whether the financial interest of [the

12  interested party] compromised the objectivity and integrity of the NEPA process."  *Ctr. for*

13  *Biological Diversity*, 290 F. Supp. 2d at 1186 (citation omitted).

14       Plaintiffs first contend that by permitting Barrick to submit responses to public comments,

15  the BLM compromised the objectivity and integrity of the NEPA process.  In support of this

16  argument, Plaintiffs point to the Memorandum of Understanding ("MOU") outlining the

17  responsibilities of the BLM, Barrick, and the contractor the BLM hired to prepare the EIS.  Under

18  the MOU, the contractor was responsible for responding to public comments.  *See* Administrative

19  Record ("AD") 28238.  As Plaintiffs note, however, the contractor requested Barrick's input on

20  how to respond to specific comments.  *See* AR 47508 (referring to requests for Barrick's input);

21  47510-13, 47542-45 (identifying comments for which the Barrick's input was sought); 47542-45

22  (same).  According to Plaintiffs, Barrick's preparation of responses to the comments violated the

23  MOU and demonstrates that the responses were not objective.

24       While the MOU placed the ultimate responsibility for responding to public comments with

25  the contractor, the MOU did not prevent the contractor from soliciting input on the responses from

26

7

Barrick and the BLM.  For this reason, Plaintiffs' citation to *Colorado Wild, Inc. v. United States Forest Service*, 523 F. Supp. 2d 1213, 1229 (D. Colo. 2007), is unavailing.  There, the MOU explicitly prohibited direct communication between the contractor and the project proponent.  The MOU in this case contains no such limitation.

Further, the record indicates that, rather than accepting Barrick's responses without any inquiry into the responses' accuracy, the BLM actively and substantially participated in preparing the responses that were ultimately included in the Final EIS.  For example, after Barrick submitted its suggested responses, the BLM held a two-day meeting to review and discuss Barrick's responses, as well as other issues.  Additionally, the contractor specifically sought the BLM's input on issues raised by some of Barrick's proposed responses.  *See* AR 48203.

Once the contractor issued the Preliminary Final EIS, the BLM's Native American Coordinator and Archeologist reviewed all responses concerning Native American and other cultural issues.  Further, the BLM made the final decision on several changes to the Final EIS, including comments suggested by Barrick.  *See* AR 55971-85.  Thus, the record indicates that the BLM actively participated in the comment review and response process and was ultimately responsible for the content of the Final EIS.

Plaintiffs next fault the BLM for permitting Barrick to insert the "critical language in the EIS which eliminated the Draft EIS' finding that the Project would adversely affect Western Shoshone uses of the Project area."  (Pls.' Reply (#138) 13.)  Plaintiffs' concern centers around a statement in the Executive Summary section of the Final EIS.  The relevant section originally read, "Direct and indirect effects to Native American traditional values would occur as a result of the Proposed Action.  These would include . . . effects related to pine nut harvesting areas and spiritual and religious use of the project area."  AR 42423.  In its comments on the Preliminary Final EIS, Barrick suggested that the phrase "spiritual and religious uses of the project" be deleted.  After a meeting on April 16, 2008, the BLM declined to delete the text and instead replaced it with the

term "traditional use areas."  *See* AR 50085, 56508.

Barrick contends that the BLM made this change in response to Plaintiffs' allegation in the comments to the Draft EIS that the Project would violate the Religious Freedom Restoration Act. According to Barrick, the BLM was concerned that its NEPA analysis, which was not intended as an analysis of the impacts to religious values, would be misread or misinterpreted.  Indeed, the following statement in the Final EIS reflects this concern:

> The NEPA process does not require a separate analysis of impacts to religion.  As a result, references in the analysis to religious beliefs or practices only convey the terminology used by tribal representatives and elders . . . This terminology does not reflect any BLM evaluation, conclusion, or determination that something is or is not religious, sacred, or spiritual in nature, but only conveys the information that has been gathered through tribal consultation and coordination and the ethnographic study.

AR 56968.

The court finds that the BLM's decision to modify language in the Executive Summary does not suggest that the BLM abdicated its independent review responsibilities.  To the contrary, in the EIS, the BLM thoroughly reviewed the Project's effects on traditional Native American uses in the Project area.  In particular, section 3.9 of the Final EIS includes a more than seventy-page discussion of the Project's potential disruption of "Native American traditional values," including the effect of the Project on Western Shoshone religious sites and practices.  Because Plaintiffs have failed to demonstrate that Barrick's participation in drafting the Final EIS compromised the integrity of the NEPA process, the court will grant summary judgment in Defendants' favor on this issue.

## 2.    BLM's Evaluation of Air Emissions

Plaintiffs next contend the BLM violated NEPA by failing to analyze adequately the impact of Particulate Matter 2.5 ("$PM_{2.5}$") emissions.  The Final EIS acknowledges that the BLM did not model or predict emissions of $PM_{2.5}$ from the Project.  The Final EIS states, "$PM_{2.5}$ is typically not modeled for near-field impacts due to secondary formation of $PM_{2.5}$."  AR 57031

1    However, in response to comments submitted during the EIS process, the BLM did address

2  the amount of $PM_{2.5}$ emissions from the Project. The comment response states, "The ratio of

3  $PM_{2.5}/PM_{10}$ for fugitive dust sources is approximately 0.15 (USEPA 2007).  Using this ratio,

4  impact of $PM_{2.5}$ would be 15.9 µg/m3 for 24-hour impacts and 5.8  µg/m3 for annual impacts,

5  compared to [National Air Quality Standards] of 35 µg/m3 (24-hour) and 15 µg/m3 (annual)."

6  AR 57340.  Thus, under this analysis, the BLM concluded that the $PM_{2.5}$ emissions met the

7  necessary air quality standards.

8    In its decision addressing this court's denial of the preliminary injunction, the Ninth Circuit

9  noted that prior to 2007, government agencies commonly looked to $PM_{10}$ emissions modeling as an

10  alternative for modeling the emissions of the smaller $PM_{2.5}$.[4]  *South Fork*, 588 F.3d at 727-28.  The

11  Ninth Circuit, acknowledging that the BLM conducted its study of air emissions largely before

12  2007, found that the BLM "gave a reasoned explanation of why separate modeling for $PM_{2.5}$ was

13  not necessary here."  *South Fork*, 588 F.3d at 728.

14    Plaintiffs have not identified any reason for this court to disrupt the Ninth Circuit's

15  conclusion.  Because the EIS contains a "reasonably thorough discussion of the significant aspects

16  of probable environmental consequences[,]" *Hells Canyon Alliance*, 227 F.3d at 1177 (citation

17  omitted), Plaintiffs are not entitled to declaratory relief on this claim.  Accordingly, the court will

18  grant summary judgment in Defendants' favor.

19    The court recognizes, however, that the BLM's supplemental analysis of $PM_{2.5}$ emissions

20  may raise questions about both the effect of $PM_{2.5}$ emissions on the environment and the adequacy

21

22    [4]As the Ninth Circuit recognized, in 2007, the Environmental Protection Agency concluded that it
23  would "no longer accept the use of $PM_{10}$ emissions information as a surrogate for $PM_{2.5}$ emissions information
. . . ." 72 Fed. Reg. 20586, 20659-60 (Apr. 25, 2007).  Barrick notes that the April 25, 2007, Clean Air Fine
24  Particulate Implementation Rule states, "this rule does not include final $PM_{2.5}$ requirements for the new source
review (NSR) program; the final NSR rule will be issued at a later dater."  72 Fed. Reg. 20586, 20586.
25  According to Barrick, because the Cortez Hills EIS is a NSR program, the rule does not apply to the EIS in this
case.  Regardless, because, as the Ninth Circuit noted, the BLM completed much of its air emissions analysis
26  before 2007, its analysis was appropriate under the then-existing standards.

of the BLM's additional analysis.  As such, the court's granting of summary judgment is without

prejudice to any additional procedural or substantive claims Plaintiffs may have arising out of the

BLM's supplemental analysis.

### 3. Remaining NEPA Claims

Finally, Plaintiffs allege that the BLM violated NEPA by (1) failing to consider the air

quality impact of the transportation of ore to an offsite processing facility and (2) failing to conduct

an appropriate mitigation analysis for the environmental consequences of mine dewatering.

Although the question before the Ninth Circuit was whether Plaintiffs had shown a likelihood of

success on the merits of these NEPA claims, the court's language with regard to these claims was

conclusive.  For example, as to Plaintiffs' claim concerning the transportation of ore to an off-site

processing facility, the court held, "BLM's failure to consider the transport and processing of five

million tons of refractory ore over a ten-year period shows that it did not take the requisite 'hard

look' at the environmental impacts of the proposed project." *South Fork*, 588 F.3d at 726.  As to

Plaintiffs' mine dewatering claim, the court concluded that the BLM's analysis was inadequate

because "NEPA requires that the agency give some sense of whether the drying up of these water

resources could be avoided." *Id.* at 727.

As a result of the Ninth Circuit's ruling and the subsequent Supplemental EIS ordered by

this court, Barrick contends the ore transportation and mine dewatering claims are now moot.

Plaintiffs counter that, although the Ninth Circuit has already addressed these issues, this court

nonetheless may enter declaratory relief in Plaintiffs' favor.

In the complaint, Plaintiffs seek both injunctive and declaratory relief.  Because this court

has entered a preliminary injunction that resolves Plaintiffs' concerns, Plaintiffs' request for

injunctive relief as to these NEPA claims is moot.  Nonetheless, courts have a "duty to decide the

appropriateness and the merits of [a] declaratory relief request irrespective of its conclusion as to

the propriety of the issuance of [an] injunction." *Super Tire. Eng'g Co. v. McCorkle*, 416 U.S. 115,

122 (1974) (citations omitted).  To determine whether a request for declaratory relief has become moot, the court considers "whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *Id.* (citation omitted).

Here, the Ninth Circuit concluded, and the defendants no longer dispute, that the BLM's initial analysis of off-site ore transportation and mine dewatering was inadequate.  As a result of the preliminary injunction, the BLM has begun analyzing these issues anew.  Had the Ninth Circuit considered these issues on a dispositive motion, the controversy would have ceased when the Ninth Circuit issued its decision and the BLM retracted its inadequate analysis.  The Ninth Circuit's ruling, however, addressed a motion for preliminary injunction, where the court considered only the likelihood of Plaintiffs' success on the merits of their claims.  Accordingly, to the extent that the Ninth Circuit's decision cannot be considered a final ruling on the matter, the court agrees that declaratory relief is now warranted.  The court will therefore enter summary judgment in Plaintiffs' favor on their NEPA declaratory relief claims relating to mine dewatering and off-site ore transportation and processing.[5]

**B.  Federal Land Policy Management Act**

FLPMA, 43 U.S.C. §§ 1701-1787, governs the BLM's management of public lands and establishes standards for the BLM to regulate hardrock mining activities on public lands.  FLPMA requires the Secretary of the Interior to manage public lands for multiple use, including the use of land for its renewable and non-renewable resources, which include "recreation, range, timber, minerals, watershed, wildlife and fish, and natural scenic, scientific and historical values."

---

[5]Although Plaintiffs are entitled to declaratory relief on two of their NEPA claims, it does not follow, as Plaintiffs contend, that the BLM must halt the Project.  As the court noted in its order issuing the preliminary injunction, "A NEPA violation is subject to traditional standards in equity for injunctive relief and does not require an automatic blanket injunction against all development." *N. Cheyenne Tribe v. Norton*, 503 F.3d 836, 842 (9th Cir. 2007).  In its previous order, the court concluded that the equities did not favor entering a blanket injunction.  Plaintiffs have not identified any reason to disrupt this conclusion here.

43 U.S.C. § 1702(c). Thus, FLPMA "attempts to balance [the following] two vital–but often competing–interests": (1) the "need for domestic sources of minerals, food timber, and fiber from the public lands," and (2) the need to "mitigate the devastating environmental consequences of hardrock mining." *Mineral Policy Ctr. v. Norton*, 292 F. Supp. 2d 30, 33 (D.D.C. 2003) (citing 43 U.S.C. §§ 1701(a)(12), 1701(a)(8)).

The heart of FLPMA requires, "In managing the public lands the Secretary [of the Interior] shall, by regulation or otherwise, take any action necessary to prevent unnecessary and undue degradation of the lands." 43 U.S.C. § 1732(b). Pursuant to this mandate, the BLM cannot approve a mining plan that would result in "unnecessary or undue degradation of public land." 43 C.F.R. 3809.411(d)(3)(iii). "For the purposes of this case, 'unnecessary and undue degradation' is defined as any harmful activity that is either not 'reasonably incident' to an approved mining operation or that violates a state or federal law relating to environmental or cultural resource protection." *South Fork*, 588 F.3d at 723-24 (citing 43 C.F.R. § 3809.5).

Plaintiffs do not challenge the Ninth Circuit's conclusion that the BLM complied with the agency's scenic and visual resource standards. Instead, Plaintiffs contend that they are entitled to summary judgment because the BLM permitted unnecessary and undue degradation to sacred areas and water resources.

### 1. Sacred Sites

To support their sacred sites FLPMA claim, Plaintiffs rely on Executive Order 13007 (May 24, 1996), 61 Fed. Reg. 26771. The order requires agencies to (1) accommodate access to and ceremonial use of Indian sacred sites by Indian religious practitioners and (2) avoid adversely affecting the physical integrity of such sacred sites. *Id.*

In its previous order, this court noted,

Despite the clear applicability of the executive order here, BLM did not violate the order in approving the site. The order requires agencies to "accommodate access" to religious sites and requires agencies to "avoid adversely affecting the physical integrity" of sacred sites. Here, the BLM has implemented mitigation procedures to

minimize harm to the mountain.  Moreover, the BLM has concluded that the Project will not adversely harm the areas Plaintiffs identified as important to the Western Shoshone religion (the Shoshone Wells, the top of Mt. Tenabo, the White Cliffs, and Horse Canyon).  Thus, it does not appear that BLM has violated Executive Order 13007.

643 F. Supp. 2d at 1211 n.9.  The Ninth Circuit upheld this court's decision, concluding, "We see no basis to disturb the district court's conclusion that the Tribes failed to demonstrate a likelihood of success in establishing any arbitrary and capricious agency action in relation to BLM's obligation under EO 13007 to accommodate the Tribes' need for access to use of religious sites." *South Fork*, 588 F.3d at 724.

Plaintiffs contend that this court and the Ninth Circuit erred by failing to consider the religious significance of the pediment area of Mt. Tenabo.  Plaintiffs identify the following question as the central issue now facing the court: "[W]hether BLM's conclusion that Western Shoshone do not consider the [p]ediment area as part of the Mt. Tenabo Sacred Site, and do not use these lands for religious purposes, is supported by the record."  (Pls.' Reply (#148) 24.)   Plaintiffs contend the BLM ignored facts in the record demonstrating that the Western Shoshone used the pediment area for important religious ceremonies and practices.  According to Plaintiffs, if the pediment area holds religious significance to the Western Shoshone, the BLM violated FLPMA by approving the Project because the Project does not permit the tribes to access the area.[6]

The Executive Order defines a sacred site as any "specific, discrete, narrowly delineated location on Federal land that is identified by an Indian tribe, or Indian individual determined to be an appropriately authoritative representative of an Indian religion, as sacred by virtue of its established religious significance to, or ceremonial use by, an Indian religion."  61 Fed. Reg. 26771.  In support of their argument that the pediment area is a sacred site, Plaintiffs cite numerous

---

[6]The court notes that it does not necessarily endorse Plaintiffs' interpretation of the executive orders' requirements.  For example, contrary to Plaintiffs' arguments, the executive order does not guarantee access to sites of religious significance.  Instead, the executive order requires only that agencies "accommodate access" to sacred sites.  Regardless, however, as explained below, even under Plaintiffs' understanding of the executive order, Plaintiffs have failed to demonstrate that the BLM denied Plaintiffs access to a sacred site.

statements made by tribal officials.  However, none of these statements specifically identify the

pediment area as a site significant to the tribes' religious practices.  Instead, the statements refer

generally to the Mt. Tenabo area.[7]

The court recognizes that the pediment area has been significant to tribal history as a

pinyon (pine nut) bearing area and as a location for ancestral camps.  Although mining has

significantly affected the amount of pine nuts in the area, it appears that at least some Western

Shoshone people continue to go to the pediment area for the fall pinyon harvest, which remains a

focal point of Western Shoshone life.  (AR 10937-11038, 2004 Ethnographic Report at 39.)

That the tribes historically used the pediment area to gather pine nuts, however, does not

establish that the pediment area is a sacred site within the meaning of the executive order.  As

noted, the executive order defines a sacred site as a location that a tribe or authoritative

representative of an Indian religion has identified as "sacred by virtue of its established religious

significance to, or ceremonial use by, an Indian religion."  Plaintiffs have not cited to authority in

the record explaining the significance of pine nut gathering or the pediment area to Western

Shoshone religious beliefs.  Likewise, no information in the record suggests that the pediment area

is an established place for the tribes to conduct specific religious rituals and ceremonies.  Thus,

while pine nut gathering appears to be a Western Shoshone tradition, Plaintiffs have failed to

explain how pine nut gathering in the pediment area is important to the tribes' religious practice.

Absent evidence in the record suggesting that the pediment area is a sacred site within the meaning

of the executive order, the BLM did not act arbitrarily or capriciously in failing to provide

Plaintiffs access to the area.[8]  The court will therefore grant summary judgment in Defendants'

_____

[7]Although Plaintiffs identify several statements that individual tribe members submitted to the BLM discussing their religious use of the pediment area, there has been no showing that these individuals are "appropriately authoritative representative[s]" of their religions such that their statements and experiences are sufficient to establish the pediment area as a sacred site for the purposes of Executive Order 13007.

[8]The court recognizes that the tribes appear to view all of Mt. Tenabo as sacred.  As the Ninth Circuit noted, however, the executive order contemplates protecting the ceremonial uses of sacred *sites*, and the tribes

15

1  favor on Plaintiffs' religious use FLPMA claim.

2          **2.     Water Resources**

3          Next, Plaintiffs' claim that, in violation of FLPMA, the dewatering caused by the mine will

4  unnecessarily and unduly degrade the land.  Although the Ninth Circuit did not address Plaintiffs'

5  dewatering FLPMA claim, the Ninth Circuit did find that the BLM violated NEPA by failing to

6  adequately analyze the effectiveness of proposed mitigation measures concerning the

7  environmental impact of the dewatering.

8          Because NEPA is a procedural statute, NEPA does not require that the BLM actually

9  mitigate the dewatering harms.  *See South Fork*, 588 F.3d at 727.  Nonetheless, as discussed above,

10 the BLM is currently preparing a supplemental EIS that will address the effectiveness of mitigation

11 measures for the mine dewatering.  It is possible that the results of the new mitigation analysis may

12 suggest that the dewatering will unnecessarily and unduly degrade the land.  Until the BLM

13 completes this analysis, whether the dewatering will cause unnecessary and undue degradation to

14 the land remains pure speculation.  Accordingly, the court will deny summary judgment to all

15 parties on this issue.

16         **C.  Federal Government's Trust Responsibility**

17         Finally, Plaintiffs argue that because the BLM violated NEPA, it has also violated its trust

18 responsibility to the tribes.  A fiduciary relationship between the federal government and Indian

19 tribes arises when the government "assumes control over property belonging to Indians."  *United*

20 *States v. Wilson*, 881 F.2d 596, 599 (9th Cir. 1989) (citation omitted).  "Such a relationship may

21 also be created where property is purchased or set aside by the government for the express benefit

22 of Indians."  *Id.* (citations omitted).  However, "[a]bsent some showing of federal control or

23 supervision over tribal monies or properties, or the existence of a fiduciary duty based on an

24

25 _____

have not "articulate[d] the manner in which they seek agency accommodation for the entire mountain."  *South*
26 *Fork*, 588 F.3d at 724.

16

authorizing document such as a statute or a regulation, there can be no trust relationship between [a tribe] and a [federal agency]." *Id.* at 600 (citations omitted).

Here, no tribal lands are within the Project boundaries, and Plaintiffs have not identified any applicable statute or regulation specifically giving the federal government responsibility to manage Indian resources or lands. Because no evidence before the court suggests the existence of an enforceable trust relationship, summary judgment on Plaintiffs' breach of trust responsibility claim is appropriate.

**IV.     Conclusion**

To summarize, to the extent that the Ninth Circuit's decision cannot be considered a final determination of Plaintiffs' NEPA claims for declaratory relief relating to mine dewatering and off-site ore transportation and processing, summary judgment on these claims in Plaintiffs' favor is appropriate. For the remaining NEPA claims and Plaintiffs' sacred site FLPMA claim, the court will grant summary judgment in favor of Barrick and the federal defendants. As to Plaintiffs' FLPMA-based mine dewatering claim, because it is yet to be seen whether the dewatering will cause unnecessary and undue degradation, the court will deny summary judgment to all parties.

IT IS THEREFORE ORDERED that Plaintiffs' Motion for Summary Judgment (#127) is hereby GRANTED in part and DENIED in part.

IT IF FURTHER ORDERED that Barrick's Motion for Summary Judgment (#141) is hereby GRANTED in part and DENIED in part.

IT IS FURTHER ORDERED that the federal defendants' Motion for Summary Judgment (#142) is hereby GRANTED in part and DENIED in part.

IT IS SO ORDERED.

DATED this 25th day of August, 2010.

_____
LARRY R. HICKS
UNITED STATES DISTRICT JUDGE

17