UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

\* \* \*

| | |
|---|---|
| SOUTH FORK BAND COUNCIL OF WESTERN SHOSHONE OF NEVADA, et al., <br><br> Plaintiffs, <br><br> v. <br><br> UNITED STATES DEPARTMENT OF INTERIOR, et al., <br><br> Defendants, <br><br> and <br><br> BARRICK CORTEZ, INC., <br><br> Defendant-Intervenor. | 3:08-CV-00616-LRH-WGC <br><br> ORDER |

Before the court is Plaintiffs Te-Moak Tribe of Western Shoshone Indians of Nevada, Timbisha Shoshone Tribe, the Western Shoshone Defense Project, and Great Basin Resource Watch's (collectively, "the Tribes")[1] motion for summary judgment (#168[2]). In response, separate cross-motions for summary judgment were filed by Defendant-Intervenor Barrick Cortez, Inc.

---

[1] Plaintiff South Fork Band Council of Western Shoshone of Nevada was voluntarily dismissed from this action after the motion was filed.

[2] Refers to the court's docket entry number.

(#173), and by Defendants United States Department of the Interior, United States Bureau of Land Management ("BLM"), and Douglas W. Furtado (collectively, "Federal Defendants") (#174).  The motions are fully briefed.[3]

**I.     Facts and Procedural History**

The facts of this case are largely undisputed.[4]  Barrick, a subsidiary of Barrick Gold U.S., Inc. and Barrick Gold Corporation, Inc., seeks to construct and operate the Cortez Hills Expansion Project ("Project"), a gold mining and processing operation, on and around Mt. Tenabo in Lander County, Nevada.  The Project will include the development of new facilities, as well as an expansion of an existing open-pit gold mining and processing operation at the Cortez Gold Mines Operations Area.

On October 3, 2008, after nearly three years of public comment and review, the BLM published a Final Environmental Impact Statement ("EIS") Notice of Availability for the Project in the Federal Register.  Shortly after the BLM issued the Project's Record of Decision, on November 20, 2008, the Tribes initiated this action pursuant to the Administrative Procedures Act ("APA"), 5 U.S.C. §§ 701-706, for judicial review of the BLM's approval of the Project.  The Tribes contend that the BLM's approval violated the Federal Land Policy and Management Act ("FLPMA"), 43 U.S.C. §§ 1701-1787, and the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321-4370.[5]

---

[3] Barrick's unopposed motion for leave to file a reply brief (#186) in support of its proposed findings of fact and conclusions of law, submitted after hearing in this matter, will be granted.

[4] For a complete discussion of the facts, see this court's Order (#69), published at 643 F. Supp. 2d 1192 (D. Nev. 2009), and the Ninth Circuit's decision in *South Fork Band Council of Western Shoshone of Nevada v. United States Department of Interior*, 588 F.3d 718 (9th Cir. 2009) (per curiam).

[5] Initially, the Tribes also alleged a claim under the Religious Freedom Restoration Act, 42 U.S.C. §§ 2000bb-2000bb-4.  They have since dropped this claim.

Within days of filing their complaint, the Tribes filed a motion for temporary restraining order and preliminary injunction. Following a four-day hearing, on January 26, 2009, the court denied the motion. (*See* Order (#69).) On appeal, the Ninth Circuit affirmed in part and reversed in part. *See South Fork Band Council of W. Shoshone of Nev. v. U.S. Dep't of Interior*, 588 F.3d 718 (9th Cir. 2009) (per curiam).

In particular, the Ninth Circuit confirmed that the Tribes had not shown a likelihood of success on the merits for their claims alleging violations of FLPMA. However, the court reversed this court's denial of preliminary injunctive relief as to the Tribes' claims alleging violations of NEPA. The court found the Tribes had shown a likelihood of success on the merits of some of their NEPA claims and remanded for the "entry of an injunction pending preparation of an [Environmental Impact Statement] that adequately considers the environmental impact of the extraction of millions of tons of refractory ore, mitigation of the adverse impact on local springs and streams, and the extent of fine particulate emissions." *Id.* at 722.

On April 13, 2010, in accordance with the Ninth Circuit's opinion, this court entered a preliminary injunction enjoining Barrick from transporting refractory ore for off-site processing and from pumping groundwater. In addition, the preliminary injunction directed the BLM to prepare a Supplemental Environmental Impact Statement ("SEIS") addressing (1) the potential air quality impacts of the off-site transportation and processing of refractory ore, (2) "the efficacy of the mitigation measures described in the October, 2008, Cortez Hills Expansion Project Final Environmental Impact Statement and November, 2008, Record of Decision to mitigate potential impacts on seeps and springs from groundwater pumping," and (3) the extent of fine particulate emissions from the Project. (*See* Preliminary Injunction (#147), p. 7.)

On August 25, 2010, this court granted in part and denied in part each of the parties' pending cross-motions for summary judgment. Among other rulings, the court (1) granted declaratory relief to the Tribes on their claim that the BLM violated NEPA by filing to conduct an

1  appropriate mitigation analysis for the environmental consequences of mine dewatering in the
2  original EIS; (2) granted summary judgment to Defendants on the Tribes' religious use FLPMA
3  claim regarding the Mt. Tenabo pediment area as a sacred site; and (3) denied summary judgment
4  to all parties on the Tribes' dewatering FLPMA claim because, pursuant to the court's preliminary
5  injunction, the BLM was in the midst of preparing a supplemental EIS to address the effectiveness
6  of mitigation measures for the mine dewatering.  (*See* Summary Judgment Order (#157), pp. 11-12,
7  15-16.)
8      The BLM issued its Final Supplemental EIS ("FSEIS") in January 2011, and a new Record
9  of Decision and Plan of Operations Approval ("New ROD") in March 2011.  The New ROD,
10 which was issued pursuant to the FSEIS, approved certain operations of the Project previously
11 enjoined by the court.  Following notice by the Tribes of their intent to challenge the FSEIS and the
12 New ROD, the parties agreed not to re-litigate the issues previously resolved on summary judgment
13 and limit the challenge to two issues: (1) whether the FSEIS, which purportedly addresses the
14 deficiencies in the 2008 FEIS identified by the Ninth Circuit, does so in compliance with NEPA;
15 and (2) whether the BLM has met its duty under FLPMA to "prevent unnecessary or undue
16 degradation" resulting from dewatering.  (*See* Joint Motion (#160), p. 3.)
17     In accordance with the parties' stipulation, the Tribes subsequently stated their NEPA and
18 FLPMA claims in a Supplemental Complaint for Declaratory and Injunctive Relief (#163), which
19 was followed by Defendants' answers and the parties' cross-motions for summary judgment now
20 before the court.
21 **II.    Legal Standard**
22     Summary judgment is appropriate only when the pleadings, depositions, answers to
23 interrogatories, affidavits or declarations, stipulations, admissions, and other materials in the record
24 show that "there is no genuine issue as to any material fact and the movant is entitled to judgment
25 as a matter of law." Fed. R. Civ. P. 56(a).  In assessing a motion for summary judgment, the
26

1  evidence, together with all inferences that can reasonably be drawn therefrom, must be read in the
2  light most favorable to the party opposing the motion. *Matsushita Elec. Indus. Co. v. Zenith Radio*
3  *Corp.*, 475 U.S. 574, 587 (1986); *County of Tuolumne v. Sonora Cmty. Hosp.*, 236 F.3d 1148, 1154
4  (9th Cir. 2001).

5        The moving party bears the initial burden of informing the court of the basis for its motion,
6  along with evidence showing the absence of any genuine issue of material fact. *Celotex Corp. v.*
7  *Catrett*, 477 U.S. 317, 323 (1986).  On those issues for which it bears the burden of proof, the
8  moving party must make a showing that is "sufficient for the court to hold that no reasonable trier
9  of fact could find other than for the moving party." *Calderone v. United States*, 799 F.2d 254, 259
10 (6th Cir. 1986); *see also Idema v. Dreamworks, Inc.*, 162 F. Supp. 2d 1129, 1141 (C.D. Cal. 2001).

11       To successfully rebut a motion for summary judgment, the non-moving party must point to
12 facts supported by the record which demonstrate a genuine issue of material fact. *Reese v.*
13 *Jefferson Sch. Dist. No. 14J*, 208 F.3d 736 (9th Cir. 2000).  A "material fact" is a fact "that might
14 affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S.
15 242, 248 (1986).  Where reasonable minds could differ on the material facts at issue, summary
16 judgment is not appropriate. *See v. Durang*, 711 F.2d 141, 143 (9th Cir. 1983).  A dispute
17 regarding a material fact is considered genuine "if the evidence is such that a reasonable jury could
18 return a verdict for the nonmoving party." *Liberty Lobby*, 477 U.S. at 248.  The mere existence of a
19 scintilla of evidence in support of the party's position is insufficient to establish a genuine dispute;
20 there must be evidence on which a jury could reasonably find for the party. *Id.* at 252.

21       Where, as here, parties file cross-motions for summary judgment on the same claims before
22 the court, the court must consider each party's motion separately and on its own merits. *Fair Hous.*
23 *Council of Riverside Cnty., Inc. v. Riverside Two*, 249 F.3d 1132, 1136 (9th Cir. 2001).  "[T]he
24 court must consider the appropriate evidentiary material identified and submitted in support of both
25 motions, and in opposition to both motions, before ruling on each of them." *Id.* at 1134.

26

## III. Discussion

The court reviews agency decisions allegedly in violation of both FLPMA and NEPA under the APA. *Or. Natural Res. Council Fund v. Brong*, 492 F.3d 1120, 1124-25 (9th Cir. 2007). Under the APA, a reviewing court may set aside agency actions that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." *Id.* at 1125 (quoting *Natural Res. Def. Council v. Nat'l Marine Fisheries Serv.*, 421 F.3d 872, 877 (9th Cir. 2005)); 5 U.S.C. § 706(2)(A).

Review under the arbitrary and capricious standard is narrow, and the court must not substitute its own judgment for that of the agency. *Lands Council v. McNair*, 537 F.3d 981, 987 (9th Cir. 2008) (en banc). Nonetheless, the court must "engage in a substantial inquiry" and a "thorough, probing, in-depth review." *Brong*, 492 F.3d at 1125 (quoting *Native Ecosystems Council v. U.S. Forest. Serv.*, 418 F.3d 953, 960 (9th Cir. 2005)). To meet its burden under this standard, an agency must present a "rational connection between the facts found and the conclusion made." *Id.* Thus, "the court will reverse a decision as arbitrary and capricious only if the agency relied on factors Congress did not intend it to consider, entirely failed to consider an important aspect of a problem, or offered an explanation that runs counter to the evidence before the agency or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Lands Council*, 537 F.3d at 987 (citations and internal quotations omitted).

### A. National Environmental Policy Act

NEPA, 42 U.S.C. §§ 4321-4370, requires federal agencies to examine the environmental effects of proposed federal actions. "NEPA is a statute that aims to promote environmentally sensitive governmental decision-making, without prescribing any substantive standards." *Anderson v. Evans*, 371 F.3d 475, 487 (9th Cir. 2004) (citing *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 353 (1989)). Pursuant to NEPA, a federal agency must prepare an EIS for all "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C.

1  § 4332(2)(C); *Klamath-Siskiyou Wildlands Ctr. v. Bureau of Land Mgmt.*, 387 F.3d 989, 993 (9th
2  Cir. 2004).
3      "An EIS is a thorough analysis of the potential environmental impacts that 'provide[s] full
4  and fair discussion of significant environmental impacts . . .[and] inform[s] decisionmakers and the
5  public of the reasonable alternatives which would avoid or minimize adverse impacts or enhance
6  the quality of the human environment.'" *Klamath-Siskiyou Wildlands Ctr.*, 387 F.3d at 993 (citing
7  40 C.F.R. § 1502.1).  More specifically, NEPA requires a federal agency to consider the following:
8  (1) the environmental impact of the proposed action; (2) any adverse environmental effects that
9  cannot be avoided should the proposed action be implemented; (3) alternatives to the proposed
10 action; (4) the relationship between local short-term uses of the environment and the maintenance
11 and enhancement of long-term productivity; and (5) any irreversible and irretrievable commitments
12 of resources should the proposed action be implemented.  42 U.S.C. § 4332(2)(C).
13     "In assessing the adequacy of an EIS, [the court] employ[s] a 'rule of reason' test to
14 determine whether the EIS contains a 'reasonably thorough discussion of the significant aspects of
15 probable environmental consequences.'" *Hells Canyon Alliance v. U.S. Forest Serv.*, 227 F.3d
16 1170, 1177 (9th Cir. 2000) (quoting *Neighbors of Cuddy Mountain v. U.S. Forest Serv.*, 137 F.3d
17 1372, 1376 (9th Cir. 1998)).  "Under this standard, [the court's] task is to ensure that the [agency]
18 took a 'hard look' at these consequences."  *Id.* (citing *Ass'n of Pub. Customers v. Bonneville Power
19 Admin.*, 126 F.3d 1158, 1188 (9th Cir. 1997)).  "This review requires the district court to make a
20 'pragmatic judgment whether the EIS's form, content, and preparation foster both informed
21 decision-making and informed public participation."  *Half Moon Bay Fishermans' Mktg. Ass'n. v.
22 Carlucci*, 857 F.2d 505, 508 (9th Cir. 1988) (quoting *California v. Block*, 690 F.2d 753, 761 (9th
23 Cir. 1982)).
24     The Tribes claim that the FSEIS violates NEPA and fails to comply with the Ninth Circuit
25 and this court's prior rulings in this case regarding the BLM's analysis of the effectiveness of
26

7

mitigation measures regarding the environmental consequences of mine dewatering. In particular, the Tribes claim that the BLM erroneously limited its supplemental effectiveness analysis to already-proposed mitigation measures regarding surface waters. They claim that the BLM thus failed to analyze any *new* mitigation measures to protect surface waters, failed to require any mitigation to prevent the loss of groundwater *in situ* (i.e., in the ground), and failed to analyze impacts to Western Shoshone values and uses in ground and surface waters. As the Tribes acknowledge, given the current procedural posture, their NEPA challenge largely turns on how the court should interpret the prior rulings in this case, including the Ninth Circuit's opinion finding a likely violation of NEPA in the original EIS and requiring entry of a preliminary injunction, and this court's orders on remand granting declaratory relief as to the original EIS and requiring preparation of a supplemental EIS. (*See* Plaintiffs' Reply/Cross-Response (#175), p. 3.)

        Having reviewed the prior decisions in this case and relevant materials in the record, the court concludes that the Ninth Circuit's opinion was limited, on its face, to finding error in the BLM's failure to include an assessment of the effectiveness of the proposed mitigation measures regarding "springs and streams" that were proposed in the original EIS. *South Fork*, 588 F.3d at 726-27. Never once did the court refer to any *new* mitigation measures or find any inadequacies in the proposed measures. Rather, the court expressly noted only one error, finding the BLM's effectiveness analysis "inadequate" under NEPA because "the EIS does not in fact assess the effectiveness of the mitigation measures relating to groundwater." *Id.* at 727. Furthermore, read in context, the court's reference to "mitigation measures relating to groundwater" concerned only the mitigation of adverse impacts to "local springs and streams" that were identified as potentially affected by groundwater pumping. *Id.* In framing the issue before it, the court noted that "[t]he extensive removal of groundwater implicit in this project is expected to cause some number of local springs and streams to dry up[,]" and that "the EIS states that BLM has identified fifty perennial springs and one perennial creek that are the most likely to dry up." *Id.* Next, in finding a

NEPA violation, the court made clear reference to these surface expressions of groundwater, stating: "NEPA requires that the agency give some sense of whether the drying up of *these water resources* could be avoided." *Id.* (emphasis added).  Finally, the court's directive on remand was unmistakable: "We reverse the denial of injunctive relief on the NEPA claims . . . and remand for entry of an injunction pending preparation of an EIS that adequately considers . . . mitigation of the adverse impact on *local springs and streams*." *Id.* at 722 (emphasis added).  Never once did the court cite any failure of the BLM to discuss mitigating the loss of groundwater *in situ*, as distinct from surface expressions of that groundwater, or any other adverse effects.

This court's orders on remand were also so limited.  In strict compliance with the Ninth Circuit's directive, this court entered a preliminary injunction requiring preparation of a supplemental EIS addressing "the efficacy of the mitigation measures described in the [original 2008 EIS and ROD] to mitigate potential impacts on seeps and springs from groundwater pumping."  (Doc. #147, p. 7.)  And in granting declaratory relief under NEPA on the Tribes' motion for summary judgment, this court found the Ninth Circuit's opinion "conclusive" regarding the BLM's mitigation analysis and went no further, finding no other NEPA violations beyond that specifically mentioned by the Ninth Circuit.  (*See* Doc. #157, p. 11-12).

The court therefore finds no merit to the Tribes' claim that the prior orders in this case required that the FSEIS include new mitigation measures or discuss the effectiveness of the mitigation measures in regard to any impacts other than surface expressions of the groundwater. Notably, in filing this challenge to the FSEIS, the Tribes have proven quite adept at making conspicuous and specific challenges regarding groundwater *in situ*, as distinct from the surface expressions of that groundwater.  Had they always intended to challenge the BLM's failure to analyze measures to mitigate the loss of groundwater *in situ*, they could have similarly brought that claim to the court's attention in their challenge to the original EIS.  As reflected in the prior decisions in this case, as well as the Tribes' prior briefing, they failed to do so.

1      The court is also unpersuaded by the Tribes' contention that the BLM also violated NEPA
2 by limiting its effectiveness analysis to livestock, wildlife and vegetation, while failing to address
3 Western Shoshone values and uses in the ground and surface waters as "identified uses."  In its
4 supplemental analysis, the BLM identifies and addresses on a site-specific or water-source-specific
5 basis such uses of the waters and the effectiveness of proposed mitigation measures in regard to
6 such uses, and the Tribes are correct that Western Shoshone uses are not included as identified uses
7 in that particular analysis.  But the Tribes have failed to identify any specific cultural or religious
8 uses of any specific water source that BLM should have included in its effectiveness analysis.  To
9 the extent the Tribes have identified Western Shoshone cultural and religious values in the ground
10 and surface waters, they have done so only in general terms.  Accordingly, in the original EIS, the
11 BLM did recognize that the planned dewatering will have some adverse impacts to those cultural
12 and religious values and uses of the area.  *See, e.g.*, AR 056972 (2008 FEIS Vol. II at 3.9-25).  But
13 because the Tribes themselves have failed to identify any uses of the waters with any reasonable
14 degree of specificity, the Tribes cannot fault BLM for not including those unidentified uses in its
15 site-specific analysis of the effectiveness of the proposed mitigation measures.  The court will
16 therefore grant summary judgment in Defendants' favor on the Tribes' NEPA claim.

17      **B.  Federal Land Policy Management Act**

18      FLPMA, 43 U.S.C. §§ 1701-1787, governs the BLM's management of public lands and
19 establishes standards for the BLM to regulate hardrock mining activities on public lands.  FLPMA
20 requires the Secretary of the Interior to manage public lands for multiple uses, including the use of
21 land for its renewable and non-renewable resources, which include "recreation, range, timber,
22 minerals, watershed, wildlife and fish, and natural scenic, scientific and historical values."
23 43 U.S.C. § 1702(c).  Thus, FLPMA "attempts to balance [the following] two vital–but often
24 competing–interests": (1) the "need for domestic sources of minerals, food timber, and fiber from
25 the public lands," and (2) the need to "mitigate the devastating environmental consequences of

hardrock mining." *Mineral Policy Ctr. v. Norton*, 292 F. Supp. 2d 30, 33 (D.D.C. 2003) (citing 43 U.S.C. §§ 1701(a)(12), 1701(a)(8)).

The heart of FLPMA requires: "In managing the public lands the Secretary [of the Interior] shall, by regulation or otherwise, take any action necessary to prevent unnecessary or undue degradation of the lands." 43 U.S.C. § 1732(b). Pursuant to this mandate, the BLM cannot approve a mining plan that would result in "unnecessary or undue degradation of public land." 43 C.F.R. § 3809.411(d)(3)(iii). Here, the Tribes claim that the dewatering caused by the mining operation will cause unnecessary or undue degradation to the ground and surface waters of Mt. Tenabo and the Western Shoshone cultural and religious uses and values inherent in those waters.

Regarding the groundwater, it is undisputed that there are no proposed mitigation measures to replace the groundwater that is to be extracted from Mt. Tenabo. The groundwater will be either consumed during the mining process or piped and dumped 12 miles away, leaving a "cone of depression" – *i.e.*, "a three-dimensional conical area surrounding the mine pit, from which groundwater has been removed." Nonetheless, the BLM has concluded that such loss of groundwater does not constitute "unnecessary or undue degradation," as that term is defined under 43 C.F.R. § 3809.5, and BLM's conclusion is not arbitrary and capricious under the APA.

Citing the regulation, the Ninth Circuit previously stated: "For the purposes of this case, 'unnecessary or undue degradation' is defined as any harmful activity that is either not 'reasonably incident' to an approved mining operation or that violates a state or federal law relating to environmental or cultural resource protection." *South Fork*, 588 F.3d at 723-24 (citing 43 C.F.R. § 3809.5). At this stage, however, the Tribes concede that the extraction of the groundwater is reasonably incident to the approved mining operation, and they point to no state or federal law that would be violated by the proposed groundwater extraction. *See* 43 C.F.R. § 3809.5.

Instead, the Tribes now argue that § 3809.5 also defines "unnecessary or undue degradation" as including conditions, activities, or practices that fail to comply with "the

11

performance standards in § 3809.420," which require, *inter alia*, that the operator "take mitigation measures specified by BLM to protect public lands." 43 C.F.R. § 3809.420(a)(4). But the Tribes have failed to show how this regulation has been violated. They have pointed to no failure by Barrick to take any mitigation measures specified by BLM. And the Tribes' contention that these regulations place a duty on BLM to require mitigation is a misreading of the regulations' plain language. Section 3809.420(a)(4) merely requires that Barrick take any mitigation measures that BLM specifies, and § 3809.5 deems it an unnecessary or undue degradation for Barrick to fail to comply with such performance standards. But neither provision imposes any duty on BLM to specify any particular mitigation measures.

The Tribes may prevail on their groundwater claim only by showing that the failure to replace extracted groundwater constitutes unnecessary or undue degradation under some other provision. They have failed to do so, however. The Tribes argue only that BLM has a duty to protect public lands and waters, as well as any cultural significance of those lands and waters, that the extraction of the groundwater constitutes degradation, and therefore BLM has a duty to either prohibit removal or require replacement of the groundwater. But any degradation does not constituted "unnecessary or undue" degradation. "Interior is to prevent, not only unnecessary degradation, but also degradation that, while necessary to mining, is undue or excessive." *Mineral Policy Ctr. v. Norton*, 292 F. Supp. 2d 30, 43 (D.D.C. 2003). Here, the Tribes concede that the extraction of groundwater is necessary to the mining, and they have made no showing that BLM's conclusion that the removal is not undue or excessive is arbitrary and capricious under the APA.

Turning to the surface waters (springs and streams) that may be affected by the removal of groundwater, the Tribes claim that the FSEIS does not require any new mitigation measures beyond those in the original EIS, and that the specified mitigation measures are insufficient because the mitigation would be implemented only after some degradation has already occurred. For the reasons already discussed, the court rejects the first argument as based on an erroneous reading of

the prior decision in this case.

The court also rejects the Tribes' second argument as contrary to the express definition of "mitigation" in 43 C.F.R. § 3809.5. Permissible forms of mitigation include not only altering operations to avoid or minimize impacts before the fact, but also "[r]ectifying the impact by repairing, rehabilitating, or restoring the affected environment," and even "[c]ompensating for the impact by replacing, or providing substitute, resources or environments." *Id.* Furthermore, the court finds that BLM's conclusion that the responsive mitigation measures proposed here are sufficient to avoid unnecessary or undue degradation is not arbitrary and capricious under the APA. Given the uncertainties regarding the hydrological characteristics of the area and the degree to which the springs and streams will or will not be affected by the groundwater removal, it is reasonable for the agency to require monitoring and the implementation of mitigation measures only after impacts to surface waters are realized. The court will therefore grant summary judgment in Defendants' favor on the Tribes' FLPMA claim.

IT IS THEREFORE ORDERED that Plaintiffs' Motion for Summary Judgment (#168) is DENIED.

IT IS FURTHER ORDERED that Defendant-Intervenor's Motion for Summary Judgment (#173) and Request to File Brief Reply (#186) are GRANTED.

IT IS FURTHER ORDERED that Federal Defendants' Cross-Motion for Summary Judgment (#174) is GRANTED.

The Clerk of the Court shall enter judgment accordingly.

IT IS SO ORDERED.

DATED this 3rd day of January, 2012.

_____
LARRY R. HICKS
UNITED STATES DISTRICT JUDGE